IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

_____
                                        )
THE WEST VIRGINIA COALITION            )
AGAINST DOMESTIC VIOLENCE, INC.,       )
                    Plaintiff,          )
                                        )
v.                                      )   Civil Action No: ____2:19-cv-00434____
                                        )
PATRICK J. MORRISEY, in his official   )
capacity as Attorney General for the   )
State of West Virginia,                 )
                    Defendant.          )
                                        )
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This case is brought by a coalition of domestic-violence shelters whose mission is to provide a safe haven for women, men, and children fleeing violent homes and relationships across West Virginia. The shelters strive not only to protect domestic-violence victims from further physical harm, but also to create an environment in which victims are not retraumatized. Central to this mission is the need to keep weapons out of shelters and off shelter property. A domestic-violence shelter faces special dangers when someone brings a gun onto its property, whether that person is a known abuser, a shelter resident, or simply someone whom shelter staff doesn't recognize. It is essential that shelter staff be allowed to protect themselves and their residents by exercising their professional judgment about how best to respond in such situations, whether by investigating, asking the person to remove the gun from the premises, or calling the police.

For years, the shelters could do just that. But in 2018, the West Virginia legislature made this activity illegal. Over strong opposition from the shelters—who voiced their desire "to determine for themselves what is best when it comes to ensuring gun safety" on their own

property—West Virginia's lawmakers passed a sweeping statute forcing the shelters and other property owners to allow employees and visitors to bring firearms onto their parking lots. W. Va. Code § 61-7-14(d). While certain provisions of the law state that such firearms must be locked inside or to the car and out of view, the statute goes so far as to forbid the shelters from even *asking questions* about the presence of firearms in vehicles driven onto their property. *Id.* § 61-7-14(d)(2)(A).

This blatant content-based speech restriction violates the shelters' First Amendment right to free speech. Their First Amendment right of association is also violated by the law's mandate that they accept firearms onto their own property. *Id.* § 61-7-14(d)(1) & (4). This mandate is antithetical to their mission, acutely interferes with their ability to create the kind of safe haven that is essential to their existence, and thus inhibits their right to associate freely with the clients they serve. The law further tramples on the shelters' constitutional rights because it is vaguely worded, and because it inhibits their ability to protect their own safety (and the safety of their clients) on their own property.

To be clear, the shelters do not challenge the ability of anyone to keep and bear a firearm for lawful purposes inside their home, or even in public. Instead, they bring this suit to protect *their own* ability to ensure the safety of themselves, their employees, and their clients—on their own property. They seek a declaration that the challenged provisions violate their rights under the First Amendment and the Due Process Clause of the U.S. Constitution, and an injunction preventing the Attorney General of West Virginia from enforcing the provisions against them.

## JURISDICTION AND VENUE

1.      This action is brought under 42 U.S.C. § 1983 to address the deprivation, under color of state law, of rights secured by the First and Fourteenth Amendments to the Constitution of the United States.

2.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a). The Court may grant injunctive and other relief under 28 U.S.C. §§ 2201 and 2202.

3.      Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because the defendant's place of business is located within this district, and because a substantial part of the events giving rise to the claims in this complaint occurred in this district.

## PARTIES

4.      The West Virginia Coalition Against Domestic Violence, Inc. is a 501(c)(3) nonprofit membership organization with a principal place of business in Elkview, West Virginia. The coalition has fourteen members, each of which is a domestic-violence program licensed by the West Virginia Family Protection Services Board. In service of its mission to end personal and institutional violence, the coalition supports member programs in their provision of services to victims of domestic violence by strengthening public policy, coordinating statewide education and training, providing assistance to member programs, and raising public awareness about violence against women. It is overseen by a board of directors drawn in part from its membership, and advised by member committees.

5.      Defendant Patrick J. Morrisey, sued in his official capacity, is the Attorney General for the State of West Virginia with a principal place of business in Charleston, West Virginia. Article VII, § 1 of the West Virginia Constitution and West Virginia Code § 5-3-1 *et seq.* establish

the office of the Attorney General and empower the Attorney General to act as the chief legal officer of the state. The statute challenged in this case authorizes the Attorney General to enforce its prohibitions by seeking civil penalties and equitable relief. W. Va. Code. § 61-7-14(f). Defendant Patrick J. Morrisey is a person within the meaning of 42 U.S.C. § 1983, and acts under color of state law when enforcing the statute under section 61-7-14(f).

## FACTS

### *The Parking Lot Amendments*

6.    Before June 2018, West Virginia recognized the traditional and constitutional rights of property owners to prohibit the open or concealed carrying of "any firearm or deadly weapon" on their property, in language now codified as West Virginia Code § 61-7-14(b). Anyone who brought a firearm or deadly weapon onto the property of another, and who refused to temporarily relinquish the weapon or leave the premises upon a request to do so, was guilty of a misdemeanor. *See* W. Va. Code § 61-7-14(c).

7.    But in March 2018, the West Virginia legislature enacted House Bill 4817, which amended West Virginia Code § 61-7-14 and became effective on June 8, 2018. These amendments (referred to here as the Parking Lot Amendments) sharply curtailed the rights of persons who own, lease, or control private property to decide whether—and under what circumstances—others may bring firearms onto their parking lots. They do this through four principal restrictions:

- the Prohibition Provisions (subsections 61-7-14(d)(1) and (d)(4));

- the Inquiry and Search Provisions (subsections 61-7-14(d)(2)(A) and (B));

- the Take No Action Provision (subsection 61-7-14(d)(2)(C)); and

- the Employment Provision (subsection 62-7-14(d)(3)(B)).

4

**The Prohibition Provisions**

8.     The Prohibition Provisions, set out in subsections 61-7-14(d)(1) and (d)(4), forbid persons who own, rent, or control property from prohibiting firearms in their parking areas.

9.     Specifically, subsection (d)(1) provides:

> No owner, lessee, or other person charged with the care, custody, and control of real property may prohibit any customer, employee, or invitee from possessing any legally owned firearm, when the firearm is: (A) [l]awfully possessed; (B) [o]ut of view; (C) [l]ocked inside or locked to a motor vehicle in a parking lot; and (D) [w]hen the customer, employee, or invitee is lawfully allowed to be present in that area.

