# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT CHARLESTON

THE WEST VIRGINIA COALITION AGAINST
DOMESTIC VIOLENCE, INC.,

   *Plaintiff,*

  v.

PATRICK J. MORRISEY, in his official
capacity as Attorney General for the
State of West Virginia,

   *Defendant.*

Civil Action No. 2:19-cv-00434
(Judge John T. Copenhaver, Jr.)

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

Eric Tirschwell*
Alla Lefkowitz*
James Miller*
**EVERYTOWN LAW**
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017
(646) 324-8222
*etirschwell@everytown.org*

Deepak Gupta*
Jonathan E. Taylor*
**GUPTA WESSLER PLLC**
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

J. David Fenwick
Lucas R. White
**GOODWIN & GOODWIN, LLP**
300 Summer Street, Suite 1500
P.O. Box 2107
Charleston, WV 25328
(304) 346-7000
*jdf@goodwingoodwin.com*

September 3, 2019

*Counsel for Plaintiff The West
Virginia Coalition Against Domestic
Violence, Inc.*

*\*Pro hac vice*

# TABLE OF CONTENTS

Table of authorities ................................................................................................ ii

Introduction ........................................................................................................... 1

Statement ............................................................................................................... 3

Argument ............................................................................................................... 5

    I.     The Coalition has Article III standing ................................................. 5

          A.     The Coalition has standing to bring this pre-enforcement challenge to section 61-7-14(d) because its members face a credible threat of enforcement and the statute has already chilled their expression. ............. 5

          B.     The ability to ask whether visitors are armed is directly related to the Coalition's mission of ensuring safety and security for victims of domestic violence ............................................................... 14

    II.    The Coalition's claims are ripe for adjudication. ................................. 18

    III.   The Coalition's complaint is fully consistent with Rule 10(b) ............................ 19

Conclusion ............................................................................................................. 20

i

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Pastides*,
　900 F.3d 160 (4th Cir. 2018) .................................................................... *passim*

*Adult Video Association v. Barr*,
　960 F.2d 781 (9th Cir. 1992) ................................................................................ 18

*American Booksellers Association v. Commonwealth*,
　802 F.2d 691 (4th Cir. 1986) ......................................................................... 11, 12

*Association of American Physicians & Surgeons, Inc. v. Texas Medical Board*,
　627 F.3d 547 (5th Cir. 2010) ......................................................................... 15, 17

*Babbitt v. Farm Workers*,
　442 U.S. 289 (1979) ............................................................................................... 7

*Bauer v. Shepard*,
　620 F.3d 704 (7th Cir. 2010) ................................................................................. 7

*Benham v. City of Charlotte, North Carolina*,
　635 F.3d 129 (4th Cir. 2011) ............................................................................... 12

*Building & Construction Trades Council of Buffalo v. Downtown Development, Inc.*,
　448 F.3d 138 (2d Cir. 2006) ................................................................................ 15

*Cayuga Nation v. Tanner*,
　824 F.3d 321 (2d Cir. 2016) .................................................................................. 7

*Cooksey v. Futrell*,
　721 F.3d 226 (4th Cir. 2013) ......................................................................... 8, 18

*Davison v. Randall*,
　912 F.3d 666 (4th Cir. 2019) ............................................................................... 11

*Florida League of Professional Lobbyists, Inc. v. Meggs*,
　87 F.3d 457 (11th Cir. 1996) ............................................................................... 10

*Hedges v. Obama*,
　724 F.3d 170 (2d Cir. 2013) .................................................................................. 7

*Humane Society of the United States v. Hodel*,
　840 F.2d 45 (D.C. Cir. 1988) ............................................................................... 15

*Hunt v. Washington State Apple Advertising Commission*,
　432 U.S. 333 (1977) ....................................................................................... 14, 17

*International Union, United Automobile, Aerospace, & Agricultural Implement Workers of America v. Brock*,
 477 U.S. 274 (1986) ........................................................................................................ 17

*Kenny v. Wilson*,
 885 F.3d 280 (4th Cir. 2018) ............................................................................................ 2

*Laird v. Tatum*,
 408 U.S. 1 (1972) ............................................................................................................ 13

*Mangual v. Rotger-Sabat*,
 317 F.3d 45 (1st Cir. 2003) ................................................................................... 8, 11, 12

*MedImmune, Inc. v. Genentech, Inc.*,
 549 U.S. 118 (2007) ........................................................................................................ 13

*Mobil Oil Corp. v. Attorney General of Virginia*,
 940 F.2d 73 (4th Cir. 1991) ...................................................................................... *passim*

*North Carolina Right to Life, Inc. v. Bartlett*,
 168 F.3d 705 (4th Cir. 1999) ..................................................................................... 2, 8, 9

*New Hampshire Right to Life Political Action Committee v. Gardner*,
 99 F.3d 8 (1st Cir. 1996) ................................................................................................... 8

*National Constructors Association v. National Electric Contractors Association, Inc.*,
 498 F. Supp. 510 (D. Md. 1980) ...................................................................................... 15

*National Organization for Marriage, Inc. v. Walsh*,
 714 F.3d 682 (2d Cir. 2013) ....................................................................................... 9, 10

*Ostergren v Cuccinelli*,
 615 F.3d 263 (4th Cir. 2010) ............................................................................................ 9

*Ostergren v. McDonnell*,
 2008 WL 3895593 (E.D. Va. Aug. 22, 2008) ................................................................... 9

*PETA, Inc. v. Stein*,
 737 F. App'x 122 (4th Cir. 2018) ...................................................................................... 9

*Presedio Golf Club v. National Park Service*,
 155 F.3d 1153 (9th Cir. 1988) ........................................................................................ 16

