**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
at Charleston

| | |
|---|---|
| THE WEST VIRGINIA COALITION <br> AGAINST DOMESTIC VIOLENCE, INC., <br><br> *Plaintiff,* <br><br> v. <br><br><br> PATRICK J. MORRISEY, in his official <br> capacity as Attorney General for the <br> State of West Virginia <br><br> *Defendant.* | Case No. 2:19-cv-00434 <br> (Judge John T. Copenhaver, Jr.) |

## DECLARATION OF JOYCE YEDLOSKY

1. I am a Team Coordinator of the West Virginia Coalition Against Domestic Violence (the Coalition), the plaintiff in the above-captioned lawsuit. I have served in this role since 2013. Before moving to this position, I served as the Coalition's Protective Services Coordinator since 1999. I submit this declaration in support of the Coalition's motion for a protective order. I attest to the following matters from a combination of personal knowledge, my review of business records belonging to the Coalition and Coalition member programs, and, as indicated, based on my personal interactions with Coalition member programs during the course of my duties. If called as a witness, I could competently testify to the matters set forth herein.

2. The Coalition is comprised of 14 member programs, each of which is an independent non-profit entity licensed as a domestic violence program by the West Virginia Family Protection Services Board ("FPSB"). Each Coalition member provides a variety of direct services to victims of domestic violence and their children, including case management, advocacy,

1

crisis intervention, referrals, counseling, a 24-hour hotline, safety planning, temporary emergency shelter, and sexual-assault services, among others.

3. One of my responsibilities as a Coalition team coordinator is to help member programs develop and update their policies, procedures, and training materials to reflect best practices and to comply with applicable laws and regulations. For example, I advise Coalition members about legal changes that affect their policies and procedures, provide guidance about model policies, and facilitate the review and discussion of particular programs' policies by Coalition membership. This includes work on policies, procedures, and training relating to the safety and security of their facilities, clients, and staff. It also includes review and discussion of security threats and incidents facing member programs. Due to this work, I am familiar with the variety of approaches, including policies, procedures, and physical security measures, that Coalition members use to protect shelter staff, residents and others. Providing safety to their clients and their clients' children is of paramount importance to all Coalition members.

4. Because Coalition members provide direct services to victims of violence and abuse, they operate in an environment that poses special and significant security concerns. One of the most dangerous times for abuse victims is when they attempt to leave their abusers, and indeed the Coalition's own "Dangerousness Lethality Assessment Guide" identifies a victim's attempt to leave her abuser as an indicator of highly dangerous or potentially lethal behavior on the part of the abuser.

5. Member programs regularly receive threats of violence from abusers. Through discussions at member meetings and conversations with program directors, I have learned that one of the Coalition's member programs has received a firebomb threat. I have also learned that an abuser rammed a victim's car in another shelter's parking lot with his truck. I also learned that at

2

yet another program, an abuser hid near a shelter for several days to monitor how the facility operated before breaking in to assault his victim. I know firsthand and from discussions with Coalition members that multiple programs have had abusers loiter near their properties to intimidate residents. Abusers also sometimes impersonate a victim's family, law enforcement, or even a pizza delivery driver to try to confirm whether their victim is staying at a member program's shelter. They also regularly exploit community resources to try to locate their victim, doing things like filing missing persons reports or asking child protective services to investigate their victim. It is also not uncommon for abusers or their family members to attempt to gain access to program facilities by posing as the victim's family members. In many incidents like the ones described above, abusers appear to have made concerted efforts to exploit perceived vulnerabilities in shelter security, including both physical security measures as well as procedures for accessing the shelter.

6. Because of these ongoing threats to security, Plaintiff's member programs strictly control access to their shelters, do not publicly disseminate shelter addressees, and have implemented a variety of security policies and procedures, and physical security measures to protect their program, staff, clients, and facilities. These include policies concerning firearms, weapons, intake, and shelter access, as well as physical security measures like video surveillance on the interior and/or exterior of the shelter, intercom and monitoring systems, alarms, and double-door entry.

7. In my professional judgment, public disclosure of information concerning the specific security policies and procedures, and physical security measures employed by each member program ("Security Information") would compromise the safety of their staff, clients, and facilities, to the extent such Security Information is identified as pertaining to a particular member program or facility. The ongoing threat posed by abusers and others attempting to gain

unauthorized access to Coalition members' shelters is significantly increased if the abuser has specific knowledge of a particular facility's security practices.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 16, 2019.

Joyce Yedlosky

4