IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| | |
|---|---|
| THE WEST VIRGINIA COALITION AGAINST DOMESTIC VIOLENCE, INC., <br>        Plaintiff, <br><br> v. <br><br> PATRICK J. MORRISEY, in his official capacity as Attorney General for the State of West Virginia, <br>        Defendant. | Civil Action No: 2:19-cv-00434 |

DECLARATION OF ███████████,
EXECUTIVE DIRECTOR OF PROGRAM A

1. I am the Executive Director of ███████████, referred to in this lawsuit as "Program A." Program A is a member program in the West Virginia Coalition Against Domestic Violence (WVCADV). I have worked at Program A for the last two years, becoming the Executive Director this past fall. I have 24 years of experience working with physical, mental, and sexual abuse victims, as well as in substance abuse counseling. I oversee all aspects of Program A's operations, including managing our four outreach offices and shelter, drafting and revising policies and procedures and making sure they are followed, and ensuring the safety and security of all residents and employees, among other duties. This declaration is based on my personal knowledge, and if called as a witness, I could competently testify to the matters described herein.

2. Program A is a private, non-profit entity that provides temporary emergency shelter, counseling, crisis intervention, advocacy and other supportive services for victims, survivors, and witnesses of domestic violence and sexual violence. We run a 36-bed shelter, as

well as several outreach offices. Our shelter has two parking lots that are for Program A's exclusive use: one in the rear of our shelter (which we own) and one in the front of the shelter (which we rent).

3. The cornerstone of Program A's mission is its commitment to the elimination of personal, institutional, and cultural violence against women, children, and men regardless of their race, creed, age, color, national origin, religion, sexual orientation, or disability. Through our professional program and community support, we provide safety to victims of domestic and/or sexual violence, and work to assure and empower families with options for building lives free of violence. A true and correct copy of Program A's mission statement is attached as Exhibit 1.

4. In line with our commitment to eliminating interpersonal violence, Program A's shelter residents are not allowed to have a firearm or other weapon at our shelter. Before the law changed in 2018, Program A had a policy for shelter residents that prohibited all weapons anywhere on its property, including in our shelter's parking lots. This policy was enshrined in posted notices and house rules given to prospective shelter residents at intake. A true and correct copy of an excerpt of the house rules that were in effect at the time the parking lot laws were enacted is attached as Exhibit 2. We also had signs up that said "Weapons, Drugs, and Alcohol are strictly prohibited on this property." A true and correct copy of an image of one of these signs is attached as Exhibit 3.

5. When the law changed in 2018, Program A was forced to change this policy, so that it now prohibits firearms only in our shelter building, but not anywhere else on Program A property. A true and correct copy of an excerpt of Program A's current house rules, reflecting this change, are attached as Exhibit 4.

Program A Decl.

6. As a result of this changed policy, Program A no longer prohibits shelter residents from keeping guns in their cars, even though it wants to for safety reasons. Before this policy change, shelter staff were allowed to ask residents about whether they had a weapon in their car during intake, or if circumstances warranted later on. For example, if a resident said they had a weapon at intake, our staff would either make arrangements to lock it in a lockbox (if it was a knife), or would instruct the resident to give it to a family member or friend to be taken off property (if it was a gun). In the past, Program A has had several clients come onto the property with weapons. After the policy change, staff were instructed that they can no longer ask whether someone has a weapon in their vehicle, or ask them to remove it from shelter property, even if staff know or strongly suspect that the resident has a gun in their car.

7. It is a serious danger to both safety and emotional well-being for shelter residents to have easy access to firearms stored in their cars while they are living at Program A's shelter. Many of the domestic violence victims that our program serves have mental health and substance abuse issues as a result of years of sustained trauma. These residents are used to constant aggression, and to being hurt by their abuser at the drop of a dime. Many are affected by learned behavior from their abusers, and are used to constantly fighting back to protect themselves and their children. For many of our residents, it takes a long time to learn to live without constant confrontation. Allowing these residents to have firearms close at hand would be a serious safety hazard for everyone living and working at Program A's shelter.

8. Firearms are also the source of deep trauma for many of the domestic violence victims that Program A serves, and allowing firearms onto our property risks re-traumatizing them. The majority of our shelter clients have experienced gun violence at the hands of their abusers, some being threatened with a gun, and others being shot or shot at. Many suffer from paranoia

and post-traumatic stress disorder as a result of years of physical and emotional abuse, and can jump at things unpredictably. The main purpose of Program A's shelter—and the first step to healing for our clients—is to create an environment where victims know they are safe. The presence of a firearm creates a possible threat that negates this feeling of safety and makes shelter residents feel the need to constantly be on guard again. It goes against the primary purpose of our program.

9. Recently, one of our shelter residents was triggered by a loud noise caused when a shelter worker dropped something heavy in a closet that backed up to her wall. The resident panicked, came out of her room screaming uncontrollably, and ultimately had to be taken to a local hospital's behavioral health unit. She later told me that when she heard the bang, it transported her back to her closet where she was hiding with her dog while her abuser banged on the windows and tried to get into her house.

10. Allowing shelter residents to keep weapons in their cars also increases the risk that someone like a child—or even an abuser—could access an unsecured gun and use it to hurt themselves or someone else. A victim's vehicle is often shared property with the abuser, and the abuser is likely to have a key. Our shelter regularly deals with abusers coming to our property to stalk, harass, and threaten, and they are our single greatest security threat. Just in the last few months we had someone lurking by the back fence near our rear lot. He ran off when staff went to confront him, but he was almost certainly an abuser. Other times, abusers or their family members have tried to access the shelter by pretending to be someone else—for example, around Christmas 2020 we turned away the sister of an abuser who came to the shelter pretending to be the victim's friend. This type of thing happens several times a year. Sometimes, victims will invite their abuser to the shelter parking lot to talk about potential reconciliation, or to drop

something off, or to pick her up to move out. This happens regularly (even monthly) despite being against shelter rules. Courts have also ordered child custody exchanges to take place in our shelter parking lot, including as recently as last summer. In all of these cases, abusers have come to our property, and we do not want them to have a weapon when they do so. For abusers, violence and the threat of violence is about power and control, and when we take clients into our shelter, we take away this power and this often makes them angry. An abuser with a gun on our property would be an extremely dangerous situation.

11. Program A also changed our firearms policies for employees as a result of the changed law. Before the parking lot law changed, employees were prohibited from having weapons anywhere on Program A property, including in their cars. This was spelled out in our employee handbook at the time the law was enacted, which provided that "Weapons are strictly prohibited on [Program A's] property as well as any location or activity where [program] employees are or may be conducting business. Concealing a weapon or attempting to conceal a weapon on [program] property or any location or activity where [program] employees are or may be conducting business will be cause for immediate termination." A true and correct copy of an excerpt of the employee handbook in effect at the time the parking lot laws were enacted is attached as Exhibit 5. As a result of the change in law, Program A revised its employee handbook to provide only that "Weapons are strictly prohibited in [Program A's] shelter facility." A true and correct copy of an excerpt of Program A's current employee handbook is attached as Exhibit 6.

12. At Program A, we take the safety of our clients and staff extremely seriously. For many of Program A's clients, the choice to leave their abuser and take shelter with us is literally a matter of life and death: some have been brutalized, tortured, and threatened with death or great bodily harm by their abuser. We want to take every reasonable step possible to ensure that these

victims are safe when they are with us, and one of the ways we would do this is by prohibiting guns anywhere on our property. Because of the Parking Lot Laws, Program A is no longer able to use this important tool to keep our clients and staff safe.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on *March 11*, 2021.

███████████

Executive Director, Program A