IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| | |
|---|---|
| THE WEST VIRGINIA COALITION AGAINST DOMESTIC VIOLENCE, INC., <br> Plaintiff, <br><br> v. <br><br> PATRICK J. MORRISEY, in his official capacity as Attorney General for the State of West Virginia, <br> Defendant. | Civil Action No: 2:19-cv-00434 |

DECLARATION OF ▓▓▓▓,
EXECUTIVE DIRECTOR OF PROGRAM B

1. I am the Executive Director of ▓▓▓▓, referred to in this lawsuit as "Program B." Program B is a member program in the West Virginia Coalition Against Domestic Violence (WVCADV). I have worked at Program B for more than 20 years, starting as an intern in college, then as a case manager and nighttime advocate at the program's visitation and exchange center, and now coming up on my ninth year as Executive Director. I am certified as a domestic violence advocate by WVCADV, and have served as a member and chairperson of the West Virginia Family Protection Services Board, which licenses domestic violence programs in the state. As Program B's Executive Director, I manage outreach offices, visitation and exchange centers, and a shelter for an eight county area, develop and oversee all program finances, facilitate educational offerings, represent Program B in public relations and in partnerships with community organizations and government agencies, review and revise program policies and procedures, and manage and evaluate program staff. I make this declaration based on my own personal knowledge, and could competently testify to these matters if called as a witness.

1

Program B Decl.

2. Program B is a non-profit domestic violence and rape crisis program covering an eight county catchment area in West Virginia. We operate a 15-bed shelter, seven outreach offices, and four visitation and exchange centers. Our program provides victims of domestic and sexual violence with crisis intervention, peer counseling, information and referral, legal advocacy, emotional support, case management, transportation, and group therapy, among other services. Although the needs fluctuate from year-to-year (and during the current pandemic), in a given calendar year Program B provides more than 9,000 hours of services to over 2,000 separate clients, and provides more than 4,000 shelter nights to clients requiring emergency housing.

3. Program B leases its shelter property, which includes a large parking area in front of the shelter building that our clients and staff use. At least four of our outreach offices also control the parking lots outside their offices, and one of our visitation and exchange centers shares a parking lot with neighboring businesses. At this visitation and exchange center, Program B employs an off-duty police officer to enforce program rules in the parking lot as necessary (for example, to escort a non-custodial parent off the property, or to ensure that non-custodial parents do not loiter outside of permitted visitation times).

4. Program B's mission and purpose is to advocate and support social change that will result in non-violent relationships, homes, and communities. We strive for a world where everyone has the support and the right to live a safe life free of sexual and domestic violence. Our programs and services fulfill this purpose by protecting victims, preventing violence, and empowering survivors of domestic violence. A true and correct copy of Program B's Statement of Purpose is attached as Exhibit 1.

5. To protect victims and survivors of domestic and sexual violence, and to prevent violence at its program locations, Program B prohibits firearms on its property. Our shelter

policies for residential clients state that "[t]he following shall not be permitted on the premises of [Program B]: violence, the use of alcohol, drugs (except by prescription), or weapons." Our employee policy provides in relevant part that "employees shall be prohibited from carrying or bringing any weapon to the workplace" and that "[r]egardless of whether an employee possesses a concealed weapons permit (CWP), employees are prohibited from carrying or bringing any weapon to the work site or any [Program B] property." True and correct copies of Program B's Shelter Policies and Policy Prohibiting Weapons in the Workplace are attached as Exhibits 2 and 3, respectively.

6. Our shelter also has a sign on the front of the building, facing the parking lot, which depicts a gun and a knife with a circle and slash through them, and the words "NO WEAPONS ON PROPERTY."

7. Before the law changed, Program B interpreted its weapons policies to apply to all areas of our property, including parking lots. Since the law changed, we have changed how we interpret and apply the policies so that they now prohibit firearms only within Program B's buildings, but not in our parking lots. We have also begun the process of revising the text of each policy to more clearly reflect this new interpretation that the law now requires. That said, Program B does not want to change our policies; we want to return to our original policies that prohibited staff and clients from possessing firearms anywhere on Program B property. If the law allowed us to go back to these policies, we would do so.

8. Program B recently had an occasion where the new law forced us to allow a gun on our property where our old policy would have let us prohibit it. Shortly after the law changed, an employee brought a semiautomatic handgun to work at our shelter and left it on the front seat of their car, visible to anyone passing by. I know this because I saw it when I parked my own car in

the shelter lot that morning and walked by the employee's car on my way into the building. I was alarmed. An unsecured gun was a serious safety hazard for people living and working at our shelter, because the gun could easily have been seen—and potentially taken—by anybody passing by, including shelter residents and their kids, people coming or going to neighboring businesses, or even abusers coming to the property.

