IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| | |
|---|---|
| THE WEST VIRGINIA COALITION<br>AGAINST DOMESTIC VIOLENCE, INC.,<br>    Plaintiff,<br><br>v.<br><br>PATRICK J. MORRISEY, in his official<br>capacity as Attorney General for the<br>State of West Virginia,<br>    Defendant. | Civil Action No: 2:19-cv-00434 |

DECLARATION OF ███████,
EXECUTIVE DIRECTOR OF PROGRAM C

1. I am the Executive Director of ████████████████████████ ██████, referred to in this lawsuit as "Program C." Program C is a member program in the West Virginia Coalition Against Domestic Violence (WVCADV). I have worked at Program C since 2012, and have been its Executive Director since 2017. As Executive Director of Program C, I oversee all aspects of our shelter, maintain our program and facility licenses and compliance, write and oversee our grant funding, develop programming, manage staff, develop and conduct our training programs, and provide technical assistance to other stakeholders on domestic violence, sexual violence, and human trafficking, among other duties. This declaration is based on my personal knowledge, and if called as a witness, I could competently testify to the matters set forth herein.

2. Program C is a non-profit, community-based agency that operates a 16-bed shelter and three outreach offices in West Virginia. Our program provides victims of domestic violence, sexual violence, stalking, and human trafficking a variety of services including comprehensive

1

Program C Decl.

case management, safety planning, emergency shelter, individual counseling, support groups, legal advocacy, assistance obtaining domestic violence protection and personal safety orders, accompaniment to court hearings and medical appointments, and help accessing housing, employment, and other services.

3. Program C owns its shelter building and maintains and controls the adjacent parking lot, which is mainly used by shelter residents. Shelter staff regularly shovels snow from this parking lot, and tells people to leave the parking lot if they are not permitted to be there.

4. As reflected by our vision statement, Program C was founded on the belief that every person has the right to be safe, empowered, and free from violence and the fear of violence. Program C's mission is to protect victims, prevent violence and empower survivors of domestic violence, sexual assault, stalking, and human trafficking. We do this by providing victims and survivors the resources necessary to effectively cope with the personal, social, emotional, and legal ramifications of victimization. A true and correct copy of Program C's vision, mission statement, strategic goals, and diversity values statement are attached as Exhibit 1.

5. Firearms pose a particular danger to the safety of domestic-violence victims and the programs that shelter and serve them. I have witnessed victims be deterred from seeking services at Program C because of firearm-related threats that their abusers have made to them and to our staff. In a recent example, a client's abuser threatened to shoot up our outreach offices if he was not told where his victim was. He often drove by the outreach office, which was terrifying to his victim because she knew that he kept a firearm in his glove compartment. In another recent example, an abuser who was in jail for pulling a gun on his victim during a domestic violence assault plotted with his cellmate to get friends to harass his victim. The friends did this by leaving threatening notes and bullets on her porch, and on one occasion by texting the victim that when

Program C Decl.

she left Program C's outreach office, he was going to "light [her] up"—meaning, shoot her. In response, our staff had to hustle her out the back door to conceal her exit. To this day, neither victim has returned to our offices for services, out of fear for their personal safety and out of a desire not to endanger Program C's staff.

6. To protect the safety of our clients and staff, Program C does not permit clients to bring weapons of any kind (including firearms) onto shelter property. Every incoming shelter resident is given a shelter participant handbook during intake that explains that residents have a right to a weapon-free environment and have the responsibility not to bring weapons onto shelter property. A true and correct copy of an excerpt of Program C's Shelter Participant Handbook is attached as Exhibit 2.

7. At intake, our staff also ask every incoming shelter resident whether they have a weapon—of any kind—with them, in their belongings, or in their car. This is a basic safety precaution we take in order to protect our shelter's residents and staff. We do the same thing for other contraband like prescription medications: we ask about these to make sure they are properly stored under lock and key.

8. Around once or twice a year, our staff learn that a client has a weapon on shelter property. Sometimes, that weapon is a firearm; other times it is a knife. Shelter staff recently came to suspect that a resident had a knife in the shelter. They asked her about the weapon, and she confirmed that she had an eight to ten inch serrated hunting knife in her purse, at which point they told her to take it off property and give it to a friend.

9. The Parking Lot Amendments have left Program C unsure of whether we can follow-up about a gun in a resident's car the way we can about knives, pepper spray, and prescriptions. When our staff has had to deal with residents potentially having firearms in the past,

they could ask questions to find out whether there was really a gun in someone's car, and then could ask them to immediately take it off property, just as they could for a knife. But if this were to happen again tomorrow, it is not clear whether our staff could do either of these things without risking liability, even though Program C wants to take these steps in order to keep our shelter safe.

10. Program C staff, volunteers, and interns are also prohibited from bringing weapons of any kind onto Program C property. This policy is set forth in our Policy and Procedure Manual; excerpts of the current Policy and Procedure Manual are attached as Exhibit 3. The policy manual explains that firearms and weapons are prohibited on Program C property, and that staff who possess a firearm or other weapon on Program C property can face discipline up to and including termination of employment.

11. Program C's shelter and the outreach offices have signs on their outsides that read "No firearms or weapons allowed on this property." At the shelter, one of these signs faces the shelter parking area, so that people parking in our lot know that firearms are prohibited there.

12. It is common for victims of domestic violence to want to arm themselves based on an imagined belief that this will help them protect themselves. In reality though, allowing firearms anywhere on Program C property creates a serious safety risk for all of our residents and staff. Unfortunately, I have never heard of a victim successfully defending themselves with a firearm. It is much more likely that an abuser will take the firearm from the victim and use it to hurt them or others nearby. This is especially true for weapons kept in a victim's car, which abusers often have the keys to because they are shared property. Keeping firearms off our property is one of the ways we protect our shelter from violence by abusers. It also protects the children who live at our shelter as well, by keeping them from finding an unsecured gun by accident in a parent's car.

4

13. Many victims of domestic violence have never felt safe in their lives, and their behavior in response to trauma and stress can be erratic and unpredictable. Living in a communal environment is stressful, and altercations between residents—or between residents and staff—are a fact of life. If a weapon is readily accessible, a minor incident can escalate into a serious danger in a heartbeat. To mitigate the risk of lethal violence, Program C does not allow firearms or weapons on its property, because it only takes one time for something horrible to happen, and it would be a disservice to the population that Program C serves if the organization did not do everything in its power to prevent that.

14. In addition, the presence of firearms would prevent Program C from creating the safe environment that we promise clients as part of our mission. Whether it's providing a safe place to live temporarily, or just an environment where clients feel secure enough to receive counseling, the core of Program C's mission is to provide a safe space for victims. Creating a safe space allows victims to open up to our trained staff and tell us what they really need from us. If we cannot provide a place where our clients feel both physically and emotionally secure, it is all but impossible for our program to provide them effective services. Navigating the difficulties of providing services during the current pandemic has highlighted the importance of having a physical safe space where clients do not have to worry about their abuser having access to them.

15. The Parking Lot Amendments interfere with Program C's ability to create a safe space for victims of domestic violence. It is not safe to have clients who have been affected by gun violence in an environment where firearms may be present. The change in the law means that Program C's staff must choose between doing their jobs safely and effectively, or putting our clients and staff in danger to avoid potential liability.

Program C Decl.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 5, 2021.

[signature redacted]

Executive Director, Program C

Program C Decl.