IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

| | |
|---|---|
| THE WEST VIRGINIA COALITION AGAINST DOMESTIC VIOLENCE, INC., <br> Plaintiff, <br><br> v. <br><br> PATRICK J. MORRISEY, in his official capacity as Attorney General for the State of West Virginia, <br> Defendant. | Civil Action No: 2:19-cv-00434 |

DECLARATION OF TONIA THOMAS

1. I am one of two Team Coordinators of the West Virginia Coalition Against Domestic Violence (the Coalition), a position I have held since 2004. Before that I worked for the West Virginia Division of Justice and Community Services for ten years as the grant manager for Victims of Crimes Act (VOCA) and Violence Against Women Act funding. During that time, I was also appointed to the West Virginia Family Protection Services Board (FPSB), which is the state's licensing board for domestic violence programs. I served on the FPSB for three years, including time spent as chairperson. I attest to the following matters from personal knowledge and based on more than 26 years of experience in domestic violence program administration and development. If called as a witness, I could competently testify to the matters set forth herein.

2. The Coalition has 14 member programs, each of which is an independent non-profit domestic-violence program that runs one or more licensed shelters where victims and survivors of domestic violence can reside on a temporary basis. Member programs also run outreach offices that provide services that include case management, advocacy services, crisis intervention,

1

referrals, a 24-hour hotline, safety planning, and sexual-assault services, among others. Six member programs operate visitation and exchange centers where estranged parents can have supervised visitation with their minor children.

  3.  The Coalition helps member programs serve victims and survivors of domestic violence by acting as a statewide hub and clearinghouse for resources and information for domestic violence programs and the professionals, organizations, and communities that they work with. We provide training and technical assistance, raise awareness and educate the public and government stakeholders, and advocate for strengthening public policy on behalf of 14 licensed domestic violence programs and the victims and survivors they serve. The Coalition was founded on the vision that every person has the right to be safe, empowered, and free from violence and the fear of violence, and a key aspect of our mission is to end personal and institutional violence in the lives of people of all genders and ages. A true and correct copy of the Coalition's mission statement and principles of unity are attached as Exhibit 1.

  4.  As a team coordinator, I am involved in every facet of the Coalition's work. My duties include raising public awareness about the prevalence and prevention of abuse and violence in intimate relationships, training professionals in their response to domestic violence, providing technical assistance to licensed domestic violence programs, and expanding leadership capacity within the statewide coalition. I am contacted regularly by member programs to assist them in dealing with situations that arise in their programs that could potentially endanger the safety of their residents, children, and staff.

  5.  Firearms pose a particular danger to the safety of victims and survivors of domestic-violence, and the programs that shelter and serve them. The Coalition compiles an annual report of domestic-violence-related deaths in West Virginia that highlights this danger: there were at

least 19 domestic-violence deaths in the year leading up to September 2020, and a firearm was used in more than 60% of these deaths. The year before (ending September 2019) saw at least 31 domestic-violence-related deaths, with 80% involving firearms as the means of death. True and correct copies of West Virginia Domestic Violence Related Deaths Reports for 2016 through 2020 are attached as Exhibits 2, 3, 4, and 5.

6. Perpetrators use firearms not only to kill and injure their victims, but also to threaten, intimidate, and control them. Research shows that a perpetrator's access to a firearm increases the risk of homicide for his female intimate partner by at least five-fold. True and correct copies of this research is attached as Exhibit 6. Because of this, the Coalition and its member programs treat a perpetrator's access to firearms as one of the leading risk factors for lethal violence.

7. This risk of lethal violence increases further when a victim or survivor tries to leave their perpetrator and seek shelter or advocacy services at a domestic-violence program. This is one of the reasons why guns pose a greater danger for domestic violence shelters than coffee shops and other businesses: people come to shelters as a last-ditch effort to escape violence and abuse that makes them scared for their lives. And unlike coffee or other things you buy at a store, the shelters' services help victims and survivors escape the perpetrator's control—something that perpetrators see as undermining and threatening. Perpetrators often escalate their violence when their partner leaves in order to coerce a reconciliation or to retaliate for perceived rejection. Research has consistently shown that separation or threatened separation are a significant risk factor for intimate partner violence, including intimate partner homicide. An example of this research, collecting and synthesizing prior studies, is attached as Exhibit 7.

