**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

| | |
|---|---|
| THE WEST VIRGINIA COALITION AGAINST DOMESTIC VIOLENCE, INC., | |
| *Plaintiff,* | |
| v. | Civil Action No. 2:19-cv-00434 (Judge John T. Copenhaver, Jr.) |
| PATRICK J. MORRISEY, in his official capacity as Attorney General for the State of West Virginia, | |
| *Defendant.* | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

Eric Tirschwell*
Alla Lefkowitz*
James Miller*
**EVERYTOWN LAW**
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017
(646) 324-8222
*etirschwell@everytown.org*

J. David Fenwick
Lucas R. White
**GOODWIN & GOODWIN, LLP**
300 Summer Street, Suite 1500
P.O. Box 2107
Charleston, WV 25328
(304) 346-7000
*jdf@goodwingoodwin.com*

Deepak Gupta*
Jonathan E. Taylor*
**GUPTA WESSLER PLLC**
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

Neil K. Sawhney*
**GUPTA WESSLER PLLC**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*neil@guptawessler.com*

*Counsel for Plaintiff*

*Pro hac vice

March 15, 2021

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................ ii

Introduction ..........................................................................................................................1

Factual Background ..............................................................................................................2

    1.    Coalition Members are dedicated to providing critical services to domestic-violence survivors and to creating safe and secure environments for them..............................................................................................................2

    2.    Coalition Members, their residents, and their staff face significant and unique risks of violence from firearms....................................................................3

    3.    To prevent violence and other harms, Coalition Members have long had policies restricting firearms on shelter property, including in parking lots. ............7

    4.    The Parking Lot Amendments force Coalition Members to allow firearms on their property, endangering survivors' and shelter staff's safety and security...............................................................................................................8

Argument ..............................................................................................................................9

    I.    The Parking Lot Amendments violate Coalition Members' free-speech rights. ..........................................................................................................9

        A.    Because the inquiry and take-no-action provisions are content-based and speaker-based restrictions on speech, they are subject to strict scrutiny....................................................................................10

        B.    These provisions fail strict scrutiny........................................................12

    II.    The Parking Lot Amendments violate Coalition Members' First Amendment right of free association....................................................................16

    III.    The Parking Lot Amendments violate Coalition Members' fundamental rights to ensure their own personal safety (and that of their guests) on their own property. ............................................................................................18

    IV.    The Parking Lot Amendments are unconstitutionally vague.................................22

Conclusion .........................................................................................................................25

i

# TABLE OF AUTHORITIES

**Cases**

*American Association of Political Consultants, Inc. v. FCC,*
    923 F.3d 159 (4th Cir. 2019) ................................................................... 10, 12, 15

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000) ................................................................................. 16, 17

*Century Radio Co. Inc. v. City of Norfolk,*
    811 F.3d 625 (4th Cir. 2016) ................................................................... 14

*De Jonge v. State of Oregon,*
    299 U.S. 353 (1937) ................................................................................. 21

*Estate of Rosenbaum by Plotkin v. New York,*
    975 F. Supp. 206 (E.D.N.Y. 1997) .......................................................... 21

*Fusaro v. Cogan,*
    930 F.3d 241 (4th Cir. 2019) ................................................................... 11

*GeorgiaCarry.Org, Inc. v. Georgia,*
    687 F.3d 1244 (11th Cir. 2012) ............................................................... 14, 20, 22

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ................................................................................. 22

*Harbolt v. Steel of West Virginia, Inc.,*
    640 F. Supp. 2d 803 (S.D.W. Va. 2009) ................................................. 23

*Hawkins v. Freeman,*
    195 F.3d 732 (4th Cir. 1999) ................................................................... 19, 21

*Hill v. Colorado,*
    530 U.S. 703 (2000) ................................................................................. 22, 23, 24

*Hoven v. Walgreen Co.,*
    751 F.3d 778 (6th Cir. 2014) ................................................................... 13

*In re Murphy-Brown, LLC,*
    907 F.3d 788 (4th Cir. 2018) ................................................................... 23

*Ingraham v. Wright,*
    430 U.S. 651 (1977) ................................................................................. 19

*Kallstrom v. City of Columbus,*
    136 F.3d 1055 (6th Cir. 1998) ................................................................. 21

*Kennedy v. Ridgefield*,
    439 F.3d 1055 (9th Cir. 2006)...................................................................19

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ...................................................................15

*Lambert v. Hartman*,
    517 F.3d 433 (6th Cir. 2008) ...................................................................19

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982) .................................................................................20

*Meyer v. Nebraska*,
    262 U.S. 390 (1923) .................................................................................19

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) ...........................................................................16, 18

*National Institute of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018).............................................................................12

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) ...................................................................13

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) .................................................................15

*Ramsey Winch v. Henry*,
    555 F.3d 1199 (10th Cir. 2009)...............................................................22

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .....................................................................10, 12, 15

*Reno v. American Civil Liberties Union*,
    521 U.S. 844 (1997) .................................................................................23

*Republican Party of Minnesota v. White*,
    536 U.S. 765 (2002) .................................................................................15

*Robinson v. Lioi*,
    536 F. App'x 340 (4th Cir. 2013)............................................................21

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ...................................................................................18

*Thomas v. Bright*,
    937 F.3d 721 (6th Cir. 2019)....................................................................12

*Turner Broadcasting System, Inc. v. FCC*,
   512 U.S. 622 (1994) ..............................................................................12

*United States v. Class*,
   930 F.3d 460 (D.C. Cir. 2019) ...............................................13, 18, 20

*United States v. Masciandaro*,
   638 F.3d 458 (4th Cir. 2011) ................................................................14

*United States v. Miselis*,
   972 F.3d 518 (4th Cir. 2020) ...........................................................23, 24

*Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ..............................................................................23

*Washington Post v. McManus*,
   944 F.3d 506 (4th Cir. 2019) ................................................................10

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ..............................................................................19

*White v. Napoleon*,
   897 F.2d 103 (3d Cir. 1990) ..................................................................19

*Wollschlaeger v. Governor, Florida*,
   848 F.3d 1293 (11th Cir. 2017) ......................................................*passim*

**Statutes**

U.S. Const. amend. I .....................................................................................20

W. Va. Code § 61-7-14(d)(1) ....................................................................8, 24

W. VA. Code § 61-7-14(d)(2) ...........................................................11, 22, 23

W. Va. Code § 61-7-14(d)(2)(A) ...............................................................8, 10

W. Va. Code § 61-7-14(d)(2)(C) ...........................................................*passim*

W. Va. Code § 61-7-14(d)(3)(B) ......................................................................8

W. Va. Code § 61-7-14(d)(4) ...........................................................................8

W. Va. Code § 61-7-14(f) .................................................................................9

W. Va. Code R. § 191-2-3.1.a ..........................................................................6

**Other Authorities**

William Blackstone,
  *Commentaries on the Laws of England* ................................................................. 19

