## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

THE WEST VIRGINIA COALITION AGAINST
DOMESTIC VIOLENCE, INC.,

     *Plaintiff,*

     v.

PATRICK J. MORRISEY, in his official
capacity as Attorney General for the
State of West Virginia,

     *Defendant.*

Civil Action No. 2:19-cv-00434
(Judge John T. Copenhaver, Jr.)

## REPLY AND RESPONSE BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

Eric Tirschwell*
Alla Lefkowitz*
James Miller*
**EVERYTOWN LAW**
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017
(646) 324-8222
*etirschwell@everytown.org*

J. David Fenwick
Lucas R. White
**GOODWIN & GOODWIN, LLP**
300 Summer Street, Suite 1500
P.O. Box 2107
Charleston, WV 25328
(304) 346-7000
*jdf@goodwingoodwin.com*

Deepak Gupta*
Jonathan E. Taylor*
**GUPTA WESSLER PLLC**
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*

Neil K. Sawhney*
**GUPTA WESSLER PLLC**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*neil@guptawessler.com*

*Counsel for Plaintiff*

*Pro hac vice

April 26, 2021

# TABLE OF CONTENTS

Table of authorities ........................................................................................................ ii

Introduction ...................................................................................................................1

Argument .......................................................................................................................2

I.    The inquiry and take-no-action provisions are content-based and speaker-based restrictions that facially violate the First Amendment....................................2

    A.    The inquiry provision prevents Coalition Members from engaging in core protected speech, not commercial speech, and it cannot satisfy any form of heightened scrutiny.....................................................2

    B.    The take-no-action provision plainly restricts speech. ...............................7

II.    The Attorney General admits that the Parking Lot Amendments' prohibitions are either unconstitutionally vague, or so broad in scope that they must facially violate the First Amendment. ......................................................9

III.    The Parking Lot Amendments interfere with Coalition Members' rights to freedom of association. ..........................................................................................11

IV.    As applied to Coalition Members, the Parking Lot Amendments violate due process because they force domestic-violence shelters to allow firearms on their private property and thus risk their staff's and guests' personal security. ...................................................................................................................14

    A.    The Parking Lot Amendments cannot satisfy even rational-basis review.......................................................................................................14

    B.    The Parking Lot Amendments infringe on Coalition Members' fundamental rights. ...................................................................................17

Conclusion ...................................................................................................................20

i

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
　517 U.S. 484 (1996) ...................................................................................5

*American Association of Political Consultants, Inc. v. Federal Communications Commission*,
　923 F.3d 159 (4th Cir. 2019)......................................................................2

*Boy Scouts of America v. Dale*,
　530 U.S. 640 (2000) ............................................................................12, 13

*Christian Legal Society Chapter v. Martinez*,
　561 U.S. 661 (2010) .................................................................................13

*Edenfield v. Fane*,
　507 U.S. 761 (1993) ...................................................................................6

*Florida Retail Federation, Inc. v. Attorney General of Florida*,
　576 F. Supp. 2d 1281 (N.D. Fla. 2008)............................................4, 17, 18

*Fusaro v. Cogan*,
　930 F.3d 241 (4th Cir. 2019)......................................................................2

*GeorgiaCarry.Org, Inc. v. Georgia*,
　687 F.3d 1244 (11th Cir. 2012)...........................................................14, 18

*Greater Philadelphia Chamber of Commerce v. City of Philadelphia*,
　949 F.3d 116 (3d Cir. 2020).....................................................................3, 7

*Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*,
　879 F.3d 101 (4th Cir. 2018)....................................................................4, 5

*Harris v. Quinn*,
　134 S. Ct. 2618 (2014)................................................................................3

*Hill v. Colorado*,
　530 U.S. 703 (2000) .................................................................................10

*Hoven v. Walgreen Co.*,
　751 F.3d 778 (6th Cir. 2014)......................................................................6

*Huskey v. Ethicon, Inc.*,
　29 F. Supp. 3d 736 (S.D. W. Va. 2014)......................................................9

*Ibanez v. Florida Department of Business & Professional Regulation*,
　512 U.S. 136 (1994) ...................................................................................6

*Italian Colors Restaurant v. Becerra*,
　878 F.3d 1165 (9th Cir. 2018).....................................................................5

*Kolbe v. Hogan,*
   849 F.3d 114 (4th Cir. 2017) ................................................................................ 15

*Moseley v. Branker,*
   550 F.3d 312 (4th Cir. 2008) ................................................................................. 9

*National Institute of Family & Life Advocates v. Becerra,*
   138 S. Ct. 2361 (2018) .......................................................................................... 2

*Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations,*
   413 U.S. 376 (1973) ............................................................................................. 3

*Radiance Foundation, Inc. v. NAACP,*
   786 F.3d 316 (4th Cir. 2015) ................................................................................. 3

*Ramsey Winch Inc. v. Henry,*
   555 F.3d 1199 (10th Cir. 2009) ......................................................... 10, 15, 16, 17

*Reed v. Town of Gilbert, Arizona,*
   576 U.S. 155 (2015) ............................................................................................. 2

*Reynolds v. Middleton,*
   779 F.3d 222 (4th Cir. 2015) ................................................................................. 6

*Rumsfeld v. Forum for Academic & Institutional Rights,*
   547 U.S. 47 (2006) ..................................................................................7, 8, 12, 13