10.     Subsection (d)(4) contains complementary language that prevents a property owner from denying vehicles with firearms access to their parking lot:

> No owner, lessee, or other person charged with the care, custody, and control of real property may prohibit or attempt to prevent any customer, employee, or invitee from entering the parking lot of the person's place of business because the customer's, employee's, or invitee's motor vehicle contains a legal firearm being carried for lawful purposes that is out of view within the customer's, employee's, or invitee's motor vehicle.

**The Inquiry and Search Provisions**

11.     The Inquiry and Search Provisions, set out in subsections 61-7-14(d)(2)(A) and (B), restrict the right of persons who own, rent, or control property to ask about the presence of firearms in a vehicle, or to search vehicles on their property that they have reason to believe contain a gun.

12.     Specifically, subsections (d)(2)(A) and (B) provide in relevant part:

> No owner, lessee, or other person charged with the care, custody, and control of real property may violate the privacy rights of a customer, employee, or invitee either: (A) [b]y verbal or written inquiry, regarding the presence or absence of a firearm locked inside or locked to a motor vehicle in a parking lot; or (B) [b]y conducting an actual search of a motor vehicle in a parking lot to ascertain the presence of a firearm within the vehicle[.]

13.     The Inquiry and Search Provisions do not indicate what "privacy rights" would be violated if a property owner inquired about the presence or absence of a firearm in the vehicle. Nor

do they indicate how a property owner is expected to determine that the motor vehicle is locked, without actually verifying this him or herself. In addition, the Inquiry Provision does not require that the firearm be out of view.

**The Take No Action Provision**

14.     The Take No Action Provision, codified at subsection 61-7-14(d)(2)(C), curtails what persons who own, rent, or control property may say or do after they learn that someone has brought a gun onto their property.

15.     Specifically, subsection (d)(2)(C) provides:

> No owner, lessee, or other person charged with the care, custody, and control of real property may take any action against a customer, employee, or invitee based upon verbal or written statements of any party concerning possession of a firearm stored inside a motor vehicle in a parking lot for lawful purposes, except upon statements made pertaining to unlawful purposes or threats of unlawful actions involving a firearm made in violation of [West Virginia's threats of terroristic acts statute].

16.     The Take No Action Provision is not limited to firearms that are "out of view" and does not require that the motor vehicle or firearm be locked. Nor does it explain how a property owner is expected to determine whether a firearm is stored "for lawful purposes," particularly given that property owners are prohibited from making inquiries about the presence of a firearm in a car in their parking lot. In addition, the phrase "take any action" is not defined or limited anywhere in the Parking Lot Amendments.

**The Employment Provision**

17.     The Employment Provision, subsection 61-7-14(d)(3)(B), forbids employers from conditioning employment on an employee's agreement not to keep a firearm locked inside his or her vehicle. Specifically, it provides:

> No employer may condition employment upon . . . (B) [a]n agreement with an employee or a prospective employee prohibiting that natural person from

keeping a firearm locked inside or locked to a motor vehicle in a parking lot when the firearm is kept for lawful purposes.[1]

18.     Subsection (e) of the Parking Lot Amendments declares that property owners have "no duty of care related to the acts prohibited under [subsection (d)]" and have immunity from any "civil action for money damages based upon any action or inactions taken in compliance with subsection (d)[.]" W. Va. Code § 61-7-14(e)(1), (2). But this provision does not explain how a property owner is supposed to determine whether a firearm is "lawfully possessed" for "lawful purposes" in a "locked" motor vehicle, when they are prohibited from making any inquiries about the firearm's presence in the motor vehicle.

19.     Finally, subsection (f) of the Parking Lot Amendments authorizes the West Virginia Attorney General to enforce these prohibitions by seeking injunctive relief and civil penalties of up to $5,000 for each violation, plus costs and attorney's fees. W. Va. Code § 61-7-14(f)(1), (2). The law also permits "aggrieved" customers, employees, and invitees to bring a parallel lawsuit to enforce the Parking Lot Amendments' prohibitions, and likewise entitles them to seek injunctive relief, civil penalties, and costs and attorney's fees. *Id*. § 61-7-14(f)(4).

20.     Before the Parking Lot Amendments went into effect, property owners in West Virginia had the right to determine for themselves how best to ensure the safety and security of their property and the people on it, including by prohibiting the carrying or concealing of firearms throughout the property and any parking area. Property owners were also able to take reasonable steps to investigate potential threats to the safety and security of their property, including by asking employees, customers, and invitees whether they had brought a firearm onto the property. But the

---

[1]     The Employment Provision also prohibits an employer from conditioning employment on whether the employee holds a conceal carry license. W. Va. Code § 61-7-14(d)(3)(A). That subsection is not challenged in this lawsuit.

Parking Lot Amendments override the rights of property owners to assess and decide for themselves how best to ensure safety on their own property.

***Coalition members provide critical services to victims fleeing domestic violence***

21.     The mission of the West Virginia Coalition Against Domestic Violence is "to end personal and institutional violence in the lives of women, children and men." With its members, the coalition works to "transform social, cultural, and political attitudes" and promote values of respect and nonviolence.

22.     The coalition's fourteen members provide direct services to victims of domestic violence and their children in all of West Virginia's 55 counties. Each member program is an incorporated non-profit entity that manages its own facilities and programs and promulgates its own policies, within the parameters of the coalition's "principles of unity," as well as the licensing requirements of the West Virginia Family Protection Services Board.

23.     The coalition's member programs own, lease, or are charged with the care, custody, and control over a variety of properties throughout the state, many of which include parking areas that are subject to the Parking Lot Amendments. For instance, each coalition member operates at least one licensed shelter where victims of domestic violence and their minor children can reside on a temporary basis. Because of security and confidentiality concerns, member programs strictly control access to their shelters and do not publicly disseminate shelter addresses.