*Reno v. American Civil Liberties Union*,
 521 U.S. 844 (1997) ........................................................................................................ 20

*Retail Industry Leaders Association v. Fielder*,
 475 F.3d 180 (4th Cir. 2007) ............................................................................................ 5

*Rhode Island Association of Realtors, Inc. v. Whitehouse*,
 199 F.3d 26 (1st Cir. 1999). ................................................................................... 9, 10, 19

iii

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ...................................................................................10

*Sullivan v. City of Augusta,*
    511 F.3d 16 (1st Cir. 2007) .......................................................................18

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ...................................................................................18

*Taubman Realty Group Limited Partnership v. Mineta,*
    198 F. Supp. 2d 744 (E.D. Va. 2002)........................................................18

*Taubman Realty Group Limited Partnership v. Mineta,*
    320 F.3d 475 (4th Cir. 2003)......................................................................18

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,*
    517 U.S. 544 (1996) ...................................................................................15

*Vermont Right to Life Committee, Inc. v. Sorrell,*
    221 F.3d 376 (2d Cir. 2000)...................................................................9, 19

*Virginia v. American Booksellers Association, Inc.,*
    484 U.S. 383 (1988) ...................................................................................11

*Virginia Society for Human Life, Inc. v. Federal Election Commission,*
    263 F.3d 379 (4th Cir. 2001)........................................................................9

*West Virginia Citizens Defense League, Inc. v. City of Charleston,*
    2012 WL 4320983 (S.D. W. Va. Sept. 20, 2012) ...............................2, 6, 8, 13

*Wollschlaeger v. Governor of Florida,*
    848 F. 3d 1293 (11th Cir. 2017) ............................................1, 2, 7, 18

**Statute**

W. Va. Code § 61-7-14 ...................................................................................1, 3, 4

**Other Authorities**

Federal Rule of Civil Procedure Rule 10(b).................................................19

Office of the West Virginia Attorney General, *On the Mark: A Guide to Concealed Handgun Laws in West Virginia* (June 2019), https://bit.ly/2jSVgjE ...................................................9

## INTRODUCTION

In keeping with its mission to protect victims of domestic violence, and to advance its members' interest in creating safe havens where victims will not be physically endangered or psychologically retraumatized, the West Virginia Coalition Against Domestic Violence—a statewide coalition of domestic-violence shelters—challenges a state statute that violates its members' constitutional rights. The statute, which went into effect just last year, impairs the shelters' ability to safeguard the physical and emotional well-being of their residents and to foster the kind of environment that is so essential to their existence. It does so by forcing shelters to allow firearms onto their parking lots and forbidding them from even *asking* about the presence of firearms there or taking action based on that information. W. Va. Code § 61-7-14(d).

This blatant content-based speech restriction violates the shelters' First Amendment right to free speech. *See Wollschlaeger v. Governor of Fla.*, 848 F. 3d 1293, 1319 (11th Cir. 2017) (en banc) (invalidating a law prohibiting doctors from asking about firearm ownership). The law's requirement that shelters accept firearms onto their property is also antithetical to their mission and inhibits their First Amendment right to associate freely with their clients. And the law further tramples on their constitutional rights because it hinders their ability to protect their own safety (and their clients' safety) on their own property.

Facing an unconstitutional law that squarely prohibits activity they wish to engage in—and *did* engage in, before the law took effect—the shelters have now been put in a lose-lose situation: obey the law and refrain from engaging in activity that is constitutionally protected, or violate the law and risk an enforcement action by the Attorney General or a private lawsuit by anyone claiming to be aggrieved by the shelters' no-gun policies. To end this Hobson's choice, the shelters—acting through the Coalition of which they are all a part—have filed this lawsuit to obtain declaratory relief and to enjoin the law's enforcement against them.

In his motion to dismiss, the Attorney General does not defend the law on the merits. Instead, he argues that no shelter has Article III standing because his office has not yet had occasion to enforce the law. But coalition members are injured in two ways. Those shelters that have not yet changed their policies to conform to the statute face a credible threat of enforcement. A "non-moribund statute that facially restrict[s] expressive activity by the class to which the plaintiff belongs presents such a credible threat, and a case or controversy thus exists in the absence of compelling evidence to the contrary." *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999). That rule fully applies here, and the Attorney General gives no contrary compelling evidence. In addition, those shelters that have changed their policies to conform to the statute are suffering "an ongoing injury in fact" by forgoing constitutionally protected activity. *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018). That injury is plainly caused by the statute. "Due to the challenged provisions," the shelters "are no longer asking . . . questions related to firearm[s]" and are thus suffering the injury of "self-censorship"—a "harm [that] can be realized even without an actual prosecution." *Wollschlaeger*, 848 F.3d at 1304–05. They need not "put themselves in the dock" to enjoy their constitutional rights. *W. Va. Citizens Def. League, Inc. v. City of Charleston*, 2012 WL 4320983, *8 (S.D. W. Va. Sept. 20, 2012) (Copenhaver, J.). The Attorney General's contrary argument—that obeying the law is "unreasonable" here (at 11)—defies common sense.

Equally unpersuasive is his other standing argument: that the Coalition's mission is not sufficiently "germane" to allow it to challenge the speech prohibition (or "inquiry provision"). Ensuring that member shelters may ask about the presence of loaded firearms on their own property is unquestionably related to the Coalition's mission of ensuring safety and security for domestic-violence victims because it empowers shelters to take steps they deem necessary to protect domestic-violence victims and helps ensure that victims fleeing violence feel safe.