9. Because of the new parking lot law, I felt constrained in what I could ask the employee about the gun, what I could instruct them to do with it, or how I could do follow-up investigation to make sure that the hazard was properly addressed. I wanted to ask the employee to remove the gun from Program B's property by taking it home, and would have done so under our old policy. But because of the new law, I wasn't sure whether this was allowed and so instead asked the employee to lock the gun in their car but did not instruct them to remove it from the property. I believe the employee complied, but was not sure what the new law permitted me to do to confirm this. If I had been allowed to, I would have looked through the windows of the car to see if the gun had been removed from sight, would have checked that the car was in fact locked, and would have asked the employee what they had done to secure the gun and make sure that it could not be accessed by shelter residents, kids, or passersby. Because of the new law, though, I could do none of these things to protect the people that live and work at Program B's shelter.

10. Guns kept in cars in our shelter's parking lot are a serious danger for several reasons. First, kids staying at Program B's shelter could find them. It makes me sick to my stomach to think what could have happened if a child had spotted the gun in our employee's car, instead of me. While our shelter has a fenced play area in the back, the fire code requires our doors to be push-to-open from the inside, and kids regularly get outside unsupervised because they're upset at a parent or just because they want to go out and play. Plus, school busses and public

Program B Decl.

transit busses pick up in front of our shelter, and kids are often waiting out by the parking area for a ride to school, or in to town.

11.  Abusers are another serious risk, especially if they were to find a gun in a car in our lot. Our shelter parking is easily visible from the road, and abusers sometimes exploit this to look for victims' vehicles. We recently had an abuser take the license plates off his victim's car while in our lot, to harass her and make her get pulled over. Other times, abusers have tried to get into our shelter; in recent memory an abuser even got into the shelter's main entryway by posing as a victim's family member. We've also had occasional instances where shelter residents have invited their abuser to the shelter in violation of program rules, for example to pick them up or to reconcile. We take the threat from abusers very seriously, to the point where Program B installed bullet resistant glass on the windows of our shelter that face the parking lot and road.

12.  An abuser with a weapon in their car would also be a serious security risk at our child visitation and exchange programs, where non-custodial parents engage in court-ordered supervised visitation with their minor children. On at least a monthly basis, our staff faces situations where non-custodial parents have violated program rules and have to be escorted off the premises—for example, because they have behaved inappropriately during visitation, or because they have come outside of appointed times and overlapped with a custodial parent (who may have an order or protection against them). These incidents often become heated, to the point where we hire an off duty police officer to handle security at our primary center, and frequently call local police for assistance when a non-custodial parent becomes threatening or refuses to leave. If such a person were allowed to have a gun in their car, the danger they would pose to the children, custodial parents, and staff at our visitation and exchange center is obvious. In 2018, there was a

Program B Decl.

high profile murder-suicide in Craigsville, WV, where a man shot his son-in-law during a child exchange at a gas station.

13. Finally, even though Program B's shelter is off the beaten path, we still get a lot of foot traffic in front of the building and through our parking area, and we do not want members of the public to see a firearm in someone's car either. We are located near a residential drug treatment program, and sometimes people who have been discharged from the program (or refused treatment) hang out in our lot for lack of somewhere else to go. We've also begun to see an increase in the local homeless population going through our parking lot, as there is an encampment off our property in the wooded area behind our shelter. Shelter staff have had to call the police multiple times in recent memory due to strangers loitering on or near our shelter. A gun in a car would make a tempting target for theft, and put everyone nearby in danger.

14. Although it is thankfully rare, our shelter staff do occasionally find weapons and other contraband during the intake process, or later when they suspect and are investigating a possible issue. The change in the law concerning guns in parking lots makes it harder for Program B's staff to know what they can and cannot ask when investigating whether a shelter resident has a weapon on our property. When reviewing shelter policies with incoming residents, shelter staff will typically ask whether a prospective resident has brought a weapon or prescription medication to the shelter, and if necessary will ask follow-up question to figure out what it is and where it is being kept. In the past year, our shelter staff discovered a large switchblade knife this way, as well as a dummy gun (which looked real, but was thankfully not functional). We've had at least one real gun turned in during intake in my recollection, though it was before the parking lot law changed. Prescription medication is also a hazard that we ask about—in fact, our license requires that we secure all prescription medications in a double-locked cabinet. It makes little sense to me

Program B Decl.

that our staff can ask about, investigate, and secure our residents' switchblade knives and prescription medications, but cannot do the same for a firearm.

15. The clients that Program B serves—and in particular, the families who come to live in our temporary shelter—have made the wrenching and difficult choice to leave an abusive relationship and start over in a violence-free environment. They are often trading a terrible but known situation for an unknown one, and living in a communal shelter that may be far from their family, friends, job, and school. As the Executive Director of Program B, it falls on my shoulders to make sure that that our program is a safe haven for these clients, and they know that by walking through our doors they will be safe here, their children will be safe here, and that they won't face being threatened here. Life is precious, and we want to be proactive and do everything that we can to protect people who have come to Program B for help. By forcing Program B to allow guns—even if just in the parking lot—the law has stripped Program B of one of the tools that we use to keep violence and the threat of violence off of our property.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 10, 2021.



Executive Director, Program B

Program B Decl.