8.      For a fleeing victim or survivor, parking lots pose a particular danger because perpetrators will often exploit their victim's travel patterns to stalk, terrorize, or confront their victim at locations he or she frequents.  In West Virginia, this problem is particularly acute because the widespread lack of public transportation means that a car—often one shared with a perpetrator—is many victim's or survivor's only means of escape.  In a 2012 study of workplace violence co-authored by the National Institute for Occupational Safety and Health and West Virginia University, researchers found that nearly three in ten intimate partner workplace homicides nationwide occur in parking lots or garages, with another quarter occurring in schools, offices, or other public buildings.  A true and correct copy of this research is attached as Exhibit 8.

9.      To mitigate the risk of lethal violence, member programs undertake individualized safety planning with each new client during intake.  Safety planning includes a research-based lethality assessment to identify risks of violence and develop strategies to reduce a victim's or survivor's exposure.  Among other things, advocates are trained to ask about a perpetrator's history of violence and access to firearms, as these are primary risk factors.

10.     The Parking Lot Amendments interfere with safety planning by prohibiting member programs from asking clients important questions concerning firearms access.  While each Coalition member program has their own intake procedures for their shelter(s), all of them have policies that prohibit weapons (including firearms) on shelter premises and all of them review these policies with new residents at intake in accordance with FPSB requirements.  It is relatively common for abuse victims to remove firearms from their perpetrator's home and take them when they leave.  Before the Parking Lot Amendments, advocates encountering this scenario during safety planning would be expected to ask follow-up questions like where the guns are currently,

whether the victim is storing them in her car on shelter property, if so how they are secured, and whether anyone else (like a child or the perpetrator) has a key and could access them. Before the Parking Lot Amendments, some member programs prohibited weapons on shelter property outright for safety reasons, and would require that they be removed from any car parked in the shelter's lot. Now, these programs are forced to choose between compliance with the law and asking the questions necessary to adequately protect their clients and staff.

11. The Parking Lot Amendments also prevent member programs from investigating and addressing other firearms risks on their property. Member programs regularly encounter perpetrators who attempt to access shelter property under false pretenses by posing, for example, as a delivery person or as a family member of a victim or survivor. These perpetrators' status as trespassers is often unclear, and the Parking Lot Amendments curtail member programs' discretion to investigate whether these individuals are armed, or to impose a blanket policy prohibiting firearms as a backstop.

12. In addition, six member programs serve estranged parents at their visitation and exchange centers, meaning that the Parking Lot Amendments now require these programs to permit estranged parents to bring firearms into close proximity with minor children and custodial parents against whom they may have a significant history of abuse.

13. The Parking Lot Amendments also harm member programs by interfering with their ability to deliver advocacy services and other assistance to survivors of abuse in an environment that is free from violence, including the threat of firearm violence. Many victims and survivors in West Virginia have fled perpetrators who use firearms as a means to threaten and terrorize them, if not worse. In accordance with their overlapping missions to provide a haven from violence, the Coalition and its member programs strive to offer survivors an environment where they will not

5

be re-traumatized by the presence of weapons, including firearms. Victims and survivors fleeing abuse are at an intensely vulnerable moment in their lives, and they arrive with an expectation of safety—indeed, many seek shelter for precisely this purpose. The Parking Lot Amendments prevent member programs from creating this environment, by prohibiting them from removing firearms from areas proximate to where survivors live and receive services.

14. For the above reasons, the Parking Lot Amendments interfere with Coalition members' efforts to provide a safe environment to victims of domestic violence, and to protect their clients and staff from the threat of gun violence while they are on shelter property.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  March 4 , 2021.

*Tonia Thomas*

Tonia Thomas

Team Coordinator
West Virginia Coalition Against
Domestic Violence