Joseph Blocher,
  *The Right Not to Keep or Bear Arms*, 64 Stan. L. Rev. 1 (2012) ........................... 14

Cody J. Jacobs,
  *The Second Amendment and Private Law*, 90 S. Cal. L. Rev. 945 (2017) ........................... 14

John Locke,
  *Two Treatises on Government* (1821) ..................................................................... 20

2 Frederick Pollock & Frederic William Maitland,
  *The History of English Law* (2d ed. 1899) ........................................................... 20

William Tudor,
  *Life of James Otis* (1823) ................................................................................. 20

Michael Virtanen,
  *West Virginia House backs employee guns in locked cars*, Assoc. Press (Feb. 27,
  2018), https://perma.cc/2BSK-AE87 ..................................................................... 13

Eugene Volokh,
  *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical
  Framework and a Research Agenda*,
  56 UCLA L. Rev. 1443 (2009) ............................................................................. 13

## INTRODUCTION

Every day in West Virginia, domestic-violence shelters strive to provide a safe haven for women, men, and children fleeing violence and abuse. To achieve their mission, shelters need to be able to create an environment in which survivors are free from physical harm and psychological or emotional trauma. Yet shelters must contend with unique and severe safety risks: abusers who stalk and harass their victims even on shelter property; potential violence between residents suffering from mental-health and substance-abuse issues; accidents involving children who play outside. Weapons—and firearms in particular—exacerbate all these risks. For this reason, shelters throughout the state have long adopted policies prohibiting firearms on their property, including their parking lots. And they have implemented a number of other measures—house rules for residents, individualized safety assessments and intake procedures, employee handbooks—to reduce the dangers of gun-related violence and trauma.

But now, these policies—so integral to the shelters' mission—have been severely undermined. In 2018, the state legislature passed a sweeping statute forcing shelters and other property owners to allow employees and visitors to bring firearms onto their parking lots. And not just that: The law goes further and prevents shelters from even *asking questions* about the presence of guns in cars on their property, and bars them from taking "*any* action"—whatever that might mean—based on such information. As one shelter director said, the law has simply "stripped" shelters of their ability to establish "a safe haven for the[ir] clients." Program B Decl. ¶ 15.

The law sharply interferes with the shelters' constitutional rights. It violates their First Amendment rights to free speech and to freely associate. It violates their fundamental right to protect their own safety (and the safety of their guests) on their private property. And it fails to provide them with adequate notice as to what conduct it actually prohibits, in violation of due process. The Court, therefore, should grant the shelters summary judgment on all of their claims.

1

## FACTUAL BACKGROUND

1.   **Coalition Members are dedicated to providing critical services to domestic-violence survivors and to creating safe and secure environments for them.**

The West Virginia Coalition Against Domestic Violence represents a statewide network of community-based domestic-violence programs with a mission "to end personal and institutional violence in the lives of people of all genders and ages." Thomas Decl. ¶ 3. The Coalition has 14 member programs, each of which runs one or more licensed shelters where domestic-violence victims and survivors can reside temporarily. *Id.* at ¶ 2. In addition, these programs run outreach offices that provide services including case management, advocacy services, crisis intervention, a 24-hour hotline, safety planning, and sexual-assault services, among others. *Id.* Some programs also operate visitation and exchange centers where estranged parents can have supervised visitation with their minor children. *Id.*; Stip. Facts (Dkt. 34) ¶¶ 2–6. Coalition Members own, lease, or are charged with the care, custody, and control over parking lots. *Id.* at ¶ 7.

Central to the Coalition's "vision" is the principle "that every person has the right to be safe, empowered, and free from violence and the fear of violence." Thomas Decl. ¶ 3; *see* Stip. Facts ¶¶ 10–11. Coalition Members share this vision. *Id.* ¶¶ 22–23. As one shelter director explains, "[m]any victims of domestic violence have never felt safe in their lives." Program C Decl. ¶ 13. Thus, the core mission of all the programs "is to provide a safe space for victims," which allows them "to open up to our trained staff and tell us what they really need from us." *Id.* ¶ 14; *see, e.g.*, Program A Decl. ¶¶ 3, 11; Program D Decl.¶¶ 4, 6, 10. As part of their mission to create a "haven from violence," the Coalition and its members "strive to offer survivors an environment where they will not be re-traumatized by the presence of weapons, including firearms." Thomas Decl. ¶ 13; *see* Program A Decl. ¶ 8; Program D Decl.¶ 10; Program C Decl. ¶¶ 4, 14.

**2.      Coalition Members, their residents, and their staff face significant and unique risks of violence from firearms.**

Because of the services they provide and the populations they serve, Coalition Members have enhanced security and safety concerns. Stip. Facts ¶ 19. All evidence indicates that firearms greatly increase these dangers—to survivors and their children, to shelter staff, and to other guests and visitors. As the former Deputy Superintendent of the West Virginia State Police explained, "[d]omestic violence programs that house and serve victims . . . face an increased risk of serious and potentially lethal violence if they permit these persons to have ready access to a firearm while on shelter property." Bradley Decl. ¶ 6; *see* Stip. Facts ¶¶ 17–18. And the empirical data reinforces why firearms are such a concern to shelter residents: The vast majority of domestic-violence deaths in West Virginia involve firearms, and research shows that "a perpetrator's access to a firearm increases the risk of homicide for his female intimate partner by at least five-fold." Thomas Decl. ¶¶ 5–6 & Exs. 2–6; Stip. Facts ¶¶ 12–13.

Specifically, the presence of firearms at domestic-violence shelters creates and exacerbates at least four distinct risks to Coalition Members and those that they serve:

***a. Direct threats by abusers.*** Coalition Members' "single greatest security threat" are abusers who frequently harass and violently threaten their victims while they are at the shelter. Program A Decl. ¶ 9. This threat is only heightened when the abuser is armed. Abusers typically view the shelter as "undermining and threatening" their control over the survivor, and so they "often escalate their violence when their partner leaves in order to coerce a reconciliation or to retaliate [from] perceived rejection." Thomas Decl. ¶ 7 & Ex. 7. Shelter staff have "witnessed victims be deterred from seeking services . . . because of firearm-related threats that their abusers have made to them." Program C Decl. ¶ 5. To take one example, an abuser who had been jailed for assaulting his victim with a firearm had friends leave threatening notes and bullets on her porch,

and then had a friend text her that when she left the program's outreach office, he was going to "light [her] up"—meaning, shoot her. *Id.* These kinds of incidents are unfortunately commonplace across the state. *See, e.g.*, Program D Decl.¶¶ 5, 7. Abusers routinely threaten shelter staff with violence as well: For instance, a client's abuser who "often drove by the outreach office" threatened "to shoot up" the office and its staff if he was not told where his victim was. Program C Decl. ¶ 5. As a result, "the Coalition and its member programs treat a perpetrator's access to firearms as one of the leading risk factors for lethal violence." Thomas Decl. ¶ 6.