*Sorrell v. IMS Health Inc.,*
   131 S. Ct. 2653 (2011) .......................................................................................5, 7

*Stuart v. Camnitz,*
   774 F.3d 238 (4th Cir. 2014) ................................................................................. 5

*Telescope Media Group v. Lucero,*
   936 F.3d 740 (8th Cir. 2019) ................................................................................. 7

*United States v. Miselis,*
   972 F.3d 518 (4th Cir. 2020) ............................................................................... 10

*Washington Post v. McManus,*
   944 F.3d 506 (4th Cir. 2019) ................................................................................. 2

*Western Virginia Association of Club Owners & Fraternal Services, Inc. v. Musgrave,*
   553 F.3d 292 (4th Cir. 2009) ................................................................................. 7

*Wollschlaeger v. Governor, Florida,*
   848 F.3d 1293 (11th Cir. 2017) .......................................................................4, 6, 7

**Statutes**

W. Va. Code § 61-7-14(d)(2)(A) ...........................................................................2, 3

W. Va. Code § 61-7-14(d)(2)(C) ...........................................................................2, 8

**Other Authorities**

Joseph Blocher & Darrell A.H. Miller,
    *The Positive Second Amendment: Rights, Regulation, and the Future of* Heller
    (2018)...............................................................................................................15, 19

## INTRODUCTION

Our summary-judgment motion showed how this statute infringes the constitutional rights of West Virginia domestic-violence shelters: It violates their First Amendment rights to free speech and association as well as their due-process rights to receive adequate notice of what the law forbids and to protect personal safety on their own property. Faced with defending this statute, the Attorney General does not contest (and hence concedes) the veracity of all the evidence submitted with our motion. He does not deny that these shelters face unique and severe dangers daily—including the prospect that armed abusers will enter shelter property to stalk, violently harass, or even kill their victims. And he does not deny that such entry is antithetical to these shelters' very missions: to give survivors a safe environment free from violence and trauma.

Instead, the theme of the Attorney General's defense is that this case is easy because other states have parking-lot laws too. But the Attorney General cannot deny that West Virginia's law is an outlier—both in its breadth and its focus on protected speech. Nor can he deny that its application to these shelters raises uniquely troubling constitutional concerns not presented in any prior cases. He concedes that the law broadly bars shelters from asking *any* questions about gun possession—no matter the threat to safety—and effectively concedes that the statute cannot survive strict scrutiny. He tries to downplay the law's intrusion on associational freedom, but ultimately does not claim that it could survive scrutiny on this basis either. He likewise concedes that the law is subject to a heightened vagueness standard and yet fails to contest the overwhelming evidence that shelters are unable to understand what this statute actually covers. And, finally, the Attorney General never attempts to show that the law's intrusion on the right to protect personal security on private property can satisfy *any* level of heightened scrutiny. Indeed, the only two justifications that he offers for forcing shelters to accept firearms onto their own property are too weak to withstand even rational-basis review.

1

## ARGUMENT

For the reasons below, this Court should grant the Coalition summary judgment on its facial and as-applied constitutional challenges to the Parking Lot Amendments. *First*, it should declare that the inquiry provision, W. Va. Code § 61-7-14(d)(2)(A), and the take-no-action provision, *id.* § 61-7-14(d)(2)(C), facially violate the First Amendment's free-speech guarantee and the void-for-vagueness doctrine. *Second*, it should hold that the statute, as applied to the Coalition and its members, violates Coalition Members' free-association and due-process rights.

**I.     The inquiry and take-no-action provisions are content-based and speaker-based restrictions that facially violate the First Amendment.**

**A.     The inquiry provision prevents Coalition Members from engaging in core protected speech, not commercial speech, and it cannot satisfy any form of heightened scrutiny.**

The Attorney General concedes (at 15) that the inquiry provision is a "content-based regulation" on speech. He does not contest that the provision is also a "speaker-based" restriction. *See* Coalition Mem. 11–12 (Dkt. 39). And he cannot dispute that the Supreme Court and the Fourth Circuit have repeatedly held that "[s]uch a speech restriction is presumptively unconstitutional" and subject to strict scrutiny. *Am. Ass'n of Political Consultants, Inc. v. FCC*, 923 F.3d 159, 165 (4th Cir. 2019); *see, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *Wash. Post v. McManus*, 944 F.3d 506, 513 (4th Cir. 2019); *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

Putting all this aside, the Attorney General argues that the inquiry provision need only satisfy intermediate scrutiny, because it regulates commercial speech. *See* Morrisey Mem. 16–17 (Dkt. 45). As we will explain, the law cannot even satisfy that level of scrutiny. But the Attorney General's argument is based on a more fundamental error: The inquiry provision restricts core protected speech, not commercial speech.

2

**1.** It is a well-settled principle of First Amendment law that "commercial speech is 'speech that does no more than propose a commercial transaction.'" *Radiance Found., Inc. v. NAACP*, 786 F.3d 316, 331 (4th Cir. 2015) (quoting *Harris v. Quinn*, 134 S. Ct. 2618, 2639 (2014)). Although the Attorney General seems to recognize this principle (at 16), he never tries to explain how the speech restricted by the inquiry provision fits this definition. For good reason: It plainly does not. The law bars property owners from making any "verbal or written inquiry, regarding the presence or absence of a firearm locked inside or locked to a motor vehicle" in their parking lots. W. Va. Code § 61-7-14(d)(2)(A). Asking someone if they have guns in their car cannot, by any stretch of the imagination, "propose a commercial transaction." A property owner asks that question to ensure the safety of her property and the people on that property. All the more so when it is a *nonprofit domestic-violence shelter* like a Coalition Member that is asking the questions.