24.     Coalition programs also provide additional support services through outreach offices. These services may include case management, advocacy, crisis intervention, referrals, counseling, a 24-hour hotline, safety planning, temporary emergency shelter, and sexual-assault services, among others. In addition, six coalition members operate visitation and exchange centers

where estranged parents can have court-ordered visitation with their minor children in a controlled and secure environment.

25.    Providing safety to their clients and their clients' children is of paramount importance to all coalition members. The coalition's data shows that in West Virginia, there were at least 34 domestic-violence-related deaths in the year running from October 2017 through September 2018, with 42% involving a firearm.[2] The year before, West Virginia saw at least 27 domestic-violence-related deaths, and 67% involved a firearm.[3] In addition, coalition members know that one of the most dangerous times for abuse victims is when they attempt to leave their abusers. The coalition's "Dangerousness Lethality Assessment Guide" identifies a victim's attempt to leave her abuser as an indicator of highly dangerous or potentially lethal behavior on the part of the abuser.

26.    According to the National Coalition Against Domestic Violence, there have been at least 268 gun-related domestic-violence fatalities in America so far this year.[4] And the number of domestic-violence homicides perpetrated with a firearm has been climbing in recent years, increasing by 26 % from 2010 to 2017.[5] Abusers also use guns to threaten and control their victims, even if they never pull the trigger. About 4.5 million American women alive today have been threatened with a gun by an intimate partner.[6] There is also a striking overlap between abusers who

---

[2]    W. Va. Coal. Against Domestic Violence, WV DOMESTIC VIOLENCE RELATED DEATHS OCTOBER 1, 2017 – SEPTEMBER 30, 2018.

[3]    W. Va. Coal. Against Domestic Violence, WV DOMESTIC VIOLENCE RELATED DEATHS OCTOBER 1, 2016 – SEPTEMBER 30, 2017.

[4]    NAT'L COAL. AGAINST DOMESTIC VIOLENCE, http://www.ncadv.org (last visited June 5, 2019).

[5]    Emma E. Fridel & James Alan Fox, *Gender Differences in Patterns and Trends in U.S. Homicide, 1976-2017*, 6 VIOLENCE & GENDER 34 (2019).

[6]    Susan B. Sorenson & Rebecca A. Schut, *Nonfatal Gun Use in Intimate Partner Violence: A Systematic Review of the Literature*, 19 TRAUMA, VIOLENCE, & ABUSE 431–42 (2018).

stalk their victims and those who possess a firearm. In a recent study of over 500 women who contacted the National Domestic Violence Hotline, almost half who said they were stalked also said that their abusers carried guns in their car or on their persons.[7]

27.    These numbers are not simply statistics to the coalition and its members; they are the realities that their clients and their clients' children face every day. For example, the executive director of one coalition member ("**Program A**") estimated that the majority of her shelter's clients have experienced gun violence at the hands of their abusers, including being threatened with a gun. Another coalition member ("**Program B**") has housed numerous residents who were threatened by guns. At its shelter and outreach centers combined, this program has served more than 330 victims in the last five years who reported that their abusers had access to weapons. About five years ago, Program B installed bullet-resistant glass at its shelter.

28.    The executive director of another coalition program that runs a licensed shelter ("**Program C**") explained that she wants to do everything possible to create a safe haven for victims of domestic violence. Her program recently housed a client whose abuser told the client that he loved his guns more than their kids and would choose to rescue the guns over the children if their house ever caught fire. That client had to be moved to a location in another county because the abuser posed too much of a danger after making threatening references to shootings.

29.    One coalition member ("**Program D**") has in the past year received three clients directly from the local hospital after the clients had been treated for gunshot wounds suffered at the hands of their abusers. That same program also recently took in a woman and her young son fleeing an abuser who held his gun to the son's head as his method of terrorizing and controlling

---

[7]       T.K. Logan & Kellie R. Lynch, *Dangerous Liaisons: Examining the Connection of Stalking and Gun Threats Among Partner Abuse Victims*, 33 VIOLENCE & VICTIMS 399–416 (2018).

his victim. The executive director of another coalition member ("**Program E**"), estimated that nearly half of its current clients have experienced gun violence (including being threatened by a gun), and noted that guns are used in power and control dynamics common to abusive relationships.

30.     For these reasons, coalition members hold as part of their core missions the creation of a safe place for victims where they will not be retraumatized by the presence of weapons, including firearms. Because firearms are frequently used as a mechanism of control in abusive relationships, coalition members work to keep weapons off their property, not only to make their clients and their clients' children physically safe, but also to reassure them that they are in a safe environment.

31.     To create a sanctuary where their clients can feel secure, coalition members maintain weapons-free policies, described in detail below, and also use a wide variety of security tools, including video surveillance on the interior and/or exterior of the shelter, intercom and monitoring systems, alarms, double-door entry, and glass-break sensors. They also keep in regular contact with local law enforcement to request additional patrols and to accompany residents to appointments when necessary. To maintain safety for everybody in the shelter, residents likewise must adhere to shelter rules, such as keeping confidential the identities of other residents, following lockdown and other security procedures, and not inviting their abusers to the shelter.

*Coalition members have special security concerns*

32.     As organizations that provide direct services to victims of abuse, coalition members operate in an environment that poses special and significant security concerns for their programs, their staff, and their clients. These risks are posed by abusers and by shelter residents themselves, including the children who stay at the shelters and may access weapons present on the premises.

11

33.    Abusers routinely come to coalition members' properties seeking to further threaten, intimidate, or harm their victims. For example, at **Program C**, an abuser recently threatened to ram a victim's car parked in the shelter's lot, and then did so with his truck before fleeing. The victim in that case was particularly scared because she knew her abuser to regularly carry a gun under his front seat (though no one knows whether he had it that day, or indeed whether he was even allowed to legally possess a firearm). As another example, **Program D** reports regularly receiving threats from abusers. In one instance, an abuser threatened to firebomb the shelter, prompting the program to contact police.