**STATEMENT**

The Coalition consists of fourteen domestic-violence shelters. ECF No. 1, at 3. Its "mission is to provide a safe haven for women, men, and children fleeing violent homes and relationships across West Virginia." *Id.* at 1. This means not only helping to protect victims from further physical harm, but also striving to create a nurturing environment in which victims are not retraumatized. *Id.* "In service of its mission to end personal and institutional violence, the Coalition supports member programs in their provision of services to victims of domestic violence by strengthening public policy, coordinating statewide education and training, providing assistance to member programs, and raising public awareness about violence against women." *Id.* at 3.

Central to the Coalition's mission is the need to keep weapons out of shelters and off shelter property. As the complaint details, the danger posed by the presence of weapons on shelter property comes in many forms—abusers who attempt to enter the premises, sometimes under false pretenses; residents who bring weapons onto shelter property and pose a danger to themselves or others; children who stay at the shelters and may access weapons kept in cars. *Id* at 12–14, 19–20. Given the unique dangers shelters face when anyone brings a firearm onto their property, "[i]t is essential that shelter staff be allowed to protect themselves and their residents by exercising their professional judgment about how best to respond in such situations, whether by investigating, asking the person to remove the gun from the premises, or calling the police." *Id.* at 1.

Before June 2018, the shelters had policies allowing them to do just that, as permitted by state law. But now the legislature has passed a statute making this activity illegal. Under the new "parking lot" law—which the Coalition opposed—shelters and other property owners are barred from making any "verbal or written inquiry regarding the presence or absence of a firearm locked inside or locked to a motor vehicle in a parking lot." W. Va. Code § 61-7-14(d)(2)(A) (comma omitted). They are also forbidden from: excluding firearms from their parking lots, *id.* § 61-7-

3

14(d)(1), denying vehicles with firearms access to their parking lots, *id.* § 61-7-14(d)(4), "tak[ing]

any action against" someone who says they brought a firearm onto the shelter's lot, *id.* § 61-7-

14(d)(2)(C), and conditioning employment on an employee's agreement to not bring firearms onto

their lots, *id.* § 61-7-14(d)(3)(B). There is no exception for domestic-violence shelters. The law

authorizes the Attorney General (and anyone "aggrieved" by a violation) to seek injunctive relief

and penalties of up to $5,000 for each violation, plus costs and attorney's fees. *Id.* § 61-7-14(f).

The law's passage put the shelters in an impossible spot. In their view, the law's inquiry

provision violates their First Amendment right to free speech to the detriment of the clients they

serve. In addition, the law's mandate that they accept firearms onto their property violates their

First Amendment right of association. And the law further violates their constitutional rights

because it is vaguely worded, and because it inhibits their ability to protect their own personal

safety (and their clients' safety) on their own property. But the shelters also have respect for state

law, and would prefer not to violate the statute without some assurance that they have the right to

do so. Hence their dilemma: comply with the statute and relinquish their constitutional rights while

putting their clients at risk, or exercise their rights to protect their clients and risk incurring

significant penalties. As the executive director of one of the shelters explained, the Parking Lot

Amendments put her and her program "in a 'catch-22' situation in which the state is telling the

shelter that there is one less way that it can protect its clients." ECF No. 1, at 21–22.

As the complaint details, different shelters have chosen different paths. *Id.* at 15–22. Some,

like Program A, have modified their policies to comply with the statute. Among other things,

Program A has "adopt[ed] a temporary policy of not asking *any* questions about the presence of

firearms in cars." *Id.* at 17. "But for the Parking Lot Amendments," Program A would "revert to

its former policy of prohibiting firearms throughout its property (including its parking areas) and

of permitting its staff to enforce this policy including by asking prospective shelter residents whether they have a gun." *Id.* Other coalition members, like Program B, have not formally changed the text of their no-gun policies (or signs conveying those policies). But Program B now applies its policies "only to the interior of the facilities and not to the parking areas." *Id.* at 19. "If not for the Parking Lot Amendments, Program B would continue to apply its no-weapons policies to the parking area." And still other coalition members, like Program C, have not changed their policies and are "now uncertain of [their] rights and what [they] can and cannot do." *Id.* at 21. To put an end to this intolerable "catch-22," *id.* at 22, the Coalition brought this lawsuit on behalf of its members, seeking to enjoin the statute's enforcement against them.

## ARGUMENT

I.    **The Coalition has Article III standing.**

    A.    **The Coalition has standing to bring this pre-enforcement challenge to section 61-7-14(d) because its members face a credible threat of enforcement and the statute has already chilled their expression.**

The Attorney General first contends that the Coalition lacks standing to challenge the statute because no shelter is injured by it, so none of "the association's members would have standing" in their own right. *See Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007). That is wrong for two independent reasons. *First*, coalition members who have not yet changed their policies—policies that the Attorney General says (at 17) violate the statute—are injured because they face a credible fear of enforcement. *Second*, coalition members who have changed their policies to comply with the statute are injured because they are being denied the full enjoyment of their constitutional rights, to the detriment of the clients they serve.

    **1.** Taking the first group first, the Attorney General argues that these coalition members are unharmed by the statute "because they are not facing enforcement actions, nor is there a credible threat of future enforcement." Mem. 7. In making this argument, he concedes (at 2) that the statute

"prohibits any employer or business from inquiring—either orally or in writing"—about "the presence or absence of a firearm locked inside or locked to a motor vehicle in a parking lot," and also prohibits taking any action based on that information. He further states (at 7) that "[t]he Coalition alleges that its members engage in conduct that could violate Section 61-7-14(d), including prohibiting firearms in vehicles in their parking lots and asking whether vehicles contain firearms." And he does not disavow his ability to enforce the statute against violators. To the contrary, he spends the opening paragraph of his brief defending the policy embodied in the statute.