Coalition Members cannot adequately prevent the threat from abusers by simply enforcing no-trespassing policies. Abusers often "attempt to access shelter property under false pretenses by posing, for example, as a delivery person or as a family member of a victim or survivor." Thomas Decl. ¶ 11; *see* Program B Decl. ¶ 11 (stating that "in recent memory an abuser even got into the shelter's main entryway by posing as a victim's family member"). Sometimes, residents invite abusers despite it being against shelter rules. Program A Decl. ¶ 10. At other times, programs are legally required to allow abusers onto their property—for example, during "child visitation and exchange programs, where non-custodial parents engage in court-ordered supervised visitation with their minor children." Program B Decl. ¶ 12; *see* Program A Decl. ¶ 10. These visitations sessions often become "heated," and the dangers that could result by allowing the non-custodial parent access to a gun are "obvious." Program B Decl. ¶ 12. Finally, even when the abusers are trespassing, it is difficult for shelter staff to identify them as such; for instance, one program "had someone lurking by the back fence near our rear lot," who "ran off when staff went to confront him." Program A Decl. ¶ 9. Another program even "had an abuser take the license plates off his victim's car while in our lot, to harass her and make her get pulled over." Program B Decl. ¶ 11.

4

*b. Psychological and emotional trauma.* Victims "come to shelters as a last-ditch effort to escape violence and abuse that makes them scared for their lives." Thomas Decl. ¶ 7. They "are often trading a terrible but known situation for an unknown one, and living in a communal shelter that may be far from their family, friends, job, and school." Program B Decl. ¶ 15. Most clients "have experienced gun violence at the hands of their abusers, some being threatened with a gun, and others being shot or shot at." Program A Decl. ¶ 8. As a result, for many shelter residents, "the choice to leave their abuser and take shelter with us is literally a matter of life and death: some have been brutalized, tortured, and threatened with death or great bodily harm by their abuser." *Id.* ¶ 12. In light of this widely shared experience, the presence of firearms on shelter property has the potential to "retraumatiz[e]" victims and cause them further psychological and emotional injury. Program A Decl. ¶ 8; *see, e.g.*, Program B Decl. ¶ 15; Program C Decl. ¶¶ 13–15; Program D Decl.¶¶ 5–6, 10. It doesn't take much: One resident recently "was triggered by a loud noise caused when a shelter worker dropped something heavy in a closet that backed up to her wall," which "transported her back to her closet where she was hiding with her dog while her abuser banged on the windows and tried to get into her house." Program A Decl. ¶ 9. The resident "panicked, came out of her room screaming uncontrollably, and ultimately had to be taken to a local hospital's behavioral health unit." *Id.*

*c. Risks of resident violence.* As one program director explains, "[r]esidents are used to constant aggression, and to being hurt by their abuser at the drop of a dime. Many are affected by learned behavior from their abusers, and are used to constantly fighting back to protect themselves and their children." Program A Decl. ¶ 7; Program C Decl. ¶ 13. Residents often struggle with mental-health and substance-abuse issues after years of sustained trauma. Program A Decl. ¶ 7. As

a result, residents often bring weapons, including knives and guns, with them when they enter a shelter. Program A Decl. ¶ 6; Program B Decl. ¶ 13; Program C Decl. ¶¶ 8, 12.

Shelter directors have determined, in their professional judgment, that the presence of guns on shelter property poses an unacceptable risk to residents and employees. "Living in a communal environment is stressful, and altercations between residents—or between residents and staff—are a fact of life." Program C Decl. ¶ 13. Fights occasionally break out between shelter residents, and residents have "verbally threaten[ed] shelter staff or g[otten] in their face." *Id.* But, "if a weapon is readily accessible, a minor incident can escalate into a serious danger in a heartbeat." *Id.*; *see* Program A Decl. ¶ 7 ("Allowing [] residents to have firearms close at hand would be a serious safety hazard for everyone living and working at [Program A's] shelter."). Indeed, "the presence of a firearm . . . typically increases the chance that a conflict will turn into a lethal scene[]." Bradley Decl. ¶ 2. And that is even more true if the gun were accessed "by someone unfamiliar with how to handle them, or by someone suffering from post-traumatic stress disorder as many of [Coalition Members'] clients do." Program D Decl.¶ 7; *see* Bradley Decl. ¶¶ 2–5.

***d. Risks to children.*** The safety risks posed by firearms extend beyond the direct threats to victims. As licensed domestic-violence programs, Coalition Members must also provide shelter to clients who bring their children with them. *See* W. Va. Code R. § 191-2-3.1.a. Shelter residents' children, like the residents themselves, may be subject to violence and threats of violence by abusers who bring firearms. Yet the presence of firearms poses an additional, and distinct, risk to children—the risk of accidental injury or even death. Because children at the shelters often play outside, they could access an unsecured gun in a parent's (or other resident's or shelter employee's) car and hurt themselves or others. *See, e.g.*, Program A Decl. ¶ 9; Program B Decl. ¶ 10; Program C Decl. ¶ 12; Program D Decl.¶ 8. As one program director explained after noticing a gun in an

employee's car: "It makes me sick to my stomach to think what could have happened if a child

had spotted the gun in our employee's car, instead of me." Program B Decl. ¶ 10.

3.   **To prevent violence and other harms, Coalition Members have long had policies restricting firearms on shelter property, including in parking lots.**

For decades, Coalition Members have taken a number of steps to ensure that their residents,

as well as their staff and other guests, remain safe from gun-related violence. Programs generally

"undertake individualized safety planning with each new client during intake," which typically

included risk assessments requiring staff to ask "about a perpetrator's history of violence and

access to firearms"—the "primary risk factors" for violence. Thomas Decl. ¶ 9. Then, as part of

the shelter intake process, program staff typically asked new residents if they possessed a weapon

or other contraband—including a firearm. If so, staff "would be expected to ask follow-up

questions like where the guns are currently, whether the victim is storing them in her car on shelter

property, if so how they are secured, and whether anyone else (like a child or the perpetrator) has

a key and could access them." *Id.* ¶ 10; *see* Program A Decl. ¶ 6; Program C Decl. ¶ 7.