In fact, the Attorney General cites no case even suggesting that this kind of safety- or security-oriented speech could ever be characterized as commercial speech. It directs this Court to the Third Circuit's recent decision in *Greater Philadelphia Chamber of Commerce v. City of Philadelphia*, but the law at issue there barred employers from "inquiring into a prospective employee's wage history in setting or negotiating that employee's wage." 949 F.3d 116, 121 (3d Cir. 2020). That kind of job-recruiting speech is entirely different from the safety-related speech at issue here—indeed, as the Third Circuit recognized, "a 'proposal of possible employment . . . is a classic example of commercial speech.'" *Id.* at 137 (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 385 (1973)) (cleaned up). And the Attorney General's reliance on *Wollschlaeger* is even more flawed. There, the Eleventh Circuit suggested that strict scrutiny *should* apply to Florida's law barring physicians from inquiring about guns but *expressly*

*declined* to decide that question because the law "fail[ed] even under" a lesser level of heightened scrutiny. 848 F.3d 1293, 1308 (11th Cir. 2017); *see also id.* at 1311.

Nor can the Attorney General seek refuge in *Florida Retail*. Although he asserts (at 15) that that decision found "identical statutory language" to be constitutional, he conspicuously omits the fact that the plaintiffs in that case did not bring a First Amendment challenge to the Florida law. *See, e.g.*, Compl. (Dkt. 1), *Fla. Retail Fed'n, Inc. v. Att'y General of Fla.*, 576 F. Supp. 2d 1281 (N.D. Fla. 2008) (No. 4:08-cv-00179-RH-WCS); Mot. for Prelim. Inj. (Dkt. 9), *Fla. Retail Fed'n, Inc. v. Att'y Gen. of Fla.*, 576 F. Supp. 2d 1281 (N.D. Fla. 2008) (No. 4:08-cv-00179-RH-WCS). For that reason, the district court did not have any opportunity to address how and whether the purportedly identical inquiry provision restricted speech—let alone analyze it under First Amendment scrutiny. *See Fla. Retail Fed'n, Inc. v. Att'y Gen. of Fla.*, 576 F. Supp. 2d 1281, 1293 (N.D. Fla. 2008).

Nevertheless, the Attorney General urges this Court to analyze the inquiry provision as a commercial-speech restriction because the definition of commercial speech "is not static." Morrisey Mem. 16. But that would flout binding circuit precedent. The Fourth Circuit has held that, even outside its core definition, courts "rely on three factors to identify [] commercial speech: (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 879 F.3d 101, 108 (4th Cir. 2018). The Attorney General does not (and cannot) show how the speech here satisfies any of these three factors. Asking whether someone has a gun in the parking lot has no relation to advertising or the products and services provided by the property owner. Nor does the speaker have an "economic motivation" for that speech. Certainly not Coalition Members—who, after all, provide services to survivors and

their families free of charge. *See id.* (noting that "[a] morally and religiously motivated offering of free services cannot be described as a bare 'commercial transaction'").[1] But even for private businesses—who, presumably, could *lose* customers by asking them if they have any guns with them—such inquiries are still motivated by safety, not economics.

In sum, because the inquiry provision does not regulate commercial speech, it is subject to strict scrutiny. And because the Attorney General does not even try to explain how the inquiry provision could satisfy strict scrutiny, the Court should conclude that the inquiry provision violates the First Amendment.

**2.** Even if the inquiry provision restricted commercial speech (and it does not), it still would violate the First Amendment. That is because the Attorney General has failed to show how it could overcome even intermediate scrutiny.

"Under an intermediate standard of scrutiny, the state bears the burden of demonstrating 'at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest.'" *Stuart v. Camnitz*, 774 F.3d 238, 250 (4th Cir. 2014) (quoting *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667–68 (2011)). And the State's "burden under this test is 'heavy.'" *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1176 (9th Cir. 2018) (quoting *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996)). This burden cannot be "satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on

---

[1] The Attorney General cites (at 19) the Fourth Circuit's 2013 en banc opinion in *Greater Baltimore Center for Pregnancy Concerns* to suggest that speech directed to a nonprofit's provision of free services can be commercial speech. But there, the Fourth Circuit simply remanded the case for further discovery because of various procedural errors, without "comment[ing] on how this matter ultimately should be resolved." 721 F.3d 264, 271 (4th Cir. 2013) (en banc). And the Attorney General omits that, in 2018, the Fourth Circuit held in the same case that the plaintiff nonprofit's speech was *not* commercial speech. *See* 879 F.3d at 108–09.

commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993); *see Ibanez v. Fla. Dep't of Bus. & Pro. Regul.*, 512 U.S. 136, 143 (1994). In other words, to satisfy immediate scrutiny, the government must submit "*actual evidence* supporting its assertion that a speech restriction does not burden substantially more speech than necessary." *Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015) (emphasis added).