34.    More common are abusers who lurk around the shelter or outreach offices, a common control tactic that works through intimidation, even if the abusers never directly make contact with their victims. **Programs A, B, and C** have all had abusers or their family members loitering on roads adjacent to shelter property—or even coming into the shelter lot—in an effort to intimidate residents. At **Program B**, an abuser recently snuck into the shelter's parking area to steal the license plates from his victim's car.

35.    Another tactic used by abusers is to access shelter property under false pretenses, making it difficult for shelter staff to determine whether they are trespassing or there lawfully (a problem compounded by the fact that victims occasionally invite their abuser to the shelter).[8] For example, **Program B** had a pair of recent incidents where an abuser posed as the victim's family member, gaining access to the shelter's main entryway. **Program C** had an abuser come to the shelter claiming to be there for a job interview and another one claiming that he needed a copy of a lease from his wife. **Program E** has had abusers pose as delivery persons in attempts to gain

---

[8]    **Programs A, B, and C** have all faced situations in which shelter residents have invited potentially dangerous people onto shelter property, contrary to shelter rules.

access, with one abuser going so far as to pretend to have a court order directing him to deliver the victim's belongings.

36.     For the six coalition members that operate visitation and exchange centers, abusers pose an additional security challenge because they are participants in the visitation program and therefore allowed on the property. These centers provide a location for supervised visitation of children by noncustodial parents, allowing a custodial parent to sign a child into the center and then depart before the noncustodial parent arrives for visitation. The importance of providing a safe visitation and exchange location cannot be overstated. Just last year, a man shot and killed his son-in-law during a child custody exchange at a gas station in Craigsville, West Virginia. The man then took his own life. The children witnessed these horrific events.

37.     **Program B**, which runs a series of these centers in its service area, regularly handles incidents where noncustodial parents have become irate at program staff and were escorted from the premises, at times by local police. In addition, on a more than monthly basis, the program's primary visitation and exchange center must handle situations in which a visiting parent has broken the rules—for example, by coming earlier than permitted and overlapping with the custodial parent (who may have an order of protection against him or her). The program's visitation and exchange centers have also had other security scares, such as an unknown person sitting in a parked car in its lot and taking pictures of people entering and exiting the center.

38.     In addition to the special risks posed by abusers, coalition members' shelter staff and residents at times face the risk of violence from other shelter residents. According to the executive director of **Program E**, victims of domestic violence have experienced significant trauma, and as a result may experience heightened mood and agitation, or engage in fear-driven decision-making that can lead to confrontation. These issues are compounded for certain shelter

clients, who may be experiencing mental-health issues, have drug or alcohol dependency, or be survivors of sexual assault. For these reasons, the executive director of **Program E** is concerned that some shelter residents may pose security risks to other residents or staff if they have a weapon or if they have ready access to a weapon.

39.     The executive director of **Program C** explained that it is not uncommon for residents to bring weapons or drugs onto the property. She estimated that residents bring firearms onto the property approximately three times a year. She also estimated that the program learns of residents keeping weapons (usually knives, but sometimes guns) and drugs in their cars about eight times a year. The director explained that the danger posed by weapons and drugs in cars is that residents may access them, endangering themselves or others, and that the weapons are prone to theft. **Program A**, which has had several clients come onto the property with knives and firearms, has similar concerns that a client may access weapons that are on the property (either in the shelter itself or the parking lot).

40.     Finally, coalition members also worry that weapons in close proximity could be accessed by children staying at the shelter. For example, the executive director of **Program B** explained that a motivating factor for the program's weapons policy is that they do not want children to inadvertently gain access to weapons.

### Coalition members' policies regarding firearms on shelter property

41.     To contend with all these risks, the Family Protection Services Board (FPSB) requires licensed domestic-violence shelters to have written policies "that prohibit the possession and use of weapons . . . violence and drug and alcohol use within the shelter." W. Va. Code R. § 191-2-4.1 (exempting law enforcement officers who are carrying weapons while on the premises). A copy of the policies must be "supplied to and signed by residents to acknowledge

agreement to adhere to the policies." *Id*. All coalition members comply with these minimum licensing requirements. But coalition members frequently go a step further and also prohibit the presence of weapons, including firearms, in their parking lots.

42.     As described in more detail below, the Parking Lot Amendments implicate the coalition members' policies and practices in at least four different respects: (i) the house rules and guidelines for residents, which are discussed with and signed by residents at intake; (ii) employee agreements and manuals; (iii) signs on the property prohibiting weapons; and (iv) case-by-case situations in which coalition members want to exercise their professional judgment to take appropriate action if they determine a firearm is or may be present in a vehicle on their property.

***Program A***

43.     Program A runs a shelter as well as several outreach offices. Program A's shelter has two parking lots—a front lot and a rear lot—that are used exclusively by the shelter. The rear lot sits on land owned by Program A. The front lot is owned by a private company, which leases it to Program A.

44.     Program A's mission echoes the coalition's commitment to nonviolence, and its policies are motivated in large part towards its goal of eliminating actual and potential violence from the lives of its clients. Specifically, Program A describes its mission as:

> [T]he elimination of personal, institutional, and cultural violence against women, children, and men regardless of their race, creed, age, color, national origin, religion, sexual orientation, or disability. By developing strong community support and a professional program, [Program A] provides safety and quality emergency intervention, advocacy, prevention, and educational services for victims and witnesses of domestic and/or sexual violence. [Program A] works for systemic changes and changes in public attitudes to assure and empower families with options for building lives free of violence.

45.     Program A's house rules echo this purpose, and tell prospective clients that "we want each resident to feel comfortable, safe and at ease in our shelter." The employee handbook makes a similar commitment to employees, stating that "[i]t is the goal of [Program A] to provide a safe, hazard-free environment for all employees," and any employee who raises concerns about their personal safety "can expect that [Program A] will address the employee's safety concerns confidentially with the Executive Director on an individual basis."