The Attorney General focuses instead (and exclusively) on past enforcement history, which he says is essential to establishing a credible threat of future enforcement. Because his office has not yet brought an enforcement action since the statute took effect in June 2018, he argues that no coalition member—nor *anyone*—has standing to challenge the statute, even on First Amendment grounds. On that logic, no one in West Virginia should be discouraged from violating the statute because there is no "credible threat" that the Attorney General will actually enforce the law against them or anyone else—that is, until he does. *See W. Va. Citizens Def. League*, 2012 WL 4320983 at *9 n.2 ("[If] no credible threat of prosecution exists, it all but invites [violation of the law].").

This is not a persuasive argument. When a plaintiff brings a pre-enforcement challenge to a new statute, a lack of past enforcement history is both inevitable and irrelevant. If a statute is enacted that prohibits someone from saying or doing something that they were previously saying or doing (or would like to start saying or doing) in a way that they claim violates their constitutional rights, that person may ordinarily challenge the law's application as to them. In that scenario—the same as here—the very existence of the statute is all that is needed to make the fear reasonable. *See Mobil Oil Corp. v. Att'y Gen. of Va.*, 940 F.2d 73, 76 (4th Cir. 1991) ("We see no reason to assume that the Virginia legislature enacted this statute without intending it to be enforced. Mobil

has certainly alleged 'an actual and well-founded fear' that the law will be enforced, and has in fact 'self-censored' itself by complying with the statute, incurring harm all the while."); *see also Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010) ("[T]he existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper [under Article III].").

An example makes the point. Suppose that the West Virginia legislature were to pass a law tomorrow that banned newspapers from asking government officials any questions about their personal financial ties. Suppose further that two of the biggest newspapers in the state brought suit challenging the law shortly after it went into effect. One alleged that it has a practice of asking such questions and has decided to tell its reporters to keep asking those questions. The other decided to be more cautious and refrain from asking such questions while the law is in effect. Of course, it is too early for there to be any past history of enforcement, and there have been no complaints to the Attorney General's office yet. Do the newspapers lack Article III standing as a result? If the Attorney General's argument were correct, the answer would have to be yes.

But the cases hold no. Indeed, the very cases on which the Attorney General relies for his argument in fact demonstrate why he is wrong. He cites, for example, the Supreme Court's decision in *Babbitt v. Farm Workers*, 442 U.S. 289 (1979). *See* Mem. 8. But "[t]he standard established in *Babbitt* sets a low threshold and is quite forgiving to plaintiffs seeking such preenforcement review, as courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (quotation marks omitted); *see also Wollschlaeger*, 848 F.3d at 1305 (describing the credible-threat standard as "quite forgiving" and finding standing to challenge law forbidding doctors from asking patients about gun ownership); *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013) ("[I]n numerous preenforcement cases where the Supreme Court has found standing" to

challenge a statute, "it did not place the burden on the plaintiff to show an intent by the government to enforce the law against it," but "presumed such intent."); *Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003) ("As to whether a First Amendment plaintiff faces a credible threat of prosecution, the evidentiary bar that must be met is extremely low. 'Courts will assume a credible threat of prosecution in the absence of compelling contrary evidence.'").

The Fourth Circuit has followed the same approach. The case the Attorney General cites most often, *Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013), makes this clear. *See* Mem. 7, 9, 11, 12, 18, 19. It reaffirmed the rule that a "non-moribund statute that facially restricts expressive activity by the class to which the plaintiff belongs presents [] a credible threat, and a case or controversy thus exists in the absence of compelling evidence to the contrary." 721 F.3d at 237 (quoting *N.C. Right to Life*, 168 F.3d at 710); *see also W. Va. Citizens Def. League*, 2012 WL 4320983, *7–*8 (reciting this rule); *accord N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8 (1st Cir. 1996) (canvassing the cases and adopting same rule). This rule "is particularly appropriate when the presence of [a] statute tends to chill the exercise of First Amendment rights." *Cooksey*, 721 F.3d at 237 (quoting *N.C. Right to Life*, 168 F.3d at 710). In that context, another case cited by the Attorney General explains that there is a "presumption of a credible threat of enforcement" if the statute is "non-moribund" and "facially restrict[s]" the desired activity. *Abbott v. Pastides*, 900 F.3d 160, 178 n.9 (4th Cir. 2018) (brackets and quotation marks omitted).

This settled rule—which the Attorney General declines to mention—is fatal to his position. He has not "alleged that the Act is moribund," nor identified any "compelling evidence" that would override the presumption, so "we are left with the question of whether the Act facially restricts [the plaintiffs'] expressive activity." *Cooksey*, 721 F.3d at 237–38. On this point, he offers no resistance, conceding that it does (at 2, 7). And for good reason: "by its terms," the statute applies

"to the plaintiffs' anticipated speech and contain[s] no 'rule exempting'" domestic-violence shelters, *see Abbott*, 900 F.3d at 178 n.9, despite the fact that they strongly opposed the statute's passage, *see* ECF No. 1, at 1–2. Thus, even if the Attorney General were to provide "nonbinding assurances that [coalition members] would not be prosecuted"—which he has not done—the Coalition would still have standing to challenge the statute, because his assurances would "not overcome the presumption of a credible fear of prosecution" given that "the statute's plain language prohibit[s] [their] activities." *Va. Soc'y for Human Life, Inc. v. Fed. Elec. Comm'n*, 263 F.3d 379, 388 (4th Cir. 2001) (describing *N.C. Right to Life*). Otherwise, the Coalition's "First Amendment rights would exist only at the sufferance of" the current Attorney General. *N.C. Right to Life*, 168 F.3d at 711; *accord Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000).[1]