In addition to asking these questions, many Coalition Members had "blanket" policies

banning weapons from shelter property. Thomas Decl. ¶¶ 10–11; *see, e.g.*, Program D Decl.¶ 6;

Program C Decl. ¶ 6, 10–11; Program A Decl. ¶ 4. These policies were implemented by posting

signs informing visitors that weapons and/or firearms were not permitted on shelter property, and

by requiring new residents and employees to agree to not bring weapons onto the property. *See id.*

For most members, the prohibitions extended to the shelter's parking lot. *See, e.g.*, Program D

Decl. ¶ 6. That is because "parking lots pose a particular danger" for domestic-abuse victims:

Studies show that nearly 30% of "intimate partner workplace homicides nationwide occur in

parking lots or garages." Thomas Decl. ¶ 8. And the risk is even more serious in West Virginia,

because the lack of public transportation means that a car shared between the victim and the

perpetrator is often the victim's only means of escape. *See id.* In addition, Coalition Members' staff "regularly" confront unknown people and unauthorized vehicles in parking lots, and having a no-weapons policy made this task less dangerous. *See* Thomas Decl. ¶¶ 10–11.

The policies described above helped Coalition Members ensure a safe environment at their shelters in numerous ways. Most obviously, they reduced the possibility that an abuser could access a gun in a car to harm, threaten, or harass his victim—even from a locked car, because abusers often have the keys to their "shared property." Program C Decl. ¶ 12; Program A Decl. ¶ 9. The no-weapons policies also helped to keep the peace between residents, and between residents and shelter staff. Program C Decl. ¶ 13; Bradley Decl. ¶¶ 2–5. Finally, the programs' policies ensured the safety of residents' children, by decreasing the risk of them "access[ing] an unsecured gun and us[ing] it to hurt themselves or someone else." Program A Decl. ¶ 10; *see e.g.*, Program D Decl.¶ 8; Program C Decl. ¶ 12.

### 4. The Parking Lot Amendments force Coalition Members to allow firearms on their property, endangering survivors' and shelter staff's safety and security.

In June 2018, the state legislature enacted a set of statutory provisions, which we refer to as the Parking Lot Amendments, barring property owners in the state from taking certain actions relating to the possession of firearms on their property. Specifically, the law prohibits owners from (1) making any "verbal or written inquiry, regarding the presence or absence of a firearm locked inside or locked to a motor vehicle in a parking lot," W. Va. Code § 61-7-14(d)(2)(A); (2) excluding firearms from their parking lots, *id.* § 61-7-14(d)(1); (3) denying vehicles with firearms access to their parking lots, *id.* § 61-7-14(d)(4); (4) "tak[ing] any action against" someone who says they brought a firearm onto the lot, *id.* § 61-7-14(d)(2)(C); and (5) conditioning employment on an employee's agreement to not bring guns onto the lot, *id.* § 61-7-14(d)(3)(B). The law authorizes the Attorney General (and anyone "aggrieved" by a violation) to seek an injunction and penalties

of up to $5,000 per violation, plus costs and attorney's fees. *Id.* § 61-7-14(f). There is no exception for domestic-violence shelters or other properties facing unique security and safety threats.

Since its enactment, the statute has, in numerous ways, "interfere[d] with Coalition members' efforts to provide a safe environment to victims of domestic violence, and to protect their clients and staff from the threat of gun violence while they are on shelter property." Thomas Decl. ¶ 14. *First*, the law undermines shelters' "safety planning" and security procedures by preventing them from "asking the questions necessary to adequately protect their clients and staff." Thomas Decl. ¶ 10; *see, e.g.*, Program C Decl. ¶ 9; Program D Decl.¶ 8. At some shelters, staff have been "instructed that they can no longer ask whether someone has a weapon in their vehicle, or ask them to remove it from shelter property, even if staff know or strongly suspect that the resident has a gun in their car." Program A Decl. ¶ 6. *Second*, the law "prevent[s] member programs from investigating and addressing other firearms risks on their property" by outlawing "blanket polic[ies] prohibiting firearms" and "curtail[ing] member programs' discretion to investigate whether these individuals are armed." Thomas Decl. ¶ 11; *see* Program A Decl. ¶¶ 5–6, 10. *Third*, the law impairs shelters' ability to deliver services "to survivors of abuse in an environment that is free from violence, including the threat of firearm violence." Thomas Decl. ¶ 13. Coalition Members and their staff understand the Parking Lot Amendments presents them with a stark choice. As one program director explained: "The change in the law means that [our] staff must choose between doing their jobs safely and effectively, or putting our clients and staff in danger to avoid potential liability." Program C Decl. ¶ 15.

## ARGUMENT

### I.     The Parking Lot Amendments violate Coalition Members' free-speech rights.

Two of the Parking Lot Amendments plainly violate Coalition Members' free-speech rights. The first (the "inquiry provision") bars them from making any "verbal or written inquiry,

regarding the presence or absence of a firearm locked inside or locked to a motor vehicle" in their parking lots. W. Va. Code § 61-7-14(d)(2)(A). The second (the "take-no-action provision") bars them from "tak[ing] any action . . . based upon verbal or written statements of any party concerning possession of a firearm stored inside a motor vehicle in a parking lot." *Id.* § 61-7-14(d)(2)(C). Both provisions target speech based on its content and speaker, and neither can satisfy strict scrutiny.

### A. Because the inquiry and take-no-action provision are content-based and speaker-based restrictions on speech, they are subject to strict scrutiny.

"In the First Amendment context, a statutory provision constitutes a content-based speech restriction if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *Am. Ass'n of Political Consultants, Inc. v. FCC*, 923 F.3d 159, 165 (4th Cir. 2019), *aff'd*, 140 S. Ct. 2335 (2020) ("*AAPC*") (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). "Such a speech restriction is presumptively unconstitutional and can only be justified if it is narrowly tailored to further a compelling governmental interest." *Id.* In the end, if "the statute is content-based on its face—that is, whether the text thereof distinguishes between speech based on content or subject matter," then "the court must conduct a strict scrutiny review." *Id.*

The inquiry and take-no-action provisions are facially content-based speech restrictions and thus "presumptively unconstitutional." *Id.* Most obviously, the inquiry provision explicitly "singles out one particular topic of speech . . . for regulatory attention"—speech about the presence of firearms in motor vehicles and parking lots. *See Wash. Post v. McManus*, 944 F.3d 506, 513 (4th Cir. 2019).[1] And it explicitly targets *only* firearm-related speech: Shelter staff still can ask new residents and guests whether they are carrying contraband, illegal drugs, or even *other* weapons

---

[1] Unless otherwise specified, internal quotation marks, citations, alterations, and emphases are omitted throughout the brief.

like knives or pepper spray. *See, e.g.*, Program D Decl.¶ 8; Program C Decl. ¶¶ 7–9. They just can't engage in speech about firearm possession. *See* Program B Decl. ¶ 14 ("It makes little sense to me that our staff can ask about, investigate, and secure our residents' switchblade knives and prescription medications, but cannot do the same for a firearm."). In preventing Coalition Members from asking questions solely about one subject matter, the law is a content-based speech restriction.