The Attorney General has defaulted on that burden here. Initially, it is doubtful that "protect[ing] Second Amendment rights against *private* encumbrances" is a legitimate, let alone substantial, governmental interest in the first place. Morrisey Mem. 18. This is a category error. The rights conferred by the United States Constitution are rights against *government* encumbrances on private citizens, not the other way around. As numerous courts have held, "the Second Amendment" does "not prevent interference with [the right to keep and bear arms] by private actors." *Hoven v. Walgreen Co.*, 751 F.3d 778, 784 (6th Cir. 2014); *see* Coalition Mem. 13 (citing cases). Nor can the Second Amendment be understood bar private property owners from engaging in speech. *See Wollschlaeger*, 848 F.3d at 1313 ("The Second Amendment right to own and possess firearms does not preclude questions about, commentary on, or criticism for the exercise of that right.").[2]

But even if the government's proffered interest were legitimate, the Attorney General offers no evidence indicating that the inquiry provision does in fact advance that interest. For example, the Attorney General does not provide any evidence showing that private property owners' inquiries about guns in vehicles on their property before the enactment of the Parking Lot

---

[2] Indeed, as explained below, forcing private property owners to admit guns onto their own property may itself violate the Second Amendment.

6

Amendments actually "restrict[ed] the ownership or possession of firearms by [guests or customers]." *Wollschlaeger*, 848 F.3d at 1313. And they point to nothing in the record that shows that private property owners in West Virginia actually discriminated against gun owners. In this respect, the Attorney General's evidentiary showing here is even less than the "six anecdotes" that the Eleventh Circuit held insufficient to justify the Florida physician gun-inquiry law. *See id.* (describing the State's "evidentiary void"). And it falls far short of the "substantial evidence in the form of testimony and metanalysis of relevant research" that the City of Philadelphia submitted "to support the need for the Inquiry Provision" at issue in *Greater Philadelphia Chamber of Commerce*. 949 F.3d at 145.

Despite the Attorney General's urging, this Court "[can]not simply defer to [his] contention because it is a legislative judgment." *W. Va. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 303 (4th Cir. 2009). Instead, it must "independently evaluate [the] defendant's assertion that the [speech] restrictions advance the state's interest." *Id.* Here, the government has failed to meet its "burden to justify its content-based law as consistent with the First Amendment." *Sorrell*, 564 U.S. at 571–72. Thus, even under intermediate scrutiny, the inquiry provision must be struck down as unconstitutional.

### B.   The take-no-action provision plainly restricts speech.

The Attorney General barely tries to defend the take-no-action provision's constitutionality. He spends just a few sentences arguing that the provision only regulates what Coalition Members can "do"—"not what they may or may not say." Morrisey Mem. 20 (quoting *Rumsfeld v. Forum for Acad. & Inst'l Rts.*, 547 U.S. 47, 60 (2006)). But "[s]peech is not conduct just because the government says it is." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019). The take-no-action provision squarely prohibits Coalition Members from engaging in a wide range of

speech concerning gun possession in their parking lots. Because the law bars them from taking "any" action, it presumably prohibits shelter staff from: (1) *asking* people to leave the shelter property; (2) *calling* the police to *tell* them about a gun in someone's vehicle; (3) *posting signs* describing the shelter's opposition to having guns in vehicles; or even (4) *telling* other staff members about the risk of a gun in someone's car. All of these "actions" involve pure speech.

Further, in making his speech vs. conduct argument, the Attorney General edits the statute's language to remove a key clause. The provision does not, as the State asserts, just bar property owners from "tak[ing] any action upon learning of the presence of a firearm in a vehicle in the parking lot." Morrisey Mem. 20. It prohibits them from "tak[ing] any action . . . *based upon verbal or written statements* of any party concerning possession of a firearm stored inside a motor vehicle in a parking lot." W. Va. Code § 61-7-14(d)(2)(C) (emphasis added). In other words, even *conduct* barred by the provision is predicated on speech. For example, if a shelter employee *saw* a person in the parking lot putting a gun in their car, the employee would not be barred by subsection (d)(2)(C) from taking any action against that person. But if someone *told* the employee the very same thing about the person, the employee would be prohibited from taking any action. This situation is thus nothing like that in *Rumsfeld*, where the restriction on speech was "plainly incidental to the Solomon Amendment's regulation of conduct." 547 U.S at 62. Here, the law's regulation of conduct turns entirely on speech.

Putting the speech vs. conduct argument aside, the Attorney General makes no effort in his cross-motion to explain how the take-no-action provision satisfies any form of First Amendment

scrutiny. *See* Morrisey Mem. 20. Any argument in that regard is therefore waived.[3] Accordingly, the Court should conclude that the take-no-action provision, too, is facially unconstitutional.

## II. The Attorney General admits that the Parking Lot Amendments' prohibitions are either unconstitutionally vague, or so broad in scope that they must facially violate the First Amendment.

The Attorney General concedes (at 12–13) that the Parking Lot Amendments are subject to a heightened vagueness standard. *See also* Coalition Mem. 23 (describing the "more stringent vagueness test" applied to speech restrictions). And the Attorney General does not contest that the Coalition has offered substantial evidence showing that its members do not understand what the statute actually prohibits and what it permits. *See, e.g.*, Program B Decl. ¶¶ 8–9 (Dkt. 38-8) (noting that executive director asked an employee to "to lock the gun in their car" but "was not sure what the new law permitted [her] to do to confirm" that they did so); *see also* Program C Decl. ¶¶ 9, 15 (Dkt. 38-12); Program D Decl. ¶ 8 (Dkt. 38-16). The Attorney General, tellingly, doesn't offer *any* evidence of his own.