46.     Before the Parking Lot Amendments were enacted, Program A had a strict policy prohibiting all weapons anywhere on its property, including the parking areas under its control. This policy was enshrined in posted notices, in house rules given to prospective shelter residents at intake, and in the employee handbook. Under Program A's former policy, staff were permitted to ask residents whether they had firearms or other contraband in their vehicles, if they believed such inquiry was warranted. As a result of the Parking Lot Amendments, Program A has been forced to change this policy and allow residents, staff, and others to possess firearms in its parking areas.

47.     Prior to the Parking Lot Amendments, Program A's weapons policy stated:

> Weapons are strictly prohibited on [Program A's] property as well as any location or activity where [program] employees are or may be conducting business. Concealing a weapon or attempting to conceal a weapon on [program] property or any location or activity where [program] employees are or may be conducting business will be cause for immediate termination.

48.     After the Parking Lot Amendments were passed, however, Program A changed its policy to say: "Weapons are strictly prohibited in [Program A's] shelter facility."

49.     Before the Parking Lot Amendments, when a resident came onto the property with weapons, Program A would make arrangements to lock the weapons in a lockbox or ask the resident to give the firearms to a family member or friend. After the Parking Lot Amendments

went into effect, Program A had an all-staff meeting at which staff were instructed that, because of the change in the law, they may no longer enforce a policy prohibiting guns throughout the program's property, or even ask prospective residents whether they have guns in their cars. As a result of the Parking Lot Amendments, residents who come to the shelter may now keep firearms in their cars. Program A was also forced to revise its employee handbook, and to change how it interprets and applies its posted notices and house rules.

50.     The Parking Lot Amendments exacerbate the security concerns faced by Program A. The executive director of Program A explained that in their line of work, staff have to be able to make judgment calls to avoid potentially dangerous situations. For example, clients have previously brought weapons, including firearms, onto the program's property and the executive director of Program A is concerned that clients may access these weapons, putting themselves or others in danger. However, because of uncertainty about what type of inquiries about firearms in cars (if any) might be allowed under the Parking Lot Amendments, Program A has been forced to adopt a temporary policy of not asking *any* questions about the presence of firearms in cars.

51.     Another pressing concern for the executive director of Program A is the fact that a victim's vehicle is often shared property with her abuser and he is likely to have a key to her car. As a result, a gun in a shelter resident's car may put her, her fellow residents, and shelter staff at significant risk even if the car is locked.

52.     Program A strongly desires to revert to its former policy of prohibiting firearms throughout its property (including its parking areas) and of permitting its staff to enforce this policy including by asking prospective shelter residents whether they have a gun. But for the Parking Lot Amendments, and its concern about incurring large financial penalties, Program A would do so.

***Program B***

53.     Program B runs a shelter (which also houses the program's administrative offices) on property that it owns. This property includes a large parking area in front of the building. Because of security concerns at the shelter, when staff see a car they don't recognize in the parking lot for ten to fifteen minutes, they ask residents if anyone is expecting a visitor. If no one is expecting a visitor, program staff will approach the vehicle and ask what the person is doing in the parking lot. The executive director of Program B explained that this situation happens a couple of times a week. The unknown visitor could be someone dropping off donations or someone looking for a neighboring property. In some situations, however, the stranger turns out to be an abuser—in which case, if the staff recognizes that the vehicle is occupied by an abuser, they will typically call the police.

54.     Program B also operates a number of outreach offices and visitation and exchange centers. Three of the visitation centers are co-located with the outreach offices; the outreach services are conducted during the day and the visitation services are provided in the evening. These offices are rented by the program and have parking areas controlled by the program. In addition, Program B runs a stand-alone visitation and exchange facility.

55.     Before the Parking Lot Amendments, Program B had a pair of policies prohibiting weapons. The employee policy provided that "employees are prohibited from carrying or bringing any weapon to the work site or any [Program B] property." The program's Shelter Policies (for residents) stated that weapons "shall not be permitted on the premises of the [program]." These policies were motivated by safety concerns as well as licensing requirements of the Family Protection Services Board. Prior to the enactment of the Parking Lot Amendments, both prohibitions were understood to cover the shelter's parking areas.

56.     Program B has also posted signs to this effect both inside and outside its shelter, and at its outreach offices. The interior signage explains that "[t]o ensure a safe place for clients and employees, weapons are not permitted on any of the work sites, domestic violence shelter residence, and/or any property of [the program]." Although for security reasons there are no exterior signs identifying the shelter building as a shelter, there is a large "no guns" sign (depicting a pistol with a circle and slash, and the phrase "NO WEAPONS ON PROPERTY") on the exterior door, easily visible from the parking lot.

57.     Although Program B has not altered the text of its policies or signs, the policies are now applied only to the interior of the facilities and not to the parking areas. This change has occurred solely due to the enactment of—and fear of enforcement under—the Parking Lot Amendments. Program staff are well aware that the program has changed the scope of its policy, without altering the language. If not for the Parking Lot Amendments, Program B would continue to apply its no-weapons policies to the parking area.

58.     The Parking Lot Amendments exacerbate the security risks faced by Program B, making it more difficult for the program to protect its staff, its clients, and its clients' children. Program B has had situations where abusers or their family members come onto shelter property, sometimes under false pretenses, making it difficult to quickly determine whether the individual is on the property lawfully. In addition, estranged parents are permitted on the property of Program B's visitation and exchange centers. The Parking Lot Amendments constrain what staff can do or say in such situations to address security concerns.

59.     The executive director of Program B worries specifically about the impact of the Parking Lot Amendments on the children who stay at the shelter. While the Parking Lot Amendments' Prohibition Provisions require that any firearms in the parking lot be in a locked car

or locked to the car, other sections forbid inquiry and verification or enforcement of that provision, increasing the risks of unauthorized access by minors or others.

60.     Recently, an employee at Program B left a handgun in the front seat of their car in plain view in the shelter's parking lot. The shelter's executive director became alarmed because shelter residents and their children were present in the area where the gun was left unattended, and it could have been a tempting target for them or for any passersby—including abusers. Despite the danger this posed to nearby residents, children, and staff, the executive director felt constrained by the Parking Lot Amendments in determining how to best respond in the interest of shelter safety.