Out-of-circuit precedent further underscores why the statute's lack of enforcement history is beside the point here. In *Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, for instance, the state "Attorney General relie[d] heavily on the fact that the state ha[d] never pursued" an

---

[1] The Attorney General's half-way assurance (at 4, 10) that he does not "plan" to bring an enforcement action until he receives a complaint is no assurance at all. Even if it were a binding promise (and it is not), the shelters are just one complaint away from an enforcement action. In fact, just a couple of months ago, the Attorney General published a guide to concealed handgun laws in which he twice referred to the challenged statute, indicating that his office does not consider the law to be moribund. Office of the West Virginia Attorney General, *On the Mark: A Guide to Concealed Handgun Laws in West Virginia* (June 2019), https://bit.ly/2jSVgjE. Nor does it "matter that the law at issue impose[s] only civil, and not criminal, liability." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 690 (2d Cir. 2013); *see Mobil Oil*, 940 F.2d at 75 (finding standing to bring pre-enforcement challenge to law with a "stiff civil remedy for violation"—$2,500, "plus actual damages and attorney's fees"); *PETA, Inc. v. Stein*, 737 F. App'x 122, 128–31 (4th Cir. 2018) (finding standing to bring pre-enforcement First Amendment challenge to civil statute); *Ostergren v. McDonnell*, 2008 WL 3895593 (E.D. Va. Aug. 22, 2008), *aff'd sub nom. Ostergren v Cuccinelli*, 615 F.3d 263 (4th Cir. 2010) (same). "The fear of civil penalties can be as inhibiting of speech as can trepidation [of] criminal prosecution." *Vt. Right to Life Comm.*, 221 F.3d at 382.

enforcement action. 199 F.3d 26, 32 (1st Cir. 1999). The First Circuit rejected that argument, explaining that it "has two flaws. First, the record contains no realistic basis for a suggestion that the statutory provision, enacted only twenty years ago, has fallen into desuetude. Second, predicting the future from the past is perilous business. There are a minimum of three possible explanations for a history of nonenforcement: a statutory prohibition may have proven to be an effective deterrent, or the proscribed behavior may be difficult to detect, or the state may have decided not to enforce the statute." *Id.* To this list we can add a fourth: the statute may have been enacted only very recently—not "twenty years ago," as in that case, but one year ago, as is the case here. Because "it hardly can be said that the state has disavowed enforcement" of the statute, and it is of very recent vintage, there is no reason to think that the lack of prior enforcement renders the threat of future enforcement so implausible as to overcome the general presumption. *See id.*

None of the remaining cases cited by the Attorney General supports a different result. The Supreme Court's decision in *Steffel v. Thompson* (discussed at 8) actually undermines his position. 415 U.S. 452 (1974). It makes clear that plaintiffs need not place themselves "between the Scylla of intentionally flouting state law and the Charybdis of forgoing . . . constitutionally protected activity," *id.* at 462—precisely what he would have them do here. *See also Nat'l Org. for Marriage*, 714 F.3d at 689–90 ("[W]ithout the possibility of pre-enforcement challenges, plaintiffs contesting statutes or regulations on First Amendment grounds 'face an unattractive set of options if they are barred from bringing a facial challenge': refraining from activity they believe the First Amendment protects, or risk civil or criminal penalties for violating the challenged law." (quoting *Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 459 (11th Cir. 1996)).

As for the Attorney General's other cases (at 8–10), it is true that many of those in which the court found standing involved provisions that previously had been enforced. But there is no

suggestion in any of those cases that past enforcement history is *required* to challenge the statute. And some of his cases, like *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019), did not even involve a statute at all, so the "presumption" for "non-moribund" statutes was entirely inapplicable. *See Abbott*, 900 F.3d at 178 n.9. *Davison* involved a challenge to a government official's decision to block someone from commenting on her official Facebook page. In that context, past behavior is obviously relevant; had the official not "previously blocked Davison" (or threatened to block him), there would have been no reason to think she might do so in the future. *Davison*, 912 F.3d at 678. But an express statutory prohibition is a different matter entirely. What the Attorney General needs, and what he does not have, is a single case from the Fourth Circuit or the Supreme Court holding that past enforcement history *of a statute* is necessary to establish a credible threat of enforcement.

He cites no such case because none exists. "The Supreme Court has often found standing to challenge" state statutes on constitutional grounds "even when those statutes have never been enforced." *Mangual*, 317 F.3d at 57 (citing examples). The Fourth Circuit has done the same. "In *American Booksellers Association v. Commonwealth*, 802 F.2d 691 (4th Cir. 1986)," for instance, the state "argued that booksellers could not challenge a new state [] law until someone broke it and was punished. [The Court] brushed the argument aside in a footnote." *Mobil Oil*, 940 F.2d at 76. It emphasized that "the amendment [was] newly enacted," so it "would be unreasonable to assume that the General Assembly adopted the 1985 amendment without intending that it be enforced." *Am. Booksellers*, 802 F.2d at 694 n.4. "The Supreme Court agreed," adopting the same reasoning. *Mobil Oil*, 940 F.2d at 76; *see Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (finding standing in pre-enforcement challenge because there is "no reason to assume" a "newly enacted law" won't be enforced). These precedents "apply squarely to this suit." *Mobil Oil*, 940 F.2d at 76. The Attorney General's credible-threat argument cannot be reconciled with them.