The take-no-action provision is also facially content-based. It has the direct consequence of preventing property owners like Coalition Members from engaging in speech—for example, if a person tells a shelter employee that he has a loaded firearm in his jeep, the employee is barred from asking that person to leave, calling the police, or even just telling other shelter staff to be careful around the person. All of these, presumably, qualify as "tak[ing] any action . . . based upon verbal or written statements of any party concerning possession of a firearm stored inside a motor vehicle in a parking lot." W. Va. Code. § 61-7-14(d)(2)(C). And, even if they don't, the take-no-action provision at a minimum exhibits a significant chilling effect on the exercise of such protected speech by virtue of its vagueness (an issue we discuss further in Section IV below).

Both provisions' content-based constitutional infirmities are compounded because they also make *speaker*-based distinctions. *See Fusaro v. Cogan*, 930 F.3d 241, 252 (4th Cir. 2019) ("[S]peaker-based restrictions combined with content-based restrictions are frequently deemed to be constitutionally suspect"). The provisions prohibit only people who own, lease, or are "charged with the care, custody, and control of real property" in West Virginia from engaging in this speech. W. Va. Code § 61-7-14(d)(2). Anyone else—including a customer or guest at the very property— is free to ask other customers, guests, or employees if they have firearms stored in their car in the parking lot. "A law," like this one, "that allows a message but prohibits certain speakers from communicating that message" triggers strict scrutiny. *Thomas v. Bright*, 937 F.3d 721, 731 (6th

11

Cir. 2019). In short, the law's content- and speaker-based restrictions render it presumptively invalid.

Indeed, "this is not a hard case." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1307 (11th Cir. 2017). In *Wollschlaeger*, the Eleventh Circuit considered the constitutionality of a state statute that, similar to the laws at issue here, prohibited doctors from asking patients or recording information about their patients' firearm ownership. *See id.* at 1302–03. The court held that the law violated the First Amendment because it "expressly limit[ed] the ability of certain speakers— doctors and medical professionals—to write and speak about a certain topic—the ownership of firearms." *Id.* at 1307. So too here: The legislature decided that a certain class of West Virginians, including Coalition Members, may not ask about or otherwise act on speech about the presence of firearms on their property. That choice "violate[s] the First Amendment." *See id.* at 1319.

## B.     These provisions fail strict scrutiny

Because the provisions are "content-based restriction[s] on speech, [they] can only pass constitutional muster if [they] satisf[y] a strict scrutiny review." *AAPC*, 923 F.3d at 167. Under that standard, "the Government [must] prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171. The state falls far short from meeting this "exacting test" here. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 680 (1994).[2]

---

[2] In *Wollschlaeger*, the Eleventh Circuit did not decide whether strict scrutiny applied because it held that the law failed even under a less exacting form of scrutiny, and the case involved "professional speech." *See* 848 F.3d at 1308, 1311. But the Supreme Court has since cast doubt on whether professional speech can be recognized "as a separate category of speech" that receives lower scrutiny than strict scrutiny. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018). Regardless, the Parking Lot Amendments do not conceivably regulate professional speech; they bar property owners from asking questions and taking action to protect their property, staff, and guests from danger. Thus, there can be no dispute that strict scrutiny applies here.

To begin, the government cannot satisfy its "burden of showing that [its] content-based regulation of speech is necessary to serve a compelling state interest." *PSINet, Inc. v. Chapman*, 362 F.3d 227, 233–34 (4th Cir. 2004). According to their sponsor, the Parking Lot Amendments were enacted primarily to protect Second Amendment rights. *See* Michael Virtanen, *West Virginia House backs employee guns in locked cars*, Assoc. Press (Feb. 27, 2018), https://perma.cc/2BSK-AE87. But even if "the protection of Second Amendment rights" *generally* is a "substantial government interest," there is no compelling state interest in prohibiting property owners from merely *asking* a person on their property about firearms. *Wollschlaeger*, 848 F.3d at 1312. As the Eleventh Circuit explained, "[t]he Second Amendment right to own and possess firearms does not preclude questions about, commentary on, or criticism for the exercise of that right." *Id.* at 1313.

Nor does the Second Amendment give the government the right to force private property owners to allow firearms on their property no questions asked. "[P]rivate property owners" have "the power to regulate conduct on [their] property," including by inquiring into and prohibiting firearm possession. *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019) (upholding gun restrictions, as applied to a parking lot, against Second Amendment challenge); *cf. Adderley v. Florida*, 385 U.S. 39, 47 (observing in free-speech context "a private owner of property" has the "power to preserve the property under its control for the use to which it is lawfully dedicated"). "[T]hough the Second Amendment . . . limit[s] some state interference with individuals' right to engage in self-defense and bear arms, [it does] not prevent interference with these rights by private actors." *Hoven v. Walgreen Co.*, 751 F.3d 778, 784 (6th Cir. 2014); *see* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1452 (2009) (explaining that "the right to bear arms doesn't apply to possession of arms on private property against the property owner's wishes").

13

Yet the law does just that by prohibiting property owners from "tak[ing] any action" based on statements about firearm possession on the premises. W. Va. Code § 61-7-14(d)(2)(C). That is not a permissible governmental interest. Like all constitutional rights, "Second Amendment rights are far from absolute." *United States v. Masciandaro*, 638 F.3d 458, 467 (4th Cir. 2011). And, just as the First Amendment cannot justify a law requiring shelters to allow "men's rights" advocates to give public speeches at the shelters, the Second Amendment cannot justify a law forcing them to allow firearms onto their private property against their will. *See, e.g.*, *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1265 (11th Cir. 2012). Indeed, "forcing a business to have a gun on its property that it does not want there may itself violate the Second Amendment's core principles." Cody J. Jacobs, *The Second Amendment and Private Law*, 90 S. Cal. L. Rev. 945, 995 (2017); *see also* Joseph Blocher, *The Right Not to Keep or Bear Arms*, 64 Stan. L. Rev. 1 (2012). In the end, "there is no actual conflict between the First Amendment rights of [property owners] and the Second Amendment rights of [their guests and visitors] that justifies [the law's] speaker-focused and content-based restrictions on speech." *See Wollschlaeger*, 848 F.3d at 1313. Thus, the state cannot show that its restrictions are "necessary" to protect citizens' Second Amendment rights.