Yet the Attorney General nonetheless claims, without citing any record evidence, that Coalition Members' confusion is unreasonable—that the law provides adequate notice about its prohibitions. In particular, he asserts that the potential actions that Coalition Members want to take "fall within the text of the prohibitions of the statute." Morrisey Mem. 14–15. But, in cherry-picking the Coalition's hypotheticals, the Attorney General only confirms the statute's vagueness. For instance, he says (at 15) that asking a resident about the presence of guns in her car or asking

---

[3] *See, e.g.*, *Moseley v. Branker*, 550 F.3d 312, 325 n.7 (4th Cir. 2008) ("As a general rule, arguments not specifically raised and addressed in opening brief, but raised for the first time in reply, are deemed waived."); *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 736, 745 n.4 (S.D. W. Va. 2014) ("[A]n argument raised for the first time in a reply brief or memorandum will not be considered.").

a person to move their weapons off the property for safety reasons both "explicitly" violate the Parking Lot Amendments. But what about the trickier scenarios that the Coalition posed in its motion for summary judgment? For example: "If a visitor to the shelter mentions that they have a gun in their car, for example, can shelter staff just ask them to make sure the gun is properly locked away?" Coalition Mem. 24. The Attorney General does not say. Or, "how can Coalition Members . . . verify that a gun is 'lawfully possessed' or 'locked'" as required by the statute? *Id.* Again, the Attorney General gives no answer.

This selective silence demonstrates how the statute "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). And this "ambiguity" will "inevitably . . . chill[] protected speech." *United States v. Miselis*, 972 F.3d 518, 544 (4th Cir. 2020). Indeed, the Attorney General does not dispute that the record evidence shows the law has already chilled Coalition Members' speech. *See, e.g.*, Program C Decl. ¶ 15 (Dkt. 38-12); Thomas Decl. ¶ 10 (Dkt. 38-18).

The Attorney General's reliance (at 14) on *Ramsey Winch, Inc. v. Henry*, 555 F.3d 1199 (10th Cir. 2009), is misplaced. There, the plaintiffs did not bring any First Amendment challenge to Oklahoma's parking-lot law, which (unlike West Virginia's) did not bar business owners from inquiring about firearm possession on its premises. *See id.* at 1202. Thus, because the statute "d[id] not involve First Amendment freedoms," the Tenth Circuit expressly applied a more forgiving vagueness standard—a standard that the Attorney General concedes does not apply here. *Id.* at 1211 n.11. In any event, the court's entire analysis of vagueness in *Ramsey* consisted of a single footnote. *See id.* It therefore provides little guidance as to how to evaluate the Coalition's vagueness challenge here.

In short, this Court should hold that the inquiry and take-no-action provisions are unconstitutionally vague. But if they are not vague, the free-speech problem is only magnified. To conclude that the statute provides people with reasonable notice, one would have to read its text to entirely prohibit private property owners in West Virginia from making *any* inquiries or statements concerning gun possession on their property. Indeed, that seems to be the Attorney General's own reading of the statute's scope. *See* Morrisey Mem. 15. Such a broad prohibition, which turns entirely on the speaker and the speech's content, cannot be squared with the First Amendment's guarantee of free speech. *See supra*, pp. 2–8.

### III.    The Parking Lot Amendments interfere with Coalition Members' rights to freedom of association.

The Attorney General argues (at 10) that the Parking Lot Amendments categorically do "not infringe on the Coalition's freedom to associate." But this argument disregards the record and misunderstands the law. It should be rejected.

First, the record. The Attorney General does not dispute what the evidence makes clear: Coalition Members' "commitment to non-violence is not a peripheral value or an ancillary view, but *the* central organizing tenet of their expressive identity." Coalition Mem. 16–17 (citing declarations). In forcing Coalition Members to allow firearms onto shelter property, the Parking Lot Amendments substantially impair those expressive associational interests. It prevents Coalition Members from maintaining an environment in which all of their residents and staff feel safe—thus making it more difficult for Coalition Members to provide survivors and their families with critical services. *See id.* at 17. And it undermines Coalition Members' ability to promote their missions and advocate for non-violence. *See id.* at 18.

Instead of grappling with these associational harms, the Attorney General dismisses them as not "cognizable" under the Supreme Court's decision in *Rumsfeld*. Morrisey Mem. 10–12. But

the Attorney General vastly overreads that decision. Initially, the premise of the Court's analysis in *Rumsfeld* was that the Solomon Amendment required a "law school [to] offer military recruiters *the same access* to its campus and students that it provides to the nonmilitary recruiter receiving the most favorable access." 547 U.S. at 55 (emphasis added); *see id.* at 69 ("To comply with the statute, law schools must allow military recruiters on campus and assist them in whatever way the school chooses to assist other employers."). By contrast, the Parking Lot Amendments require Coalition Members to treat firearms in a *different* way from all other weapons and contraband on their property—which they can lawfully ask about and even prohibit. Thus, the government's interference with Coalition Members' associational rights is greater than in *Rumsfeld*.