*Program C*

61.     Program C operates a licensed domestic-violence shelter on property that it owns. The program also exercises care, custody, and control of the parking lot at the side of the building, which is most regularly used by shelter clients and staff. The shelter staff can generally recognize the cars in the parking lot and have previously told people (particularly abusers or abusers' family members) parked in the lot that they had to leave.

62.     The program's mission is "to protect victims, prevent violence and empower survivors of domestic violence, sexual assault, stalking, and human trafficking." The program's resident handbook tells residents that the program's "goal is to ensure your safety while making sure that your needs are being met." It further explains that the residence "is a shelter for people who have experienced interpersonal violence. The overall goal for the shelter is to create a safe space that promotes healing, empowerment, and independence." The shelter explains that for safety purposes, the resident's belongings and rooms may be searched based on the report of drugs or a weapon.

20

63.     The program's resident handbook also explains that "[f]or the safety of all community members and to stay compliant with family protection services board regulations, [the program] (and its premises) is an alcohol/drugs/weapon free community." In addition, the employee manual states that "firearms and weapons are prohibited on [program] property." Possession of a firearm or other weapon on the program's "premises" is grounds for discipline. Similarly, the program has maintained signs on its property, which say that no firearms or other weapons are allowed on the property.

64.     Contrary to the program's rules, residents sometimes bring weapons onto the property. While the program does not search residents' cars, when staff learn of a weapon in a resident's vehicle, they direct the resident to remove the weapon from the property and give it to a friend or family member. If residents ask whether they could store a firearm in the car, the program would not allow them to. In one previous case, a resident kept a machete in her vehicle. When asked about the presence of the machete, the resident agreed to give it to a family member. In another situation, which took place before the Parking Lot Amendments were enacted, staff learned of a firearm in a resident's vehicle parked in the shelter's parking lot and directed her to remove it from the property. Although both situations involved the removal of a weapon from a vehicle, the Parking Lot Amendments have created an absurd situation where staff are still permitted to tell a resident to remove a machete from the property, but not a gun.

65.     The program has not had to enforce this policy since the Parking Lot Amendments were passed, and is now uncertain of its rights and what it can and cannot do. The executive director of Program C wants to be able to continue to tell residents and other visitors to remove any firearms from the parking lot. She believes that this is necessary to maintain the safety of the program's clients and that this is her duty to shelter residents. She believes that that Parking Lot

Amendments put her and her program in a "catch-22" situation in which the state is telling the shelter that there is one less way that it can protect its clients.

***The Parking Lot Amendments infringe on the coalition members' constitutional rights and endanger their employees and residents***

66.     By forcing coalition members to allow firearms on their property in contravention of their guiding principles and by prohibiting shelters from even asking about the presence of firearms, the Parking Lot Amendments violate the coalition members' First Amendment and Due Process rights under the U.S. Constitution.

67.     The Parking Lot Amendments increase the dangers faced by coalition members, their employees, and their clients by forcing the members to permit guns to be brought into the parking area, and by curtailing the discretion of shelter staff to ask about, look for, or respond to the presence of a firearm inside a vehicle. Even with clear policies forbidding weapons, the complexities of running a domestic-violence shelter mean that shelter staff are frequently called upon to use discretion in deciding how best to respond to a potential security problem. An example common to several coalition members is when shelter staff encounter unrecognized cars on shelter property and must determine what drivers' or occupants' intentions are and how to respond. Sometimes, inquiry reveals that the driver is an abuser or other prohibited person, and staff call the police. Other times, the driver is simply lost or looking for a neighboring business. In neither case, however, does staff know (without asking or looking in the car) whether the driver has a weapon.

68.     Although trespassing abusers are not generally entitled to protection under the Parking Lot Amendments, the law inhibits shelters from investigating the presence of firearms— or enforcing a policy prohibiting them—even when a person's status as an invitee or trespasser is unclear. In addition, abusers may bring guns into the parking areas of visitation and exchange

22

centers, in close proximity to their children and (potentially) their victim, because these facilities serve abuser and victim alike. In such situations, the Parking Lot Amendments inhibit coalition members from using their professional judgment to decide how best to respond to dynamic security concerns.

69.     When coalition members are unable to adequately provide for the safety of a client and her children, they may be forced to transfer the client and children to another shelter program in West Virginia or even in another state. At intake, each shelter assesses the abuser's propensity for lethal violence through a series of interview questions about topics such as threatened or past violence, the abuser's access to firearms, and the presence of children in the home. If a victim's abuser has a high "lethality," the shelter may implement additional security precautions including a full or partial lockdown of the shelter, asking law enforcement to make extra patrols for suspicious persons and vehicles, or even transferring the victim to a shelter run by a different program. By curtailing coalition members' ability to control firearms on their own property, the Parking Lot Amendments increase the likelihood that a security concern will rise to the level where only a physical transfer of the victim will suffice to guard against violence. Transferring a victim to a new shelter is preferable to leaving them at risk, but it is not a desirable outcome. It inhibits the original program from providing direct services to an individual that lives within its service area, and it often means housing the victim far from her family, friends, and support network. This infringes the free-association rights of both the coalition-member program and the client that has sought its services.

70.     In addition, the Parking Lot Amendments exacerbate the coalition members' security concerns by requiring them to allow residents and employees to leave guns in cars. This increases the risk that clients, or their children, may access the weapons and hurt themselves or

others. In addition, this increases the likelihood of guns being stolen from cars parked at coalition members' shelters, a special risk given that abusers often have the keys to their victim's cars. The Parking Lot Amendments also irrationally prohibit coalition members from barring or inquiring about the presence of firearms in the cars of residents and employees, but not other deadly weapons, such as knives.

71.     The role of professional judgment and experience in such situations is paramount. Where experience and a desire to keep their property safe led many coalition members to enforce a uniform ban on firearms in residents' cars before the Parking Lot Amendments were enacted, the law now prevents them from doing so. Where coalition members once exercised their judgment to ask about weapons at intake or if they learned of them from another resident, the Parking Lot Amendments now likewise forbid this common-sense inquiry.