11

**2.** "An additional cognizable injury under the First Amendment is self-censorship, which occurs when a claimant is chilled from exercising her right to free expression." *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011); *see Am. Booksellers*, 484 U.S. at 393 ("[T]he alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution."); *Abbott*, 900 F.3d at 176 ("We have recognized two ways in which litigants may establish the requisite ongoing injury when seeking to enjoin government policies alleged to violate the First Amendment," one of which is to "refrain from exposing themselves to sanctions under the policy [by bringing themselves into compliance with it]."); *see also Mangual*, 317 F.3d at 56–57. Because at least one coalition member, to comply with the statute, "has been forced to adopt a temporary policy of not asking *any* questions about the presence of firearms in cars" and of allowing guns onto their parking lots, at least one member is suffering ongoing free-speech and associational injuries. ECF No. 1, at 16–17 ("After the Parking Amendment Lot Amendments went into effect, Program A had an all-staff meeting at which staff were instructed that, because of the change in the law, they may no longer enforce a policy prohibiting guns throughout the program's property, or even ask prospective residents whether they have guns in their cars."). These injuries form a separate basis for the Coalition's standing.

The Attorney General also challenges this separate basis for standing. He takes the position that even if some coalition members have suppressed their speech and otherwise refrained from constitutionally protected behavior to comply with the statute—undoubtedly cognizable injuries— these injuries cannot confer standing because they are not attributable to the statute but rather to the members' decision to comply with it. In his view, in other words, the recent passage of a statute expressly prohibiting certain speech and expressive activity is not "an objectively good reason for refraining from speaking and self-censoring instead." Mem. 11 (quoting *Abbott*, 900 F.3d at 176).

This argument borders on the absurd. It is apparently the official position of the Attorney General that it is "unreasonable" to comply with a West Virginia statute that his office is tasked with enforcing until he has had occasion to enforce it. *See id.* (arguing that "[t]otal lack of enforcement of a statute," even if recently enacted, makes compliance with the statute "unreasonable"). But there is no requirement that a person "violate the law and wait to see what happens." *Mobil Oil*, 940 F.2d at 76. As this Court has put it: West Virginians need not "put themselves in the dock" to enjoy their constitutionally protected freedoms. *W. Va. Citizens Def. League*, 2012 WL 4320983 at *8. Rather, "[p]ublic policy should encourage a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power, all the while complying with the challenged law, rather than to deliberately break the law and take his chances in the ensuing suit or prosecution." *Id.* (quoting *Mobil Oil*, 940 F.2d at 75); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) ("[W]e [do] not require, as a prerequisite to testing the validity of the law in a suit for injunction, that the plaintiff bet the farm, so to speak, by taking the violative action.").

The Attorney General cites no case that even remotely supports his claim that complying with a statute is unreasonable. He cites the rule that "[a]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Mem. 10–11 (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)). But the harm here is not caused by "subjective chill"; it's caused by forgoing constitutionally protected activity because it is expressly prohibited by a statute enacted last year. This basic point also distinguishes *Abbott*, which the Attorney General says (at 12) is "remarkably similar" to this case. It is not. The plaintiffs there—students challenging a university policy after holding an event with swastikas—asserted that their speech had been chilled even though the university told them that "it had decided against

13

opening an investigation or taking any further action in connection with the [event]." 900 F.3d at 170–71. The Fourth Circuit held that there was no reasonable chilling effect because, on their "own account, the University ha[d] made manifest its intent to *allow* speech even when it might or does cause offense, first approving the display of a swastika" and "then deciding against disciplinary action in response to student complaints.'" *Id.* at 177. This case is thus nothing like *Abbott*—which expressly distinguished cases like this one, where the challenged law "appear[s] by its terms to apply to the plaintiffs' anticipated speech and contain[s] no rule exempting their intended" activity. *Id.* at 178 n.9. And whereas the university in *Abbott* took the position that the events did *not* violate the challenged policy, the Attorney General here does the opposite: he concedes that the plaintiffs' intended speech *would* violate the statute. That is more than sufficient to establish injury.

**B.** **The ability to ask whether visitors are armed is directly related to the Coalition's mission of ensuring safety and security for victims of domestic violence.**

The Attorney General challenges the Coalition's standing on one additional ground: He asks this Court (at 14) to "dismiss the Coalition's free speech claim because it is not germane to its organizational purpose 'to end personal and institutional violence.'" This argument, too, collapses on inspection. Protecting the ability of its members to monitor and control the presence of loaded firearms on their own property—whether through "no guns" policies or by being able to ask about guns—is not only germane to, but directly advances, the Coalition's mission of providing for the physical safety and psychological well-being of domestic-violence victims.

To have standing to sue on behalf of its members, an association must show that "the interests it seeks to protect are germane to the organization's purpose." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). This requirement ensures "that the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to

14

serve as the defendant's natural adversary." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–56 (1996). But the requirement is "undemanding"— imposing a "modest but sensible standard" of "mere pertinence between litigation subject and organizational purpose." *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58–59 (D.C. Cir. 1988); *see also Nat'l Constructors Ass'n v. Nat'l Elec. Contractors Ass'n, Inc.*, 498 F. Supp. 510, 521 (D. Md. 1980) (holding that germaneness imposes a "pertinent or relevant to" requirement, not a "stricter standard"). "The proper inquiry at the pleading stage is thus a limited one: A court must determine whether an association's lawsuit would, if successful, reasonably tend to further the general interests that individual members sought to vindicate in joining the association and whether the lawsuit bears a reasonable connection to the association's knowledge and experience." *Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006).