But even if the government could show a "compelling" interest, it still could not "prove that no less restrictive alternative would serve its purpose." *Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016). Indeed, as explained below, the provisions at issue are both "unconstitutionally overinclusive" and "fatally underinclusive." *Id.*

*First*, the law "unnecessarily circumscribe[es] protected expression" by sweeping in a potentially vast amount of speech that does not implicate any of the state's purported interests. *Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002). For example, the take-no-action provision would seem to prohibit Coalition Members from requesting that a resident or employee

who has a firearm leave the shelter; creating a list of "problem visitors" for additional screening; and even merely asking a visitor if his firearms are lawfully stored and locked away in the car. Yet, when it enacted the law, the legislature cited "no evidence whatsoever" suggesting that questioning customers and visitors about firearms, or taking any other communicative actions relating to firearm possession on private property, in fact impaired anyone's Second Amendment rights. *Wollschlaeger*, 848 F.3d at 1313. That omission is fatal to the law, because the state "must present more than anecdote and supposition to support a regulation subject to strict scrutiny." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

*Second*, the provisions are underinclusive because they "leave[] appreciable damage to [the government's] interest unprohibited." *Reed*, 135 S. Ct. at 172; *see AAPC*, 923 F.3d at 167–70 (analyzing underincusivity). The state might claim that the Parking Lot Amendments are necessary to protect the right to carry a gun for self-defense. But under the law, private property owners are still free to ask employees and customers if they have a firearm on their person and then take action based on their answer. Indeed, they could even ask about a guest's possession of firearms at *his home*—even though that would implicate "the core protection of the Second Amendment." *Kolbe v. Hogan*, 849 F.3d 114, 138 (4th Cir. 2017). That the law allows this speech but not speech about firearm possession in cars and parking lots undermines the government's claims that it is narrowly tailored to protect Second Amendment rights. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448 (2015) (explaining that "underinclusiveness can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint"). For this reason, too, the inquiry and take-no-action provisions cannot satisfy strict scrutiny. Accordingly, they should be enjoined as facially unconstitutional under the First Amendment.

15

## II.     The Parking Lot Amendments violate Coalition Members' First Amendment right of free association.

The law also violates the First Amendment, as applied to Coalition Members, in another respect: it interferes with their associational rights, which serve to protect "the freedoms of speech and assembly" contained in the First Amendment. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). It does so because they are expressive associations, the law significantly trenches upon their expressive associational interests, and the state's interests do not justify the intrusion.

*First*, Coalition Members are expressive associations because they "engage in some form of expression, whether it be public or private," which is all that is necessary "to come within [the] ambit" of the "expressive associational right." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Each of the Coalition Members holds as their core mission the establishment of a sanctuary for victims of domestic abuse that is "free from violence and the fear of violence." Program C Decl. ¶ 4; *see, e.g.*, Program B Decl. ¶ 4 ("Program B Decl.'s mission and purpose is to advocate and support social change that will result in non-violent relationships, homes, and communities."); *see also* Program D Decl.¶¶ 3–4; Stip. Facts ¶ 8. Coalition Members fulfill their mission by offering a range of counseling and advocacy services, including "individual counseling" and "support groups," and "by providing victims and survivors the resources necessary to effectively cope with the personal, social, emotional, and legal ramifications of victimization." Program C Decl. ¶¶ 2, 4; *see also, e.g.*, Program A Decl. ¶ 3; Program B Decl. ¶ 4. It is "indisputable that an association that seeks to transmit such a system of values engages in expressive activity." *Dale*, 530 U.S. at 650.

*Second*, the law significantly affects Coalition Members' expressive associational interests. Their commitment to non-violence is not a peripheral value or an ancillary view, but *the* central organizing tenet of their expressive identity. *See* Thomas Decl. ¶¶ 3, 7–8, 13; Program A Decl. ¶¶ 3–4, 12; Program B Decl. ¶¶ 4–6, 15; Program C Decl. ¶¶ 2, 4, 14–15; Program D Decl.¶¶ 3–

16

6, 10. Yet West Virginia's law forces them to accept onto their property the very thing that is most antithetical to that mission, and in the very place where they carry out their expressive activity. And it does so even with respect to their own members and residents.

By forcing Coalition Members to allow their employees, volunteers, and residents to bring firearms onto shelter property, the law impairs their expressive associational interests. *See Dale*, 530 U.S. at 655 ("An association must merely engage in expressive activity that could be impaired in order to be entitled to protection."). The First Amendment protects Coalition Members' "method of expression," and grants them the right to "teach . . . by example." *Id.* Coalition Members seek to exercise this right by ensuring that their membership, including their own staff, volunteers, and interns, as well as their residents, set an example that is consistent with their foundational purpose: keeping firearms out of shelters and off shelter property. Thomas Decl. ¶ 10; Program A Decl. ¶¶ 6, 11; Program B Decl. ¶¶ 8–9, 14; Program C Decl. ¶¶ 8, 10, 14–15; Program D Decl. ¶ 7. The Parking Lot Amendments interfere with this associational message by counteracting the force of Coalition Members' efforts to espouse non-violence and create a safe haven for victims.

But the law does more than just that. Because of the delicate nature of their advocacy, and the physical, emotional, and psychological vulnerability of their residents, Coalition Members' ability to effectively provide counseling services, and to retain and attract residents, hinges on their ability to provide an environment that not only *is* safe, but *feels* safe. *See* Stip. Facts ¶ 23. West Virginia's law significantly affects their ability to provide this kind of safe environment, free from gun violence. Given the law's existence, the unfortunate reality is that it is harder for shelters to foster the type of environment that is integral to their mission. And the risk isn't just from outsiders, but insiders too: As a result of the law, every verbal altercation is now at risk of becoming an armed

17

altercation in a matter of minutes. Thomas Decl. ¶ 13; Program A Decl. ¶¶ 7–9; Program B Decl. ¶ 12; Program C Decl. ¶¶ 5, 13–15; Program D Decl.¶ 5–7, 10.

These realities exert a chilling effect on residents and prospective residents that inhibits Coalition Members' right to associate freely with the clients they serve. *See Patterson*, 357 U.S. at 462–63 (invalidating law that was "likely to affect adversely the ability of [an organization] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate" by posing a risk that some members would be afraid to associate with organization); *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 69 (2006) (explaining that, even if a law does "not directly interfere with an organization's composition," but only makes "group membership less attractive," it "rais[es] the same First Amendment concerns").

 *Finally*, "state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *Patterson*, 357 U.S at 460–61. Here, too, the law comes up short. As explained, the state has no compelling interest in forcing domestic-violence shelters to accept firearms onto their property. The only interest asserted—facilitating Second Amendment rights— has no application to shelters because they (and their parking lots) are private, sensitive places that lie outside the scope of Second Amendment protection. *See Class*, 930 F.3d at 464. In any event, any interest the state might have is outweighed by Coalition Members' associational interests.