More importantly, contrary to the Attorney General's assertions, *Rumsfeld* did not categorically bar the type of free-association claims raised here. Indeed, the Court there confirmed that "the freedom of expressive association protects more than just a group's membership decisions"—laws that make "group membership less attractive" are likely to "rais[e] the same First Amendment concerns about affecting the group's ability to express its message." 547 U.S. at 69. That is exactly what the Coalition has demonstrated here: The law not only prevents Coalition Members from fully communicating and realizing their messages of non-violence, but also makes the shelter environment less safe, and thus less attractive to survivors and their families. And the Supreme Court has commanded courts to "give deference to an association's view of what would impair its expression." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000).[4]

---

[4] The Attorney General cavalierly asserts that the shelter environment will still remain safe for survivors and staff because it "is likely that no one will even know there is a firearm in the parking lot" and that, "if brought outside the vehicle, the Coalition can take necessary action." Morrisey Mem. 12. This assertion, made without any evidentiary support, is contrary to the substantial record evidence showing that victims and employees feel unsafe when they know that it is possible that guns are present on shelter property—even in the parking lot. *See* Coalition Mem. 5, 7–8 (citing declarations). Moreover, it is common sense that, by the time someone *takes the gun*

The Attorney General discounts the Coalition's concerns by claiming that the shelters can continue to voice their disapproval of violence and "express[] any beliefs that they may hold regarding firearms." Morrisey Mem. 11–12. But the Parking Lot Amendments explicitly *bar* Coalition Members from "tak[ing] *any* action" against firearm possession in their parking lots. This is another key distinction from the situation in *Rumsfeld*. The Supreme Court noted that the law school students and faculty in *Rumsfeld* were "free to associate to voice their disapproval of the military's message"—for example, by organizing protests against military recruiters' presence on campus. *Rumsfeld*, 547 U.S. at 1313. Here, by contrast, Coalition Members could face state enforcement actions and civil penalties if they were to take similar action. Indeed, under the Attorney General's expansive reading of the take-no-action provision, shelter staff would squarely violate the law if they were to protest or to post signs voicing disapproval of firearms when they learned that someone had guns stored in their vehicle in the parking lot. *See* Morrisey Mem. 15. (This result, moreover, only serves to highlight the free-speech concerns discussed above.)

In sum, the Parking Lot Amendments violate Coalition Members' free-association rights under the First Amendment. Accordingly, the Court should find them unconstitutional on an as-applied basis.[5]

---

*out of the car*, it may be too late to prevent violence. In any event, "it is not the role of the courts to reject a group's expressed values because they disagree with those values or find them internally inconsistent." *Dale*, 530 U.S. at 651.

[5] The Attorney General argues only that the statute does not interfere with the Coalition's free-association rights; he does not claim that the law would survive scrutiny if it did. *See* Morrisey Mem. 9–12; *see also Christian Legal Soc'y Chapter v. Martinez*, 561 U.S. 661, 680 (2010) (holding that "such restrictions are permitted only if they serve 'compelling state interests' that are 'unrelated to the suppression of ideas'"). He is, therefore, barred from raising any such argument for the first time in his reply brief.

IV.    **As applied to Coalition Members, the Parking Lot Amendments violate due process because they force domestic-violence shelters to allow firearms on their private property and thus risk their staff's and guests' personal security.**

A.    **The Parking Lot Amendments cannot satisfy even rational-basis review.**

The Attorney General does not even attempt to show that the Parking Lot Amendments can satisfy *any* level of heightened scrutiny. Instead, he argues that the Coalition's as-applied due-process claim fails because the law meets rational-basis review. *See* Morrisey Mem. 8–9. But the law cannot overcome even that minimal threshold. Neither of the two vague rationales that the Attorney General offers can conceivably justify forcing domestic-violence shelters to accept firearms onto their property. Thus, the Court need not even address whether the Parking Lot Amendments interfere with a "fundamental right" to find that the law violates due process as applied to the Coalition.

As to the first rationale (protecting the Second Amendment), the Attorney General simply asserts (at 9) that "[a]dvancing a constitutional right is a sufficient interest under rational basis." But, even if that's true as a general matter, the Attorney General does not explain how forcing domestic-violence shelters to allow guns on their property could *ever* advance Second Amendment rights. By contrast, as we previously explained, both precedent and scholars agree that the Second Amendment does not "give the government the right to force private property owners to allow firearms on their property no questions asked." *See* Coalition Mem. 13–14 (citing authorities). The "right codified in the Second Amendment does not include protection for a right to carry a firearm" onto private property "against the owner's wishes." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012). The Attorney General simply has no response to this consensus.

For good reason: No court has ever held that the Second Amendment permits the State to authorize the entry of weapons onto someone's property. Given that "the core protection of the

Second Amendment" is "the right of law-abiding, responsible citizens to use arms for self-defense in the[ir] home," *Kolbe v. Hogan*, 849 F.3d 114, 138 (4th Cir. 2017) (en banc), mandating that someone *allow* guns into their property against the owner's wishes itself violates the Second Amendment. For that reason, scholars have recognized that "[a] law requiring an owner of private property to allow guns on that property" is "the most extreme example of regulation that may be placed along a continuum of burdens on the right not to keep or bear arms," illustrating "government interference with people's autonomous choices about gun possession and ownership." Joseph Blocher & Darrell A.H. Miller, *The Positive Second Amendment: Rights, Regulation, and the Future of* Heller 163–64 (2018).