72.     The Parking Lot Amendments further harm the coalition and its members by forcing them to adopt policies that are inconsistent with their fundamental mission to provide sanctuary for abuse victims and to combat institutional violence. The firearms-related policies that coalition members have developed, and the strategies they use to implement them, go beyond protecting the physical safety of coalition members' staff, clients, and others on shelter property. They also serve the core aim of each coalition member to provide a safe space for victims seeking to escape the trauma of an abusive relationship. These goals and policies all align with the overall mission of the coalition, which is "to end personal and institutional violence in the lives of women, children, and men" and to transform societal attitudes through the promotion of "values of respect, mutuality, accountability, and non-violence."

## CAUSES OF ACTION

### COUNT I
### Violation of 42 U.S.C. § 1983
### (Free Speech under the First Amendment to the U.S. Constitution)

73.     West Virginia Code § 61-7-14(d)(2)(A) prohibits property owners in the state from "violat[ing] the privacy rights of a customer, employee, or invitee" by making a "verbal or written inquiry, regarding the presence or absence of a firearm locked inside or locked to a motor vehicle" in the property owner's parking lot. The prohibition does not contain any exceptions for safety concerns, nor does it define the term "privacy rights."

74.     West Virginia Code § 61-7-14(d)(2)(C) states that no property owner "may take any action against a customer, employee, or invite based upon verbal or written statements of any party concerning possession of a firearm stored inside a motor vehicle in a parking lot for lawful purposes, except upon statements made pertaining to unlawful purposes or threats of unlawful actions involving a firearm made in violation of § 61-6-24 of this code." The phrase "take any action" is not defined.

75.     These provisions are speaker-based restrictions on speech because they regulate the speech of only that class of persons who own, lease, or control property in West Virginia.

76.     These provisions are also content-based restrictions on speech because they prohibit speech based on the message that a speaker conveys.

77.     The restrictions on speech contained within these provisions infringe on the First Amendment rights to free speech of plaintiff's constituent members.

78.     Section 61-7-14(d)(2)(A) is also void for vagueness because it fails to define the term "privacy rights of a customer, employee, or invitee" with sufficient precision and particularity

as to give the coalition members fair notice of what (if any) forms of inquiry concerning the presence of a firearm are permitted or prohibited under the statute.

79.     This vagueness chills the coalition members' right to engage in speech protected by the First Amendment. In addition, certain of the plaintiff's members have engaged in self-censorship by instructing staff that they are no longer permitted to inquire about the presence of a firearm in a shelter resident's vehicle under any circumstances, even if warranted in the interest of facility security.

80.     Certain members also intend to engage in speech that is prohibited by the Parking Lot Amendments, both as a matter of enforcing preexisting policies that concern the possession of weapons on members' property, and as a matter of investigating (as circumstances warrant) particular security threats that regularly occur on members' properties. The plaintiff's members fear that if they make such inquiries, they will face a civil enforcement action by the defendant under the Parking Lot Amendments or a lawsuit by a private party who claims to be aggrieved by a shelter's actions.

81.     Section 61-7-14(d)(2)(C) is also void for vagueness because it fails to define the phrase "take any action" with sufficient precision and particularity as to give the plaintiff's members fair notice of what conduct is permitted or prohibited in response to discovery that a customer, employee, or invitee is in possession of a firearm stored inside a motor vehicle in a parking lot. For example, it is not clear if coalition-member staff may call the police if they feel unsafe due to the presence of a firearm in their parking lot.

82.     Sections 61-7-14(d)(2)(A) and (C) prohibit and chill the speech of coalition members. In the absence of prospective relief, the plaintiff's members will continue to either

refrain from protected speech or else be subject to a real threat of civil enforcement action by the defendant or others who claim to be aggrieved by the members' actions.

83.    Sections 61-7-14(d)(2)(A) and (C) are invalid under the First Amendment of the United States Constitution, as applied to the states under the Fourteenth Amendment, because they violate the free speech rights of the plaintiff's member programs. As a result, the plaintiff seeks declaratory and injunctive relief against defendant Patrick J. Morrisey.

**COUNT II**
**Violation of 42 U.S.C. § 1983**
**(Freedom of Association under the First Amendment to the U.S. Constitution)**

84.    Each of the coalition members holds as their core mission the establishment of a sanctuary for victims of domestic abuse that is free from actual or threatened violence. To fulfill these missions, and to provide a safe and secure space to deliver necessary services to abuse victims, each coalition member has adopted policies that restrict or prohibit deadly weapons on its property. The adoption and full implementation of these policies is integral to creating an environment in which each coalition member can freely associate with abuse victims and their children who need its services and who live within its service area.

85.    The Parking Lot Amendments impede coalition members from enacting and implementing policies to provide the safe spaces for abuse victims that are necessary to effectively deliver services and effect their mission. As a direct consequence of, and solely due to, the Parking Lot Amendments, certain of the plaintiff's members have been forced to now permit firearms into parking lots contrary to their organization's mission. Other coalition members desire and intend to implement and enforce policies concerning firearms in their parking areas that are forbidden by the Parking Lot Amendments, and fear the threat of civil enforcement action by the defendant or a lawsuit by a private party if they do so.

27

86.     By inhibiting coalition members from establishing safe and secure environments that are free from weapons, the Parking Lot Amendments also obstruct actual and potential clients of coalition members from accessing direct services in an environment that is conducive to healing and recovery.

87.     Because the Parking Lot Amendments infringe on the rights of coalition members and their clients to freely associate, these provisions violate the rights of coalition members and clients guaranteed by the First Amendment to the United States Constitution, as applied to the states under the Fourteenth Amendment. The plaintiff therefore seeks declaratory and injunctive relief against defendant Patrick J. Morrisey to enjoin him from enforcing these provisions against the plaintiff's members.