The Coalition "easily surpasses the low threshold of *Hunt*'s germaneness prong." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010). As set forth in the complaint, the Coalition's mission is to "end personal and institutional violence," both actual and perceived. ECF No. 1, at 3, 8. To fulfill its mission, the Coalition helps member shelters create "a safe place for victims where they will not be retraumatized by the presence of weapons, including firearms." *Id.* at 11. Although the Attorney General claims (at 15) that "there is nothing in the Complaint alleging how the inability to ask a question about firearm possession advances that interest," that is not a fair reading of the complaint, and it defies common sense. Preventing firearms on shelter property is obviously related to the Coalition's mission. *See id.* ("Because firearms are frequently used as a mechanism of control in abusive relationships, coalition members work to keep weapons off their property, not only to make their clients and their clients' children physically safe, but also to reassure them that they are in a safe environment."). The only question,

then, is whether helping members obtain information about firearm possession on their property—information that plainly relates to the Coalition's mission—is also related to its mission.

That question answers itself. But even if didn't, the complaint repeatedly emphasizes the self-evident link between being able to *ask* about the presence of a firearm on shelter property and creating a safe haven free from actual and perceived threats of violence. *See, e.g.*, *id.* at 17 (alleging that Program A's former inquiry policy was intended to allow staff "to make judgment calls to avoid potentially dangerous situations," such as a "client[] access[ing] these weapons, putting themselves or others in danger," or an abuser accessing a weapon in a client's car); *id.* at 21 (alleging that Program C's inquiry policy "is necessary to maintain the safety of the program's clients"). And the complaint goes on to allege that, "[i]n service of its mission to end personal and institutional violence, the Coalition supports member programs in their provision of services to victims of domestic violence by strengthening public policy, coordinating statewide education and training, providing assistance to member programs, and raising public awareness about violence against women." *Id.* at 3. So in this way, the "individual members' interests are largely identical to the organization's goals." *Presedio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1988). Just as the inquiry provision harms individual shelters by making it more difficult for them to create a safe space for domestic-violence victims (and to take measures to ensure the safety of their residents if an abuser shows up with a gun), so too does it harm the Coalition.

In resisting this obvious conclusion, the Attorney General acts as if all that is at stake for the challenge to the inquiry provision is "promot[ing] the free exchange of ideas" unrelated to the shelters' antiviolence mission. Mem. 15. That is profoundly mistaken. Domestic-violence shelters want to ask about the presence of guns on their property for a variety of important reasons. If they know that someone has a gun, they want to be able to ask that person to leave, to persuade them

to give the gun to someone else or to place the gun in a safer location, or to call the police if circumstances warrant (all additional exercises of their First Amendment rights). *See* ECF No. 1, at 20 (recounting recent incident where shelter employee left firearm in the employee's car in view of shelter residents and their children, but the shelter's executive director felt constrained in determining how to respond to the situation because of the Parking Lot Amendments). They also want to be able to take other steps to protect their residents in that scenario, by notifying shelter staff so they can do what is necessary to protect the victims and anyone else who might be vulnerable. *See id.* at 26 (emphasizing the importance of asking about guns on shelter property "as a matter of investigating (as circumstances warrant) particular security threats that regularly occur on members' properties"). And if someone arriving at a shelter doesn't have a firearm, the shelters want to know that too—if for no other reason than to be able to reassure their residents that they are not in the presence of a weapon that could kill them.

In short, "there is little question that the interests that the [Coalition] seeks to protect in this suit are 'germane to the organization's purpose.'" *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 286 (1986) (quoting *Hunt*, 432 U.S. at 343). The Coalition "has demonstrated its obvious interest in representing its members" in challenging this statute. *Ass'n of Am. Physicians & Surgeons*, 627 F.3d at 550 n.2. Indeed, further evidence of the linkage between the statute and the Coalition's purpose can be seen in the fact that the shelters "lobbied hard" against the statute's passage, to no avail. *Brock*, 477 U.S. at 286; *see* ECF No. 1, at 1. And if more were needed, consider that one of the First Amendment claims the Coalition asserts is that the statute (including the inquiry provision) violates its members' *associational rights* by inhibiting the "full implementation" of their policies, which are "integral to creating an environment in which each coalition member can freely associate with abuse victims and their

17

children who need its services and who live within its service area." ECF No. 1, at 27–28. It would be quite surprising, to say the least, if an association of members didn't have standing to bring the members' *freedom-of-association* claim, on the theory that it was not "germane" to their mission. It doesn't get any more germane than that.[2]

## II.   The Coalition's claims are ripe for adjudication.

The Attorney General next challenges the ripeness of the Coalition's claims (at 17–19). This argument is almost entirely dependent on his incorrect belief (at 18) that "there is no credible threat of enforcement." So "[t]his is one of those cases where 'the Article III standing and ripeness issues boil down to the same question.'" *Wollschlaeger*, 848 F.3d at 1304 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) (brackets, quotation marks omitted)). The "conclusion that a reasonable threat of prosecution exists, for purposes of standing, effectively dispenses with any ripeness problem." *Adult Video Ass'n v. Barr*, 960 F.2d 781, 786 (9th Cir. 1992), *vacated*, 509 U.S. 917 (1993), *reinstated in relevant part*, 41 F.3d 503 (9th Cir. 1994); *accord Sullivan v. City of Augusta*, 511 F.3d 16, 31 (1st Cir. 2007).