## III.   The Parking Lot Amendments violate Coalition Members' fundamental rights to ensure their own personal safety (and that of their guests) on their own property.

The Parking Lot Amendments do not just violate Coalition Members' First Amendment rights, but also sharply undercut their ability to guarantee their own (and their vulnerable clients') personal safety on their own private property—putting them at a heightened risk of physical harm. This interference with their fundamental rights cannot be squared with the Fourteenth Amendment.

18

The right to protect one's personal security on one's own property is among "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). The Constitution protects "those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), and "[a]mong the historic liberties so protected was a right to be free from . . . unjustified intrusions on personal security," *Ingraham v. Wright*, 430 U.S. 651, 673 (1977). Courts have thus consistently recognized that "the Constitution protects a citizen's liberty interest in her own bodily security." *Kennedy v. Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006); *see, e.g.*, *Lambert v. Hartman*, 517 F.3d 433, 443 (6th Cir. 2008) (recognizing "the fundamental right . . . protecti[ng] against *physical* invasions"); *White v. Napoleon*, 897 F.2d 103, 112 (3d Cir. 1990) (describing the right to be free from unjustified intrusions on personal security as "fundamental").

A corollary of this right is the right to protect one's personal security by controlling the conditions under which someone may enter the property. Our "Nation's history, legal traditions, and practices" bear this out. *Hawkins v. Freeman*, 195 F.3d 732, 739 (4th Cir. 1999). Around the time of the Founding, Blackstone recognized the linkages between "the three great and primary rights [] of personal security, personal liberty, and private property." 1 William Blackstone, *Commentaries on the Laws of England* *141. And he observed that "the law of the land has postponed even *public necessity* to the sacred and inviolable rights of private property." *Id.* *140 (emphasis added). The heart of this "sacred" right, Blackstone wrote, is "sole and despotic dominion which one man claims and exercises over [his property], in total exclusion of the right of any other individual in the universe." 2 Blackstone, *Commentaries* *1; *see, e.g.*, *Loretto v.*

19

*Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."); 2 Frederick Pollock & Frederic Maitland, *The History of English Law* 41 (2d ed. 1899).

Drawing from this "historical background of criminal law, tort law, and property law," the Eleventh Circuit has recognized the longstanding "right of a private property owner . . . to determine for itself whether to allow firearms on its premises and, if so, under what circumstances." *GeorgiaCarry.Org*, 687 F.3d at 1261, 1266. The court's review of history showed that "numerous colonial leaders, as well as scholars whose work influenced the Founding Fathers, embraced the concept that a man's (or woman's) right to control his (or her) own private property occupied a special role in American society and in our freedom." *Id.* at 1264–65 (citing William Tudor, *Life of James Otis*, 66–67 (1823); John Locke, *Two Treatises on Government*, 209–10 (1821)). Indeed, "[t]he Founding Fathers placed the right to private property upon the highest of pedestals, standing side by side with . . . the Second Amendment." *Id.* at 1265. The court thus concluded that the common-law right to exclude firearms from one's property is "equally fundamental" and "equally important" to the right to bear arms guaranteed by the Second Amendment. *Id.* at 1265–66. This conclusion is consistent with the understanding of other courts, like the D.C. Circuit, that "private property owners" have "the power to regulate conduct on its property," including by prohibiting or otherwise restricting firearms. *Class*, 930 F.3d at 464.

The above authorities demonstrate that the Coalition Members have a historically recognized right to protect their personal security by excluding firearms from and otherwise regulating their possession on their property. And that right is particularly fundamental where, as here, it is exercised for the purpose of maintaining peaceable assembly—itself a "fundamental" right. *See, e.g.*, U.S. Const. amend. I (protecting "the right of the people peaceably to assemble");

*De Jonge v. State of Oregon*, 299 U.S. 353, 364 (1937) ("The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental.").Yet the Parking Lot Amendments trample on this fundamental right by preventing Coalition Members from making decisions about how to control their property to best protect their personal safety and security. Laws that infringe fundamental rights are constitutional only if they can satisfy strict scrutiny, a demanding standard that, as we explained, the state cannot meet here. *Hawkins*, 195 F.3d at 739.

West Virginia simply has no compelling interest in forcing any private business—and certainly not domestic-violence shelters—to accept firearms onto their own property. And because the law has "actually exacerbated the danger" to domestic-violence shelters and "rendered the[m] more vulnerable to violence by private actors," it violates Coalition Members' due-process rights. *Estate of Rosenbaum by Plotkin v. New York*, 975 F. Supp. 206, 217 (E.D.N.Y. 1997); *see Robinson v. Lioi*, 536 F. App'x 340, 344 (4th Cir. 2013). Indeed, as already explained, the law imposes a special and particularly significant risk on shelters because they face unique dangers of violence, ranging from abusers who attempt to enter the premises to residents who bring weapons to the shelter and thus endanger themselves or their children. Because of these special risks of violence, many Coalition Members implemented policies banning firearms anywhere on shelter property before the Parking Lot Amendments' enactment. Yet they are now hamstrung by the state's affirmative decision to displace their judgment about how to protect their personal security on their property—not only preventing the shelters from ensuring the safety of their residents and staff, but also impairing the shelters' ability to reassure victims that they are in a safe space free from violence. This interference violates due process. *Cf. Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998) (holding that due process may be offended "where the state's actions place the [plaintiff] specifically at risk, as distinguished from a risk that affects the public at large").

21

In short, the Parking Lot Amendments seek to "destroy one cornerstone of liberty—the right to [be safe] on one's private property—in order to expand another—the right to bear arms." *GeorgiaCarry.Org,* 687 F.3d at 1265. As the Eleventh Circuit held: "This we will not do." *Id.* Absent compelling justification not presented here, due process does not permit the state to deprive citizens of the ability to guarantee their personal safety on their own property. For this reason, too, the law is unconstitutional under the Fourteenth Amendment, as applied to Coalition Members.[3]

## IV.   The Parking Lot Amendments are unconstitutionally vague.

The Parking Lot Amendments purport to prohibit Coalition Members, as property owners or lessees, from "violat[ing] the privacy rights" of customers, employees, or invitees by certain specified measures. W. Va. Code § 61-7-14(d)(2). And they go on to say that Coalition Members may not "take any action" against these categories of individuals based on written or verbal statements about the possession of a firearm in a vehicle. *Id.* § 61-7-14(d)(2)(C). But the statutory provisions do not define or otherwise provide Coalition Members with *any* notice about what these two prohibitions actually mean. The provisions are, therefore, unconstitutionally vague.