Put differently, the Parking Lot Amendments not only fail to advance Second Amendment rights but actually violate Coalition Members' *own* Second Amendment "right[s] *not* to keep or bear arms." *Id.* at 162. "Just as a person has a right not to be forced by the government to speak, or to associate with speech with which the person disagrees, the person has a right not to arm themselves or to associate with those who want to be armed." *Id.* (hypothesizing the case of "an organization of pacifists" who "may not want to have a gun on their property"). Yet the Parking Lot Amendments do exactly this: They force Coalition Members, who have a deeply held commitment to non-violence, to accept guns onto their property. Such a law—which has no longstanding tradition in Anglo-American history—cannot be found to advance Second Amendment rights even under rational-basis review.[6]

---

[6] The Attorney General cites *Ramsey* (at 9) as its sole support for his Second Amendment-based rationale. But the Tenth Circuit spent just one sentence on this point. *See Ramsey*, 555 F.3d at 1211. Nor did the plaintiffs in *Ramsey* raise this issue: They argued that Oklahoma's law violated due process because it "abrogate[d] the property rights of employers by forcing the entry of firearms into the workplace," not because it violated the plaintiffs' longstanding right to ensure

The Attorney General's second rationale—that the Act promotes public safety—fares even worse. *See* Morrisey Mem. 9. In his briefing, he does not once explain how safety will be advanced by forcing guns (which may be wielded by abusers) onto the property of domestic-violence shelters. In fact, the Attorney General *agrees* that: (1) "[a] domestic abuser's access to a firearm may increase the risk of lethal violence to his or her victim"; (2) "[v]ictims of domestic violence face an increased risk of lethal violence when they attempt to leave their abuser"; (3) "[a]busers have come to Coalition Members' properties to stalk, harass, threaten, intimidate, or harm their victims and/or the victim's children"; (4) "[a]busers have threatened violence against Coalition Members' clients, staff, and facilities"; (5) "Coalition Members face security concerns to their programs, facilities, staff, and clients, as the result of providing direct services to victims and survivors of domestic violence"; and (6) "Coalition Members' shelter staff and residents at times face the risk of violence from other shelter residents, many of whom have experienced significant trauma." Stip. Facts ¶¶ 13, 15, 17–20 (Dkt. 34). And all of the record evidence bears this out: Having guns on shelter property significantly increases the danger of violence to domestic-violence survivors, their children, shelter staff, and other guests and visitors. *See, e.g.*, Coalition Mem. 3–7 (citing declarations from shelter directors); Bradley Decl. ¶¶ 2–6 (Dkt. 38-17); Thomas Decl. ¶¶ 5–7 (Dkt. 38-18). What's more, the threat to Coalition Members' personal security is compounded by the inquiry provision—which prevents shelters from even *asking* about the guns that they are being forced to accept onto their property.

The Attorney General's only response to all of this is that *Ramsey* and *Florida Retail* held that public safety can be a rational basis for a state parking-lot law. *See* Morrisey Mem. 9. Initially,

---

their own personal security on their property. *See* Appellees' Br. 40–43, *Ramsey Winch, Inc. v. Henry*, 555 F.3d 1199 (10th Cir. 2008) (No. 07-5166).

he fails to mention that the Tenth Circuit's discussion of this issue in *Ramsey* consists of just a few cursory sentences, *see* 555 F.3d at 1211, and that the Florida district court's discussion cited neither record evidence nor case law, *see* 576 F. Supp. 2d at 1290–91. Further, both decisions considered the public-safety rationale persuasive only in the context of requiring employers to allow *employees* to keep guns in their cars in the employer's parking lot—not, as is the case here, allowing all invitees to do so. And neither of them concerned a law as broad as West Virginia's—which the Attorney General concedes would bar a shelter employee from even asking someone if their gun was properly stored in their vehicle—nor such a law's application to the unique domestic-violence context in which this challenge arises. In sum, because the Attorney General has failed to establish any rational basis for the Parking Lot Amendments as applied to Coalition Members, the Court should grant summary judgment to the Coalition on its due-process claim.

**B.    The Parking Lot Amendments infringe on Coalition Members' fundamental rights.**

Alternatively, if the Court decides not to invalidate the statute on rational-basis review, it should hold that the Parking Lot Amendments impermissibly burden Coalition Members' fundamental rights to guarantee their personal safety on their own private property. In that event, it should conclude—as the Attorney General effectively concedes—that this law cannot satisfy strict scrutiny, and thus is unconstitutional as applied to the Coalition.

The Attorney General does not (and cannot) dispute that the right to personal security is a fundamental right under the Due Process Clause. *See* Coalition Mem. 18. Nor does he contest the historical understanding that a corollary of this right is the right to protect one's personal security by controlling the conditions under which someone may enter the property. *See id.* 18–19 (citing

historical authorities).[7] Instead, he just contends that this right is a "bad fit." Morrisey Mem. 6. In making this contention, the Attorney General primarily relies (once again) on *Florida Retail*. *See id.* at 1, 4–5. But the district court there addressed the issue in a single conclusory sentence, without any analysis. *See Fla. Retail*, 576 F. Supp. 2d at 1287–88 ("But at least when, as here, the statute does not implicate the limited class of rights that have been labeled 'fundamental,' a court reviewing legislative action on substantive due process grounds properly accords substantial deference to legislative judgments."). That is unsurprising: The plaintiffs there *conceded* that the law at issue implicated no fundamental rights and hence argued that their due-process claim only entailed rational-basis review. *See* Pls.' Mot. for Prelim. Inj. 11–14 (Dkt. 9), *Fla. Retail Fed'n, Inc. v. Att'y Gen. of Fla.*, 576 F. Supp. 2d 1281 (N.D. Fla. 2008) (No. 4:08-cv-00179-RH-WCS). So the *Florida Retail* court had no occasion to determine whether, as the Coalition contends here, a law requiring property owners to allow firearms on private property interferes with the owners' fundamental rights. Nor did it address the issue on the unique facts, circumstances, and record evidence presented here.