### COUNT III
### Violation of 42 U.S.C. § 1983
### (Substantive Due Process under the Fourteenth Amendment
### to the U.S. Constitution)

88.     The Fourteenth Amendment to the United States Constitution provides that a state shall not "deprive any person of life, liberty, or property, without due process of law."

89.     The substantive component of the Fourteenth Amendment's Due Process Clause includes not only the privileges and rights expressly enumerated by the Bill of Rights, but also the fundamental rights implicit in the concept of ordered liberty.

90.     The Parking Lot Amendments violate the fundamental rights of the coalition members to make decisions about personal security for themselves, their employees, their residents, and other invitees on their own property.

91.     Because coalition members provide domestic-violence services and housing to victims of domestic violence and their children—some of the most vulnerable people in our society—the risk of harm to the coalition members, their employees, and their residents and other

invitees caused by the deprivation of these rights is both real and significant. Given the strong link between domestic violence and the unlawful use of firearms, this risk is far higher than the average person or the public at large.

92.     As entities that own, lease, or control private property, the coalition members possess fundamental property rights to deny access to, or exclude persons with firearms from, their property. The right to exclude others to protect one's own personal safety, like the right to physically occupy real property, is among the core natural and inherent rights of property owners, and is a fundamental right implicit in the concept of ordered liberty protected by the Fourteenth Amendment.

93.     The Parking Lot Amendments infringe coalition members' fundamental rights to control their own private property by forcing them to allow firearms, and persons in possession of firearms, in areas of their property from which they would otherwise be excluded.

94.     To protect their personal security and that of their residents and other invitees, and in exercising their fundamental right to control access to their own private property, the plaintiff's members desire and intend to implement and enforce policies concerning firearms in their parking areas that are forbidden by the Parking Lot Amendments. These members fear the threat of civil enforcement action by the defendant or a lawsuit by a private party if they were to do so.

95.     The defendant's interference with the coalition members' fundamental rights is unconstitutionally arbitrary, does not serve any legitimate state interest, and (even if did serve a legitimate interest) would not be narrowly tailored to serve that interest.

96.     West Virginia Code § 61-7-14(d) is invalid under the Fourteenth Amendment of the United States Constitution, as it violates the due process rights of the plaintiff's members. As a result, the plaintiff seeks declaratory and injunctive relief against defendant Patrick J. Morrisey.

**COUNT IV**
**Violation of 42 U.S.C. § 1983**
**(Procedural Due Process under the Fourteenth Amendment**
**to the U.S. Constitution)**

97.     West Virginia Code §§ 61-7-14(d)(2)(A) and (B) purport to prohibit persons who own, lease, or control property from "violating the privacy rights" of customers, employees, and invitees through certain forms of investigatory conduct. But the Parking Lot Amendments do not define the term "privacy rights" or specify the circumstances in which such rights are supposedly violated.

98.     Courts in West Virginia do not recognize—and have never recognized—a right of privacy on the part of customers, employees, or invitees to be free from inquiry regarding their possession of deadly weapons. Nor have courts in West Virginia recognized a right of privacy on the part of customers, employees, or invitees to be free from reasonable search by owners of private property concerning the presence of dangerous articles in their vehicles. That the vague "privacy rights" referred to in the Parking Lot Amendments are apparently at odds with existing law only compounds the vagueness problem.

99.     West Virginia Code §§ 61-7-14(d)(2)(A) and (B) are void for vagueness because the vague term "privacy rights" does not provide a person of ordinary intelligence a reasonable opportunity to know what conduct is proscribed.

100.     In addition, West Virginia Code § 61-7-14(d)(2)(C) purports to forbid persons who own, lease, or control real property from "tak[ing] any action against a customer, employee, or invitee" based on written or verbal statements about the possession of a firearm in a vehicle. But the provision does not define the phrase "any action against" with sufficient particularity to provide a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited.

101.    Because they are unable to determine what conduct is prohibited by West Virginia Code § 61-7-14(d)(2), certain of the plaintiff's members have self-censored their constitutionally protected speech, and have refrained from taking actions with respect to persons suspected of possessing firearms in the plaintiff's members' parking lots that they would otherwise have undertaken.

102.    Other coalition members desire and intend to implement and enforce policies concerning firearms in their parking areas that are or may be forbidden by the Parking Lot Amendments. These coalition members fear the threat of civil enforcement action by the defendant or a lawsuit by a private party if they were to do so.

103.    By failing to provide sufficient notice of what conduct is proscribed and punishable by law, these provisions deprive the plaintiff's members of their right to due process of law protected by the Fourteenth Amendment. The plaintiff therefore seeks declaratory and injunctive relief against defendant Patrick J. Morrisey to enjoin him from enforcing these provisions against plaintiff's members.

**REQUESTED RELIEF**

The plaintiff respectfully requests that this Court enter judgment in its favor and that the Court:

A.    Declare that the challenged provisions of West Virginia Code § 61-7-14(d) violate the rights of the plaintiff's members under the First Amendment to the U.S. Constitution;

B.    Declare that the challenged provisions of West Virginia Code § 61-7-14(d) violate the rights of the plaintiff's members under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution;

C.    Enjoin the defendant from enforcing the challenged provisions of West Virginia Code § 61-7-14;

D.    Award the plaintiff attorney's fees under 42 U.S.C. §§ 1983 and 1988; and

E.    Grant such other relief as the Court may deem just and proper.

Date: June 6, 2019

Respectfully submitted,

/s/ J. David Fenwick
J. David Fenwick (W. Va. Bar No. 6029)
Lucas R. White (W. Va. Bar No. 12501)
**GOODWIN & GOODWIN, LLP**
300 Summer Street, Suite 1500
P.O. Box 2107
Charleston, WV 25328
(304) 346-7000
*jdf@goodwingoodwin.com*
*lrw@goodwingoodwin.com*

Deepak Gupta*
Jonathan E. Taylor*
**GUPTA WESSLER PLLC**
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

Eric Tirschwell*
Alla Lefkowitz*
James Miller*
**EVERYTOWN LAW**
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017
(646) 324-8222
*etirschwell@everytown.org*

*pro hac vice forthcoming*