But even if this Court were to analyze the question anew, the ripeness of the Coalition's claims would still be apparent. "Much like standing, ripeness requirements are also relaxed in First Amendment cases." *Cooksey*, 721 F.3d at 240. "To establish ripeness in a pre-enforcement context,

---

[2] *Taubman Realty Group Limited P'ship v. Mineta*, cited by the Attorney General (at 15), is easily distinguishable. 198 F. Supp. 2d 744 (E.D. Va. 2002), *aff'd* 320 F.3d 475 (4th Cir. 2003). The plaintiff there, a shopping mall, brought an environmental suit and sought to "base its standing upon the rights and interests of patrons in traveling to and from [the] mall." 198 F. Supp. 2d at 760. But the mall was "not a citizens group or an association with a demonstrable interest in, or commitment to, environmental or traffic-related causes or concerns"—if anything, shopping malls *contribute to* pollution and traffic congestion; they don't exist to *eradicate* those problems. *See id.* at 758 ("[The plaintiff] precipitates some of the very environmental and traffic-related impacts on which it seeks to fasten its standing in this action"). The court thus held that this interest, asserted on behalf of mall patrons, wasn't germane to the mall's real mission of economic development.

a party must have concrete plans to engage immediately (or nearly so) in an arguably proscribed activity." *R.I. Ass'n of Realtors*, 199 F.3d at 33. Coalition members plainly have that here. Program B had a strict "no gun" policy before 2018. ECF No. 1, at 18–19. That policy is "now applied only to the interior of the facilities and not to the parking areas. This change has occurred solely due to the enactment of—and fear of enforcement under—the Parking Lot Amendments." *Id.* at 19. "If not for the Parking Lot Amendments, Program B would continue to apply its no-weapons policies to the parking area." *Id.* Program A likewise has "refrained from carrying forward [policies] because it reasonably feared prosecution under [the statute]." *R.I. Ass'n of Realtors*, 199 F.3d at 34. It "thus faced the direct and immediate dilemma" of choosing between non-compliance (thereby creating the risk of future enforcement) and self-censorship (thereby creating a present, ongoing loss of constitutional rights). *Id.* "Because lost opportunities for expression cannot be retrieved, delaying or denying resolution of the issue"—as the Attorney General urges—would "work[] a substantial hardship" to coalition members. *Id.* As a result, balancing "the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration" makes clear that the claims in this case are ripe for resolution. *See Air Evac EMS, Inc. v. Cheatham*, 260 F. Supp. 3d 628, 636–37 (S.D. W. Va. 2017) (quotation marks omitted).[3]

### III.   The Coalition's complaint is fully consistent with Rule 10(b).

Finally, the Attorney General argues (at 19–20) that the complaint violates Rule 10(b), which provides that, "[i]f doing so would promote clarity, each claim founded on a separate

---

[3] The size of the civil penalty does not change that. The prospect of paying $5,000 for every violation, plus costs and attorneys' fees (potentially to both the state and private litigants), is enough to chill the exercise of First Amendment rights. *See, e.g.*, *Mobil Oil*, 940 F.2d at 75; *Vt. Right to Life Comm.*, 221 F.3d at 382 ("[The plaintiff] is at risk of a civil penalty of up to $10,000 for each infraction . . . . That penalty's deterrence of [the plaintiff's] speech is palpable enough.").

transaction or occurrence—and each defense other than a denial—must be stated in a separate count or defense." The Attorney General claims (at 20) that this rule is violated because "Count I fluctuates between challenging the statute's overall specificity and its speech restriction."

The complaint is fully consistent with Rule 10(b). Although the Attorney General suggests (at 20) that he cannot "understand" count one, the complaint is clear. Count one alleges that two provisions of the statute violate coalition members' First Amendment right to free speech: West Virginia Code § 61-7-14(d)(2)(A) and § 61-7-14(d)(2)(C). *See* ECF No. 1, at 25. It further alleges that these provisions are vaguely worded, even specifying the particular terms alleged to be vague, and that this vagueness exacerbates the First Amendment problems by chilling more speech than the provisions may have intended to reach. *See id.* at 26 ("This vagueness chills the coalition members' right to engage in speech protected by the First Amendment."). While one sentence in one paragraph (paragraph 81's use of the phrase "void for vagueness") could conceivably be read in isolation to support a broader vagueness challenge based solely on the Due Process Clause (the subject of count four), the next two sentences make clear that the vagueness assertion is linked to First Amendment concerns. *See id.* ("For example, it is not clear if coalition-member staff may *call the police* if they feel unsafe due to the presence of a firearm in their parking lot. Sections 61-7-14(d)(2)(A) and (C) prohibit and *chill the speech* of coalition members." (emphasis added)). And the rest of the count leaves no doubt that the claim is rooted firmly in the First Amendment. *See, e.g.*, *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 872 (1997) ("[A vague speech restriction] raise[s] special First Amendment concerns because of its obvious chilling effect on free speech.").

## CONCLUSION

The Attorney General's motion to dismiss and motion for a more definite statement should be denied.

Respectfully submitted,

_/s/_ Lucas R. White
J. David Fenwick (W. Va. Bar No. 6029)
Lucas R. White (W. Va. Bar No. 12501)
**GOODWIN & GOODWIN, LLP**
300 Summer Street, Suite 1500
P.O. Box 2107
Charleston, WV 25328
(304) 346-7000
_jdf@goodwingoodwin.com_

Deepak Gupta*
Jonathan E. Taylor*
**GUPTA WESSLER PLLC**
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
_deepak@guptawessler.com_

Eric Tirschwell*
Alla Lefkowitz*
James Miller*
**EVERYTOWN LAW**
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017
(646) 324-8222
_etirschwell@everytown.org_

_Counsel for Plaintiff The West Virginia
Coalition Against Domestic Violence, Inc._

_*Pro hac vice_

September 3, 2019

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2019, I electronically filed the foregoing brief with the Clerk of The United States District Court for the Southern District of West Virginia using the CM/ECF system. All participants are registered CM/ECF users and have been served by the CM/ECF system.

/s/ Lucas R. White
Lucas R. White

*Counsel for Plaintiff The West Virginia Coalition Against Domestic Violence, Inc.*