It is a "basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law "can be impermissibly vague for either of two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Id.*; *see Wag More Dogs Liab. Corp. v. Cozart,* 680 F.3d 359, 371 (4th Cir. 2012) (Courts "must ask whether the government's policy is

---

[3] This Court should not follow *Ramsey Winch v. Henry*, 555 F.3d 1199, 1210–11 (10th Cir. 2009), which held that rational-basis review applied to a due-process challenge to an Oklahoma "parking lot" law. The Tenth Circuit's two-paragraph discussion there mentioned only property rights, not the businesses' fundamental right to protect their personal security on their premises.

set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with."). Second, the law can be unconstitutionally vague if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732.

Moreover, "[t]hese twin concerns of inadequate notice and arbitrary or discriminatory enforcement are especially pronounced where a vague statute abuts upon sensitive areas of basic First Amendment freedoms because ambiguity 'inevitably lead[s] citizens to steer far wider of the unlawful zone than if the boundaries . . . were clearly marked,' thereby chilling protected speech." *United States v. Miselis*, 972 F.3d 518, 544 (4th Cir. 2020); *see Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871–72 (1997) (noting that "[t]he vagueness of [content-based regulations of speech] . . . raise[s] special First Amendment concerns because of its obvious chilling effect on free speech"). Put simply, "[s]peakers deserve to know" what they can say. *See In re Murphy-Brown, LLC*, 907 F.3d 788, 800 (4th Cir. 2018). Content-based restrictions on speech are, therefore, analyzed under "a more stringent vagueness test." *Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

The Parking Lot Amendments fail any formulation of the due-process vagueness test. For starters, the statute does not define the term "privacy rights" or specify the circumstances in which such rights are supposedly violated. W. Va. Code § 61-7-14(d)(2). And courts in West Virginia have never recognized a right of privacy on the part of customers, employees, or invitees to be free from inquiry regarding contraband, or free from reasonable search of that contraband when on another person's property. *See, e.g.*, *Harbolt v. Steel of W. Va., Inc.*, 640 F. Supp. 2d 803, 817 (S.D. W. Va. 2009). Thus, Coalition Members have no way to know what actions count as "violating the privacy rights" of their staff, residents, or visitors. The statute, in other words, gives them no opportunity whatsoever "to understand what conduct it prohibits." *Hill*, 530 U.S. at 732;

23

see *Wollschlaeger*, 848 F.3d at 1319–23 (holding that Florida law prohibiting doctors from "unnecessarily harassing" a patient about firearm ownership was unconstitutionally vague).

Even worse, the law prohibits Coalition Members from "tak[ing] *any action*" against customers, employees, and invitees based on statements about possession of firearms in a vehicle. W. Va. Code § 61-7-14(d)(2)(C) (emphasis added). But, yet again, the statute does not specify what "action[s]" are covered by the prohibition. If a visitor to the shelter mentions that they have a gun in their car, for example, can shelter staff just ask them to make sure the gun is properly locked away? Or is that a prohibited "action" because it is "based upon" a "verbal" "statement"? More concerningly, if a resident tells a shelter employee that she is concerned about an unknown person who is in the shelter's parking lot and has a loaded gun, may the employee ask that person to leave the property? Or is that likewise prohibited? To take another example—the Attorney General will likely argue that the Parking Lot Amendments don't impose significant harms because they require any guns to be "locked," "lawfully possessed," and stored "out of view" in the person's car. W. Va. Code § 61-7-14(d)(1)(A)-(D). But how can Coalition Members determine the facts relating to these requirements? Indeed, wouldn't any attempt to verify that a gun is "lawfully possessed" or "locked" itself be a prohibited "action" under the statute?

As these examples demonstrate, there is just no way to know from the statute's language. Thus, regulated parties like Coalition Members are likely "to steer far wider of the unlawful zone" and "thereby chill[] [their] protected speech." *See Miselis*, 972 F.3d at 544. And they already have. Because of the Parking Lot Amendments' vagueness, Coalition Members have self-censored their speech and have refrained from taking actions with respect to persons suspected of possessing firearms in their parking lots that they would otherwise have undertaken. One program director is unsure "whether we can ask [a] person to move the[ir] weapon off of [the] property for the safety

24

of our residents and staff." Program D Decl. ¶ 8. Another had no idea what she was legally allowed to do when she saw a semiautomatic handgun sitting on the front seat of an employee's car. Program B Decl. ¶¶ 8–9. In the end, "[t]he Parking Lot Amendments have left [domestic-violence program staff] unsure of whether we can follow-up about a gun in a resident's car the way we can about knives, pepper spray, and prescriptions." Program C Decl. ¶ 9.

The record makes clear what is already evident from the statute's text: The law does "not provide any guidance" to Coalition Members about what they prohibit and what, by contrast, they permit. *Wollschlaeger*, 848 F.3d at 1323. As a result, the law forces Coalition Members to either "choose silence and self-censorship" or "proceed with their speech and potentially face punishment." *Id.*; *see, e.g.*, Program C Decl. ¶ 15; Thomas Decl. ¶ 10. Both the First Amendment and the Due Process Clause prevent such a Hobson's choice. The unconstitutionally vague provisions, *see* W. Va. Code § 61-7-14(d)(2), must therefore be enjoined in their entirety.

## CONCLUSION

The Court should grant the Coalition's motion for summary judgment.

Dated: March 15, 2021

Respectfully submitted,

Eric Tirschwell*
Alla Lefkowitz*
James Miller*
**EVERYTOWN LAW**
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(646) 324-8222

Neil K. Sawhney*
**GUPTA WESSLER PLLC**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336

*Counsel for Plaintiff*
*Pro hac vice*

/s/ Lucas R. White
J. David Fenwick (W. Va. Bar No. 6029)
Lucas R. White (W. Va. Bar No. 12501)
**GOODWIN & GOODWIN, LLP**
300 Summer Street, Suite 1500
P.O. Box 2107
Charleston, WV 25328
(304) 346-7000
*lrw@goodwingoodwin.com*

Deepak Gupta*
Jonathan E. Taylor*
**GUPTA WESSLER PLLC**
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

THE WEST VIRGINIA COALITION AGAINST
DOMESTIC VIOLENCE, INC.,

        *Plaintiff,*

    v.

PATRICK J. MORRISEY, in his official
capacity as Attorney General for the
State of West Virginia,

        *Defendant.*

Civil Action No. 2:19-cv-00434
(Judge John T. Copenhaver, Jr.)

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2021, I electronically filed the foregoing brief with the Clerk of The United States District Court for the Southern District of West Virginia using the CM/ECF system. All participants are registered CM/ECF users and have been served by the CM/ECF system.

*/s/* Lucas R. White
Lucas R. White

*Counsel for Plaintiff The West Virginia
Coalition Against Domestic Violence, Inc.*