Even more critically, *Florida Retail* was issued four years before the Eleventh Circuit's decision in *GeorgiaCarry*. In that case, as previously explained (Coalition Mem. 19–22), the court conducted a thorough review of Anglo-American common-law history and recognized the fundamental "right of a private property owner . . . to determine for itself whether to allow firearms on its premises and, if so, under what circumstances." 687 F.3d at 1261, 1266. The Eleventh Circuit's conclusion in *GeorgiaCarry* supersedes the *Florida Retail* court's belief that laws like

---

[7] The Attorney General seems to think this corollary is purely a property right, but the historical authorities we discussed in our motion make clear that the right to ensure one's safety on one's own property is properly understood as grounded in personal security, not just property concerns. *See* Coalition Mem. 18–19.

the Parking Lot Amendments don't burden fundamental rights. Yet the Attorney General barely addresses this case, tacking it on at the very end of his due-process argument. *See* Morrisey Mem. 7–8.[8]

Moreover, this brief discussion of *GeorgiaCarry* is entirely unpersuasive. The Attorney General asserts (at 7) that the Eleventh Circuit's holding is irrelevant because there the government excluded firearms from certain properties, whereas here it is requiring that firearms be allowed on certain properties. But that's a distinction with no difference. In *GeorgiaCarry*, the Eleventh Circuit dismissed a Second Amendment challenge to Florida' law because it held that the Second Amendment "did not expand, extend, or enlarge the individual right to bear arms at the expense of other fundamental rights"—namely, a property owner's "right, rooted in the common law, to forbid possession of firearms on its property." 687 F.3d at 1264. The same reasoning applies here: In purporting to protect the Second Amendment, the State of West Virginia cannot trample on Coalition Members' "equally fundamental" right to forbid gun possession on shelter property. *See id.* at 1265; *see also* Blocher & Miller, *The Positive Second Amendment*, at 162 (explaining that, to the extent that "the Second Amendment rests on the sanctity of individual choices regarding firearms," it should "support that choice in either direction").

In sum, the Attorney General can identify no legitimate, let alone compelling, government interest in forcing Coalition Members to allow guns on their property against their wishes. This

---

[8] In a similar vein, the Attorney General boldly cites a far older Eleventh Circuit decision for the general proposition that "property rights" are "common law rights" that "are not equivalent to fundamental rights." Morrisey Mem. 7 (citing *DeKalb Stone, Inc. v. Cnty. of DeKalb*, 106 F.3d 956, 959 n.6 (11th Cir. 1997)). Of course, he fails to grapple with the fact that fifteen years later in *GeorgiaCarry*, the Eleventh Circuit specifically held that a property owner has a "fundamental" right "to control who may enter [his property], and whether that invited guest can be armed." *See* 687 F.3d at 1264–66.

19

Court should therefore find the Parking Lot Amendments unconstitutional, as applied to the Coalition, under the Due Process Clause.

## CONCLUSION

The Court should grant the Coalition's motion for summary judgment and deny the Attorney General's cross-motion for summary judgment.

Dated: April 26, 2021

Respectfully submitted,

*/s/* Lucas R. White
J. David Fenwick (W. Va. Bar No. 6029)
Lucas R. White (W. Va. Bar No. 12501)
**GOODWIN & GOODWIN, LLP**
300 Summer Street, Suite 1500
P.O. Box 2107
Charleston, WV 25328
(304) 346-7000
*lrw@goodwingoodwin.com*

Eric Tirschwell*
Alla Lefkowitz*
James Miller*
**EVERYTOWN LAW**
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(646) 324-8222

Neil K. Sawhney*
**GUPTA WESSLER PLLC**
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336

Deepak Gupta*
Jonathan E. Taylor*
**GUPTA WESSLER PLLC**
1900 L Street, NW, Suite 312
Washington, DC 20036
(202) 888-1741

*Counsel for Plaintiff*
*\*Pro hac vice*

20

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

THE WEST VIRGINIA COALITION AGAINST
DOMESTIC VIOLENCE, INC.,

      *Plaintiff,*

      v.

PATRICK J. MORRISEY, in his official
capacity as Attorney General for the
State of West Virginia,

      *Defendant.*

Civil Action No. 2:19-cv-00434
(Judge John T. Copenhaver, Jr.)

**CERTIFICATE OF SERVICE**

    I hereby certify that on April 26, 2021, I electronically filed the foregoing brief with the
Clerk of The United States District Court for the Southern District of West Virginia using the
CM/ECF system. All participants are registered CM/ECF users and have been served by the
CM/ECF system.

                                      */s/* Lucas R. White
                                      Lucas R. White

                                      *Counsel for Plaintiff The West Virginia
                                      Coalition Against Domestic Violence, Inc.*