UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

THE WEST VIRGINIA COALITION
AGAINST DOMESTIC VIOLENCE, INC.,

        Plaintiff,

v.                              Civil Action No. 2:19-cv-00434

PATRICK J. MORRISEY,
in his official capacity as
Attorney General for the
State of West Virginia,

        Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

        Pending is the Motion for Summary Judgment of the plaintiff, The West Virginia Coalition Against Domestic Violence, Inc. (ECF No. 38), filed March 15, 2021.  Also pending is the Cross-Motion for Summary Judgment of the defendant, Attorney General Patrick J. Morrisey (ECF No. 44), filed April 5, 2021.

I.   Factual and Procedural Background

        The West Virginia Coalition Against Domestic Violence, Inc. ("the Coalition") is a 501(c)(3) nonprofit membership organization with fourteen member programs (hereinafter

"Coalition members").  Joint Stipulation of Facts ("J.S.F."), ECF No. 34 at ¶ 1–2.  Each Coalition member is a domestic violence program that has been licensed by the West Virginia Family Protection Services Board.  Id. at ¶ 2.  The Coalition members operate as independent incorporated non-profit entities that "provide direct services to victims and survivors of domestic violence and their families."  Id. at ¶¶ 2–4.

Each of the Coalition members "operates at least one shelter, as well as one or more outreach offices, that provide direct services to victims and survivors of domestic violence." Id. at ¶ 6.  Some Coalition members also operate "visitation and exchange centers" that allow for supervised visitation areas for "estranged parents."  Id.

The stated mission of the Coalition is "to end personal and institutional violence in the lives of women, children and men."  Id. at ¶ 8.  The parties agree that "[p]roviding a safe environment for victims and survivors of domestic violence is vital to the work of the Coalition and its Members" and that "[p]art of creating a safe environment for victims and survivors of domestic violence is creating an environment where victims and survivors will not be retraumatized."  Id. at ¶¶ 10–11.

Domestic violence and gun violence are interconnected.
Several dozen domestic violence related homicides occur in West
Virginia every year, and at least some portion of those
homicides are committed with a firearm.  Id. at ¶ 12.  According
to West Virginia Domestic Violence Related Death Reports
provided by the Coalition, 75% of all domestic violence
homicides between October 1, 2019 and September 30, 2020 were
committed with a firearm.  ECF No. 38-20 at 5.  Domestic abusers
can use firearms to threaten and control their victims, and mere
access to firearms "may increase the risk of lethal violence" to
victims.  J.S.F. at ¶¶ 13–14; see Thomas Decl., ECF No. 38-18 at
¶ 6 (citing Jacquelyn C. Campbell et al., Risk Factors for
Femicide in Abusive Relationships: Results from Multistate Case
Control Study, 93 Am. J. Pub. Health 1089, 1092 (2003) (finding
a five-fold increase in femicide when abusers have access to a
firearm)).

Indeed, domestic abusers have "come to Coalition
Members' properties to stalk, harass, threaten, intimidate, or
harm their victims and/or the victim[s'] children."  J.S.F. at ¶
17.  Some Coalition member staff have "witnessed victims be
deterred from seeking services . . . because of firearm-related
threats that their abusers have made to them and to [Coalition
member] staff."  Program C Decl., ECF No. 38-12 at ¶ 5.

3

Coalition members, their clients, and staff have been threatened with violence in the past, and they continue to face security concerns as a result of their work and mission.  J.S.F. at ¶¶ 18–19.  Those concerns include threats of violence from both abusers and shelter residents.  Id. at ¶ 20.

Ostensibly because of concerns about safety, West Virginia's Family Protection Services Board requires domestic-violence shelters, including the Coalition members, to have written policies "that prohibit the possession and use of weapons . . . violence and drug and alcohol use within the shelter."  Id. at ¶ 21.

In connection with their shelters and offices, all of the Coalition members "own, lease, and/or are charged with the care, custody, and control over parking areas" or "parking lots."  Id. at ¶ 7.  Those parking areas are subject to West Virginia's Business Liability Protection Act ("BLPA"), W. Va. Code § 61-7-14.

Previously, the BLPA allowed property owners to prohibit the open or concealed carry of a firearm anywhere on their properties.  See W. Va. Code § 61-7-14 (2017) ("[A]ny owner, lessee or other person charged with the care, custody and control of real property may prohibit the carrying openly or

4

concealing of any firearm or deadly weapon on property under his or her domain . . ..").

In March 2018, the West Virginia Legislature enacted House Bill 4817, which amended the BLPA to prohibit property owners from banning firearms in the parking lot areas of their properties. The 2018 amendments are referred to by the parties as the "Parking Lot Amendments." The Parking Lot Amendments became effective on June 8, 2018.

Subsection 61–7–14(d)(1) of the Parking Lot Amendments provides that:

> No owner, lessee, or other person charged with
> the care, custody, and control of real property
> may prohibit any customer, employee, or invitee
> from possessing any legally owned firearm, when
> the firearm is
>
>> (A) Lawfully possessed;
>>
>> (B) Out of view;
>>
>> (C) Locked inside or locked to a motor
>> vehicle in a parking lot; and
>>
>> (D) When the customer, employee, or invitee
>> is lawfully allowed to be present in that
>> area.

Similarly, subsection 61–7–14(d)(4) states that:

> No owner, lessee, or other person charged with
> the care, custody, and control of real property
> may prohibit or attempt to prevent any customer,
> employee, or invitee from entering the parking
> lot of the person's place of business because the
> customer's, employee's, or invitee's motor

> vehicle contains a legal firearm being carried
> for lawful purposes that is out of view within
> the customer's, employee's, or invitee's motor
> vehicle.

The court will refer to subsections 61-7-14(d)(1)(storing) and

(d)(4)(entering) collectively as the "No-Prohibition

Provisions."

The Parking Lot Amendments also prohibit owners,

lessees, or persons "charged with the care, custody, and

control" over parking lots from "violat[ing] the privacy rights

of a customer, employee, or invitee . . . [b]y verbal or written

inquiry, regarding the presence or absence of a firearm locked

inside or locked to a motor vehicle in a parking lot[.]"  W. Va.

Code § 61-7-14(d)(2)(A).  The court will refer to this section

as the "Inquiry Provision."

The BLPA also prohibits owners, lessees, and persons

charged with the care, custody, and control of parking lots from

"violat[ing] the privacy rights of a customer, employee, or

invitee . . . [b]y conducting an actual search of a motor

vehicle in a parking lot to ascertain the presence of a firearm

within the vehicle[.]"  W. Va. Code § 61-7-14(d)(2)(B).  The

court will refer to this subsection as the "Search Provision."

Subsection 61-7-14(d)(2)(C) prohibits the same

individuals from taking "any action against a customer,

employee, or invitee based upon verbal or written statements of

6

any party concerning possession of a firearm stored inside a motor vehicle in a parking lot for lawful purposes, except upon statements made pertaining to unlawful purposes or threats of unlawful actions involving a firearm made in violation of § 61-6-24 [pertaining to threats of terrorist acts] of this code." W. Va. Code § 67-7-14(d)(2)(C).  The court will refer to this subsection as the "Take-No-Action Provision."

Finally, the "Employment Provision," subsection 61-7-14(d)(3)(B), prohibits employers from conditioning employment on an employee's agreement to refrain from keeping a firearm locked in or locked to a vehicle in parking lot areas.[1]

The Parking Lot Amendments authorize the West Virginia Attorney General to bring an action seeking injunctive relief and civil penalties of up to $5,000.00 for each violation plus costs and attorney's fees.  W. Va. Code § 67-7-14(f).  The Parking Lot Amendments also permit "aggrieved" customers, employees, and invitees to bring private civil actions against violators.  Id.

Prior to the enactment of the Parking Lot Amendments, "some Coalition Members had policies, procedures, and/or signage

---

[1] The Coalition does not challenge subsection 61-7-14(d)(3)(A), which prohibits employers from conditioning employment on "[t]he fact that an employee or prospective employee does or does not hold a [concealed carry license or provisional concealed carry license]."

that prohibited firearms throughout their property, including in parking areas and parked vehicles." J.S.F. at ¶ 24. Before the enactment of the Parking Lot Amendments, the BLPA specifically provided for their authority to do so. See W. Va. Code § 61-7-14 (2017).

On June 6, 2019, the Coalition filed this civil action against Patrick Morrisey ("the Attorney General"), in his official capacity as Attorney General for the State of West Virginia. Compl., ECF No.1. The Coalition's complaint asserts four violations of 42 U.S.C. § 1983: (I) the Inquiry and Take-No-Action Provisions facially violate the right to free speech under the First Amendment to the U.S. Constitution; (II) the BLPA as a whole, as applied to the Coalition, violates the freedom of association under the First Amendment of the U.S. Constitution; (III) the BLPA as a whole, as applied to the Coalition, violates substantive due process under the Fourteenth Amendment to the U.S. Constitution; and (IV) the Inquiry, Search, and Take-No-Action Provisions are unconstitutionally vague so as to violate procedural due process under the Fourteenth Amendment to the U.S. Constitution. Compl. ¶¶ 73-103. The Coalition requests declaratory judgment in its favor on each count, injunctive relief prohibiting the enforcement of the challenged provisions, and attorney's fees.

On November 25, 2020, this court denied the Attorney General's motion to dismiss, which challenged the Coalition's complaint on standing and ripeness grounds.  ECF No. 28.[2] Thereafter, the parties agreed that discovery was not necessary. Instead, the parties submitted a joint stipulation of facts and filed their respective motions for summary judgment. Additionally, the Coalition submitted a number of exhibits in support of its motion.  The Attorney General did not contest any of those exhibits and did not submit any exhibits in support of its own motion.

## II.  Legal Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see</u> <u>also</u> <u>News</u>

---

[2] At the motion to dismiss stage, the Attorney General argued that the Parking Lot Amendments had not been enforced against any business since their enactment and that he did not have plans to enforce it absent citizen complaints.  ECF No. 13 at 8-10.  These representations remain true, so far as the court knows.  The Attorney General has not expressly disavowed future enforcement.

& Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).

A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable factfinder could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.  Although the court views the evidence in the light most favorable to the nonmoving party, "that party must produce evidence that goes beyond conclusory or speculative allegations and [must] rel[y] on more than a mere scintilla of evidence to withstand summary judgment."  Hodgin v. UTC Fire & Sec. Americas Corp., 885 F.3d 243, 252 (4th Cir. 2018) (quoting Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)) (internal marks omitted).

### III. Discussion

More than twenty states in this country have passed some form of "parking lot" or "bring your gun to work" law to prohibit businesses and/or employers from banning firearms in parking lots or to provide immunity for employers who allow certain individuals to keep firearms stored in their vehicles.[3]

---

[3]  See Ala. Code § 13A-11-90 (2013); Alaska Stat. § 18.65.800 (2005); Ariz. Rev. Stat § 12-781 (2009); Ark. Code Ann. § 11-5-

Notwithstanding the prevalence of these laws, to date it appears that only the laws in Oklahoma, Florida, and Minnesota have been challenged in court.  See Ramsey Winch Inc. v. Henry, 555 F.3d 1199 (10th Cir. 2009);[4] Fla. Retail Fed'n, Inc. v. Att'y Gen. of Fla., 576 F. Supp. 2d 1281 (N.D. Fla. 2008);[5] Edina Cmty. Lutheran Church v. State, 745 N.W.2d 194 (Minn. Ct. App. 2008), review denied (Minn. Apr. 29, 2008).[6]

---

117 (2021); Fla. Stat. § 790.251 (2008); Ga. Code Ann. § 16-11-135 (2016); Idaho Code § 5-341 (2009); 430 Ill. Comp. Stat. 66/65(b) (2021); Ind. Code § 34-28-7-2 (2017); Kan. Stat. Ann. § 75-7c10 (2017); Ky. Rev. Stat. Ann. § 237.106 (West 2006); La. Rev. Stat. Ann. § 32:292.1 (2008); Me. Stat. tit. 26, § 600(1) (2012); Minn. Stat. § 624.714(17)-(18) (2017); Miss. Code Ann. § 45-9-55 (2006); Neb. Rev. Stat. § 69-2441 (2018); N.D. Cent. Code § 62.1-02-13 (2019); Ohio Rev. Code Ann. § 2923.1210 (2017); Okla. Stat. tit. 21, § 1289.7a (2007); Tenn. Code Ann. § 39-17-1313 (2021); Tex. Labor Code. Ann. § 52.061 (2016); Utah Code Ann. § 34-45-103 (2014); Wis. Stat. § 175.60(15m) (2017).

[4] In Ramsey Winch, the Tenth Circuit Court of Appeals upheld Oklahoma's parking lot law, finding that it did not constitute an unconstitutional taking, did not violate plaintiffs' due process right to exclude others from their property, and was not preempted by federal law.  555 F.3d at 1202.

[5] In Florida Retail Federation, the United States District Court for the Northern District of Florida found that Florida's parking lot law did not violate the plaintiffs' due process rights or the takings clause of the Fifth Amendment and was not preempted by the Occupational Safety and Health Act.  576 F. Supp. 2d at 1299–1300.  The court did find that the Florida statute violated equal protection inasmuch as its provision requiring businesses to allow customers to have firearms in their vehicles applied only to businesses with at least one employee who had a concealed-carry permit.  Id.

[6] In Edina Community Lutheran, Minnesota's intermediate court of appeals considered a challenge to that state's parking lot laws brought by churches alleging the law interfered with their

The Coalition submits that West Virginia's law "is an outlier — both in breadth and its focus on protected speech," and that no other parking lot law has been challenged on the exact grounds the Coalition alleges in its complaint.  Pl.'s Resp. Supp. Summ. J., ECF No. 46 at 1.  While West Virginia's law has not previously been challenged, it has been applied on at least one occasion.  See Ransom v. Guardian Rehab. Servs., Inc., 888 S.E.2d 890 (W. Va. 2023).

### A. Count I - First Amendment Free Speech

The Coalition submits that both the Inquiry Provision and the Take-No-Action Provision of the Parking Lot Amendments facially violate the First Amendment's guarantee of free speech. Pl.'s Mem. Supp. Summ. J., ECF No. 39 at 10; Pl.'s Resp. at 2. The Coalition avers that these two provisions are content and speaker-based restrictions that target only firearm-related speech spoken by individuals who own, lease, or are charged with

---

religious activities and philosophies.  745 N.W.2d at 206-07. Applying the state constitution, the court found the law to be an unconstitutional burden on the churches' religious freedom and upheld a permanent injunction of the law with respect to the churches' property.  Id. at 207.  The court expressly declined to base its decision on concepts related to property ownership. Id.

the care, custody, and control of parking lots.  Pl.'s Mem. at
10–11.

The Attorney General concedes that the Inquiry
Provision is a content-based speech regulation but submits that
the provision survives constitutional muster as a restriction on
commercial speech.  Def.'s Mem. Supp. Summ. J., ECF No. 45 at
15–19.  Additionally, the Attorney General argues that the Take-
No-Action Provision regulates conduct rather than speech and
thus is only subject to rational basis review.  Id. at 20.  The
court will address the two provisions at issue separately.


1.  *Inquiry Provision*

The First Amendment guarantees that "Congress shall
make no law . . . abridging the freedom of speech."  U.S. Const.
amend. I.  This guarantee has since been incorporated to the
states by virtue of the Fourteenth Amendment.  Stromberg v.
California, 283 U.S. 359, 368 (1931).  This brief clause
"sometimes proves difficult to apply."  Wollschlaeger v.
Governor, 848 F.3d 1293, 1300 (11th Cir. 2017) (en banc)
(Jordan, J.).  Nevertheless, "certain First Amendment principles
can be applied with reasonable consistency, and one of them is
that, subject to limited exceptions, content-based regulations

of speech are presumptively invalid." Id. (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992) (marks omitted).

A content-based speech regulation is one that "singles out one particular topic of speech . . . for regulatory attention." Wash. Post v. McManus, 944 F.3d 506, 513 (4th Cir. 2019). The Inquiry Provision at issue in this case does exactly that; it prohibits specific persons, those "charged with the care, custody, and control" of parking lots, from making "verbal or written inquir[ies]" on a particular topic of speech, namely, the "presence or absence of a firearm locked inside or locked to a motor vehicle in a parking lot." W. Va. Code § 61-7-14(d)(2)(A).

Content-based speech regulations are generally subject to strict scrutiny, "which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." Reed v. Town of Gilbert, 576 U.S. 155, 171 (2015). Thus, under strict scrutiny analysis, it would be the Attorney General's burden to show that the Inquiry Provision furthers a compelling interest of the state and is narrowly tailored to meet that end. See id.

The Attorney General argues that because the speech regulated by the Inquiry Provision is commercial in nature, only

14

intermediate scrutiny applies.  Def.'s Mem. at 15–16.[7]  Under
intermediate scrutiny, regulations on commercial speech are
constitutional if:

> (1) the regulated speech concerns lawful activity
> and is not misleading; (2) the regulation is
> supported by a substantial government interest;
> (3) the regulation directly advances that
> interest; and (4) the regulation is not more
> extensive than necessary to serve the
> government's interest.

Educ. Media Co. at Va. Tech, Inc. v. Insley, 731 F.3d 291, 298
(4th Cir. 2013).

    Commercial speech, while protected by the First
Amendment, has historically been "afforded less constitutional
protection than other forms of speech;" accordingly, "it is
important that the commercial speech concept not be defined too
broadly lest speech deserving of greater constitutional
protection be inadvertently suppressed."  Cent. Hudson Gas &
Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 580
(1980) (Stevens, J., concurring).

---

[7] The Attorney General also states that the Coalition "tellingly
ignores that the only court to address identical statutory
language found it constitutional."  Def.'s Mem. at 15 (citing
Fla. Retail Fed'n, 576 F. Supp. 2d at 1293).  While Florida
Retail Federation upheld a "guns-at-work" statute which included
an identical inquiry provision, that provision was not
challenged on First Amendment grounds.  Accordingly, the Florida
Retail Federation decision is of no persuasive value in
determining whether the Inquiry Provision of West Virginia's
Parking Law Amendments violates the First Amendment.

The Fourth Circuit has generally defined commercial speech "as speech that does no more than propose a commercial transaction." Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore, 879 F.3d 101, 108 (4th Cir. 2018) (quoting Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore ("Greater Baltimore Ctr. I"), 721 F.3d 264, 284 (4th Cir. 2013)). Nevertheless, "some speech outside this 'core notion' may also be deemed commercial." Id. To determine whether speech is commercial, courts are to analyze three factors: "(1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." Id. (quoting Greater Baltimore Ctr. I, 721 F.3d at 285).

The Attorney General argues that the Parking Lot Amendments apply only "to customers, invitees, and employees of businesses" and "appl[y] to many different types of businesses that provide paid services, such as stores." Def.'s Resp. Supp. Summ. J., ECF No. 47 at 15. He further argues that some of those businesses "will have commercial interest in asking about the presence of firearms — such as prohibiting firearms to help market itself as a firearms-free zone, and thereby attract clients and employees." Id. at 15–16.

Both the Coalition and the Attorney General make arguments about whether the specific speech the Coalition wishes to engage in is commercial in nature.   See Pl.'s Resp. at 4–5; Def.'s Resp. at 16.   Inasmuch as the Coalition has mounted a facial, rather than as-applied, challenge to the Inquiry Provision, the court finds that neither the specific intentions of the Coalition nor the potential commercial ramifications associated with the Coalition's desired speech are relevant to the court's analysis.

The court finds that the Inquiry Provision targets neither "advertisements" nor "specific products or services." Similarly, the court is unable to generally conclude that business owners, employers, or owner/operators of parking lots have an economic motivation rather than a safety concern for asking patrons, employees, customers, or invitees about the presence of firearms in their vehicles.  The Attorney General's supposition that some businesses may have a commercial interest in inquiring about firearms is speculative and fails to persuade the court that the factors described by the Fourth Circuit tilt in favor of deeming the restricted speech "commercial." Accordingly, the court is of the notion that the speech is not commercial and therefore strict scrutiny should apply.

Notwithstanding that conclusion, "the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied."  Sorrell v. IMS Health Inc., 564 U.S. 552, 571 (2011).  The Parking Lot Amendments' Inquiry Provision fails even under the less burdensome intermediate scrutiny analysis.  Under intermediate scrutiny, the Attorney General has the burden of proving that the provision is supported by a substantial governmental interest. Cent. Hudson Gas & Elec. Corp, 447 U.S. at 564.  Moreover, "[t]he limitation on expression must be designed carefully to achieve the State's goal."  Id.  Courts are to measure this second requirement by two criteria:

> First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.

Id.

The Attorney General has submitted two governmental interests for the Inquiry Provision.  First, the Attorney General avers that the "Inquiry Provision protects Second Amendment rights against private encumbrances including discrimination on the basis of the exercise of the right to bear arms."  Def.'s Mem. at 18 (marks omitted).

18

While "the protection of Second Amendment rights is a substantial government interest," Wollschlaeger, 848 F.3d at 1312, the Attorney General has failed to show both that the Inquiry Provision directly advances that interest and that the interest could not be served by less restrictive means.

The Attorney General argues that the provision "advances this interest because it prohibits businesses knowing and thus gaining the ability to discriminate against covered persons with guns." Def.'s Mem. at 18. Essentially, the Attorney General argues that by prohibiting the initial inquiry into the presence of a firearm, the state partially eliminates the ability of property owners to discriminate against gun holders.

Although the Second Amendment protects an individual's right to bear arms from government encumbrances, no court has recognized a right against private encumbrances. See Hoven v. Walgreen Co., 751 F.3d 778, 784 (6th Cir. 2014) (holding that although the Second Amendment limits "some state interference with individuals' rights to . . . bear arms" it does "not prevent interference with these rights by private actors"); Wollschlaeger, 848 F.3d at 1313 ("The Second Amendment right to own and possess firearms does not preclude questions about, commentary on, or criticism for the exercise of that right.").

Additionally, inquiry into the presence of a firearm in a vehicle does not necessarily amount to an encumbrance or attempted encumbrance.  Such inquiries may very well be a welcome subject from firearm possessors.  See Wollschlaeger, 848 F.3d at 1313 (noting that law prohibiting physicians from inquiring about firearms did not permissibly advance the state's purported goal of protecting the Second Amendment rights of patients where the record showed "that some patients do not object to questions and advice about firearms and firearm safety, and some even express gratitude for their doctors' discussion of the topic").[8]

Similarly, property owners may certainly inquire into the presence of a firearm in order to prepare for and provide for the safety of their customers, employees and invitees and do so without intending to banish or discriminate against the possessor.  Accordingly, the court is unable to conclude that the Inquiry Provision advances the Attorney General's first stated government interest.

---

[8] In Wollschlaeger, the Eleventh Circuit addressed a state law that prohibited physicians and medical professionals from "making a written inquiry or asking questions concerning the ownership of a firearm or ammunition" by their patients or their patient's family members absent a good faith belief that the "information [was] relevant to the patient's medical care or safety, or the safety of others[.]"  Wollschlaeger, 848 F.3d at 1302–03; see Fla. Stat. § 790.338(5).

The Attorney General has also failed to establish that there is no less restrictive means that would serve the purported goal.  Other provisions of the Parking Lot Amendments already prohibit businesses and parking lot owners and operators from (1) excluding a lawfully possessed firearm from their parking lot areas when it is locked in a motor vehicle and out of view; (2) prohibiting customers, employees, or invitees' vehicles from entering their parking lots because there is a lawfully-possessed firearm contained therein; and (3) from conditioning employment on an employee's agreement not to keep a firearm in his or her vehicle.  See W. Va. Code § 61-7-14(d). It is unclear why an extra provision prohibiting inquiry into, or discussion of such weapons would be necessary to protect an employee or invitee's Second Amendment rights.

The second governmental interest the Attorney General submits to support the Inquiry Provision is to protect the privacy of individuals exercising their Second Amendment rights. Def.'s Mem. at 18.  The protection of individual privacy has been recognized by courts as a substantial government interest. Walraven v. NC Bd. of Chiropractic Examiners, 273 F. App'x 220, 224-25 (4th Cir. 2008); see Wollschlaeger, 848 F.3d at 1314.

Nevertheless, the Inquiry Provision is not sufficiently tailored to advance that interest.  Individual

employees, invitees, and customers "who have privacy concerns about information concerning their firearm ownership [and possession] can simply refuse to answer questions on the topic." Wollschlaeger, 848 F.3d at 1314.  Inasmuch as the Attorney General has failed to explain why this specific speech restriction is needed to protect the privacy rights of firearm bearers, the court finds that the asserted interest and restrictive means cannot survive intermediate scrutiny.

Because the provision fails to satisfy intermediate scrutiny, it is axiomatic that it fails the greater burdens of strict scrutiny.  Accordingly, like most content-based speech regulations, the Inquiry Provision facially violates the First Amendment and may not stand.[9]

The constitutional infirmity of the Inquiry Provision, however, does not render the Parking Lot Amendments wholly unconstitutional.  West Virginia Code § 2-2-10 provides the rules for construction of statutes.  Pursuant to subsection (cc), unless otherwise specified,

> the provisions of every section, article or chapter of this code, whether enacted before or subsequent to the effective date of this subdivision, are severable so that if any

---

[9] Count I also raises a void for vagueness challenge as to the Inquiry Provision which the court denies for the reasons set forth in the Count IV discussion, infra pp. 68-73.  A similar Count I challenge is made to the Take-No-Action Provision that is dealt with under both Counts I and IV.

> provision of any section, article or chapter is
> held to be unconstitutional or void, the
> remaining provisions of the section, article or
> chapter remain valid, unless the court finds the
> valid provisions are so essentially and
> inseparably connected with, and so dependent
> upon, the unconstitutional or void provision that
> the court cannot presume the Legislature would
> have enacted the remaining valid provisions
> without the unconstitutional or void one, or
> unless the court finds the remaining valid
> provisions, standing alone, are incomplete and
> are incapable of being executed in accordance
> with the legislative intent . . ..

W. Va. Code § 2-2-10(cc).

Because the Parking Lot Amendments neither preclude severability nor are so dependent on the Inquiry Provision that the court cannot presume the West Virginia Legislature would have enacted the remaining provisions without it, the Inquiry Provision shall be severed from the rest of the enactment.

2. *Take-No-Action Provision*

The Coalition claims that the Take-No-Action Provision of the Parking Lot Amendments also constitutes a content-based regulation of speech. Pl.'s Mem. at 10–11.

In full, the provision reads:

> No owner, lessee, or other person charged with
> the care, custody, and control of real property
> may take any action against a customer, employee,
> or invitee based upon verbal or written

>            statements of any party concerning possession of
>            a firearm stored inside a motor vehicle in a
>            parking lot for lawful purposes, except upon
>            statements made pertaining to unlawful purposes
>            or threats of unlawful actions involving a
>            firearm made in violation of §61-6-24 of this
>            code.

W. Va. Code § 61-7-14(d)(2)(C).

The Attorney General submits that the Take-No-Action Provision regulates conduct, not speech.  <u>See</u> Def.'s Mem. at 20. The Coalition argues in rebuttal that the provision "squarely prohibits Coalition Members from engaging in a wide range of speech concerning gun possession in their parking lots."  Pl.'s Resp. at 7–8.  The Coalition lists examples of that which it labels as "pure speech" that are prohibited by the provision:

>        Because the law bars them from taking 'any' action, it
>        presumably prohibits shelter staff from: (1) <u>asking</u> people
>        to leave the shelter property; (2) <u>calling</u> the police to
>        tell them about a gun in someone's vehicle; (3) <u>posting</u>
>        <u>signs</u> describing the shelter's opposition to having guns in
>        vehicles; or even (4) <u>telling</u> other staff members about the
>        risk of a gun in someone's car.  All of these 'actions'
>        involve pure speech.

<u>Id.</u> at 8 (emphasis in original).  The foregoing examples, though referencing shelter staff and shelter property, apply equally to all businesses.  Additionally, the Coalition contends that the Take-No-Action Provision regulates speech because it prohibits businesses and individuals from taking actions based upon speech.  Pl.'s Mem. at 11; Pl.'s Resp. at 8.; <u>see</u> W. Va. Code § 61-7-14(d)(2)(C).

While the Coalition correctly points out examples of the Take-No-Action Provision's inhibition of speech, it has elected to challenge this provision only facially, and not as-applied.  <u>See</u> Pl.'s Mot. Summ. J. at 1.  It has, then, the burden of showing that all or most applications are unconstitutional.  <u>See</u> <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987).  The Coalition's challenge depends on whether the provision's regulation passes constitutional muster.

In the context of the Parking Lot Amendments of which it is a part, the ban of "any action against a customer, employee, or invitee" would, if otherwise valid, aptly include the banning of discriminatory conduct, against the possessor of the stored firearm who is in compliance with § 61-7-14(d)(1), consisting of barring entry to the store, business or facility served by its parking lot or a denial of service.  "Any action against" may - or may not - also include an abundance of speech rendered in the interest of furthering the safety of all one's customers, employees, invitees and others that simply asks the possessor of the firearm in the motor vehicle

to remove the firearm

to leave the premises or

to never again bring a firearm

25

or that which involves calling the police to ascertain whether the possessor is a convicted felon whose civil right to possess a firearm has not been restored or is a domestic violence misdemeanant similarly disqualified, or that which involves an endless variety of steps one may wish to take or request or warnings one may wish to sound that could be construed as an action against the possessor.

Because the term "any action against" is not defined, its scope is unknown and serves to chill any comment or conduct that one who is the "owner, lessor or other person charged with the care, custody and control of real property" may take or make, pursuant to § 61-7-14(d)(2)(C), based on verbal or written statements of any party concerning possession of a firearm stored inside a motor vehicle in a parking lot.  The term "any action against" fails to provide a person of ordinary intelligence a reasonable opportunity to know and understand what is prohibited, so that he or she may act accordingly. Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). "Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked."  Id. at 109.

It is reasonable to expect that one who is charged with the care, custody and control of the real property will

ordinarily learn of the stored firearm by the statement of another "party" and, under (d)(2)(C), be frozen into inaction, whether by way of comment or conduct, against the possessor who is a customer, employee or invitee.  The exercise of one's Second Amendment right, as permitted by the Parking Lot Amendments, does not insulate one from criticism or entreaty. See Wollschlaeger, 848 at 1313.  Yet, the ambiguity of the Take-No-Action Provision serves to silence the speaker who risks the civil penalties of the Act by speaking out and thereby taking "any action against" the possessor.

For these reasons and those added in Count IV, infra pp. 74-75, the Take-No-Action Provision is facially void for vagueness for lack of notice of that which is prohibited, in violation of Fourteenth Amendment procedural due process and in violation of First Amendment free speech.

The Take-No-Action Provision is invalid for yet another reason.  The Attorney General offers the same justifications for the Take-No-Action Provision as for the Inquiry Provision.  See Def.'s Mem. at 20 (Even if the court finds that the Take-No-Action Provision regulates free speech, "it is constitutional for the same reasons as the Inquiry Provision"); Def.'s Resp. at 19 (same).

The Parking Lot Amendments are supported and advanced, according to the Attorney General, by "the State's interest in protecting Second Amendment rights by protecting those who wish to exercise this right from private encumbrances, discrimination, and invasions of privacy." Def.'s Resp. Supp. Summ. J. at 17. A substantial government interest is one that, "accord[ing] substantial deference to the predictive judgments" of the legislature, "redress[es] past harms or prevent[s] future ones . . . in a direct and material way." Id. (quoting Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 664, 666 (1994)). A statute is narrowly tailored if it does not "burden substantially more speech than is necessary to further the government's legitimate interests." Id. (quoting Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989)); American Life League, Inc. v. Reno, 47 F.3d 642, 652 (4th Cir. 1995).

The Parking Lot Amendment is tightly drawn in § 61-7-14(d)(1) whereunder a customer, employee or invitee who is in possession of a legally owned firearm may store or maintain it on a business' parking lot when the firearm is

Lawfully possessed

Out of view

Locked inside or locked to a motor vehicle in a parking lot, and

When the possessor is lawfully allowed to be present in that area.

The Take-No-Action Provision of § 61-7-14(d)(2)(C) is not narrowly drawn to effectuate the quoted extention in (d)(1). Rather, the owner, lessee or, more likely, the "person charged with the care, custody and control of real property" may not "take any action against a customer, employee or invitee based upon verbal or written statements of any party concerning possession of a firearm stored inside a motor vehicle in a parking lot for lawful purposes except upon statements made pertaining to unlawful purposes or [terrorist] threats."[10] Consequently, the Take-No-Action Provision applies even when the motor vehicle is not locked and the firearm is in view. That is, the provision applies where the firearm, possessed and stored for lawful purposes, is carelessly left in plain view in an unattended motor vehicle that is unlocked. That provision

_____

[10] The term "for lawful purposes" as used in § 61-7-14(d)(2)(C) as well as in (d)(3)(B) and (d)(4) is understood to mean lawfully possessed and without criminal intent.

needlessly puts at risk the well-being of customers, employees, invitees and others who are present on otherwise private property should the unsecured firearm fall, opportunistically, into the hands of one intent upon mischief, perhaps of momentous proportions; it is not needed to protect the government's legitimate interest in advancing Second Amendment rights and protecting privacy.

The Attorney General having offered no explanation for how the Take-No-Action Provision materially advances those interests or how that provision is tailored to avoid burdening substantially more speech than is necessary to further those interests, other than banning discrimination that would bar entry or deny service, the court cannot conclude that the broad sweep of the Take-No-Action Provision's direct and incidental burdens on speech are consistent with the free speech guarantee of the First Amendment.  The Take-No-Action Provision is facially invalid.

For each of these two independent reasons — vagueness and substantial Second Amendment interest not narrowly tailored — the Take-No-Action Provision of § 61-7-14(d)(2)(C) fails to survive intermediate scrutiny and, a fortiori, strict scrutiny. For the same reasons given with respect to the Inquiry

Provision, the Take-No-Action Provision is severed from § 61-7-14(d). See infra, p. 23.

In view of the court's conclusions with respect to the Coalition's First Amendment free speech challenges to the Inquiry and Take-No-Action Provisions, and its Fourteenth Amendment procedural due process challenge to the Take-No-Action Provision, the Coalition's motion for summary judgment as to Count I is granted and the Attorney General's motion for summary judgment as to Count I is denied.

## B. Count II - First Amendment Freedom of Association

"Among the rights protected by the First Amendment is the right of individuals to associate to further their beliefs." Healy v. Jones, 408 U.S. 169, 181 (1972). "While the freedom of association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition." Id. Where grounded in the First Amendment, the freedom of association is referred to as "expressive association" to distinguish from the freedom of association appertaining to intimate human relationships, which is protected as a fundamental element of personal liberty. Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984).

Expressive association claims are evaluated according to a three-part inquiry followed by the Supreme Court in <u>Boy Scouts of Am. v. Dale</u>, 530 U.S. 640 (2000).  <u>See</u> <u>Slattery v. Hochul</u>, 61 F.4th 278, 287 (2d Cir. 2023); <u>Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh</u>, 229 F.3d 435, 442 (3d Cir. 2000); <u>Hamilton Cnty. Educ. Ass'n v. Hamilton Cnty. Bd. of Educ.</u>, 822 F.3d 831, 840 (6th Cir. 2016).  First, a court must consider "whether the group making the claim engaged in expressive association."  <u>Slattery</u>, 61 F.4th at 287.  Second, a court must "analyze whether the state action at issue significantly affected the group's ability to advocate its viewpoints."  <u>Id.</u>  Third, a court must "weigh the state's interest implicated in its action against the burden imposed on the associational expression to determine if the state interest justified the burden."  <u>Id.</u>

"[T]he Constitution does not recognize[] a generalized right of 'social association[.]'"  <u>City of Dallas v. Stanglin</u>, 490 U.S. 19, 25 (1989).  Thus, "[t]o make out an expressive association claim, a plaintiff must first establish that the activity undertaken by the association is itself entitled to First Amendment protection[.]"  <u>Nat'l Ass'n for the Advancement of Colored People, Inc. v. City of Myrtle Beach</u>, 476 F. Supp. 3d 308, 320 (D.S.C. 2020) (citing <u>Dale</u>, 530 U.S. at 648).  "To come within [the First Amendment's] ambit, a group must engage in

some form of expression, whether it be public or private."
Dale, 530 U.S. at 648.  "[A]n association that seeks to transmit
. . . a system of values engages in expressive activity[,]"
whether it does so expressly or by example.  Id. at 649-50.

The Coalition argues that its members are expressive
associations because they "hold[] as their core mission the
establishment of a sanctuary for victims of domestic abuse that
is 'free from violence and the fear of violence.'"  Pl.'s Mem.
at 16 (quoting Program C Decl. at ¶ 4).  It further avers that
Coalition members' method of expressing this mission is one of
teaching by example.  Id. at 17.

In light of Dale and the Coalition members'
"overlapping missions to provide a haven from violence," Thomas
Decl. at ¶ 13, and commitment to instilling concomitant values
by "set[ting] an example," Pl.'s Mem. at 17, the court concludes
that the Coalition and its member programs are expressive
associations for First Amendment purposes.[11]

At the second step, a court must analyze whether a
state action "significantly burden[s]" an organization's ability
to promote its views.  Dale, 530 U.S. at 653.  Interference with

---

[11] The Attorney General neither argues nor concedes that the
Coalition and its members are expressive associations, but
instead assumes as much for the sake of argument.  See Def.'s
Mem. at 10.

expressive associational rights is clearest when it involves matters concerning decisions about a group's membership.  See id.  But the First Amendment's associational protections reach beyond mere membership to encompass government impositions that, while they "do not directly interfere with an organization's composition, they ma[ke] group membership less attractive, raising the same First Amendment concerns affecting the group's ability to express its message."  Rumsfeld v. F. for Acad. & Institutional Rts., Inc. ("F.A.I.R."), 547 U.S. 47, 69 (2006). A court must "give deference to an association's view of what would impair its expression."  Dale, 530 U.S. at 653.

The Coalition argues that the Parking Lot Amendments, as a whole, violate the Coalition members' associational rights. Specifically, the Coalition avers that "commitment to non-violence is . . . the central organizing tenant of their expressive identity."  Pl.'s Mem. at 16 (emphasis in original); see also, e.g., Thomas Decl. at ¶ 3; Program A Decl., ECF No. 38-1 at ¶¶ 3–4; Program B Decl., ECF No. 38-8 at ¶¶ 4–6.[12]  The Coalition argues that the Parking Lot Amendments impair this expressive associational interest for two reasons:  first, by imposing the presence of firearms, which the Coalition contends are antithetical to its commitment to non-violence, Pl.'s Mem at

[12] In each of these declarations, directors of Coalition members testify that non-violence is part of the Coalition's mission.

16–17, and second, by  inhibiting their ability to provide a safe environment for domestic abuse survivors, thus making membership less attractive.  Id. at 17–18.

The Attorney General argues that "'nothing about the statute affects the composition of the group[.]'" Def.'s Mem. at 10 (quoting F.A.I.R., 547 U.S. at 70).  Instead, the Attorney General submits that the Coalition's claim that the Parking Lot Amendments impede on its "'expressive associational' commitment to non-violence" is non-cognizable.  Id. at 10–11 (citing Pl.'s Mem. at 22–23).  The Attorney General also argues that the Parking Lot Amendments do not infringe on the Coalition's associational rights by making membership less desirable because of the Amendments' limited applicability to firearms that are out of view and secured inside of motor vehicles and because the remainder of the BLPA allows Coalition members to prohibit firearms elsewhere on their property.[13]  Def.'s Mem. at 12.

---

[13] The Attorney General's argument on this point incorrectly states that Coalition members "can still prevent open or concealed carry on their properties."  Def.'s Mem. at 12.  This argument misstates the Parking Lot Amendments' command to the contrary as it relates to parking lots, which are also Coalition property.  See W. Va. Code § 61-7-14(d).  Nevertheless, read in context, the court credits the Attorney General's statement to suggest only the more limited proposition that the Parking Lot Amendments do not impinge on Coalition members' ability to prevent open or concealed carry elsewhere on their property.

As an initial matter, the court notes that while the Coalition purports to raise this free association applied challenge against the Parking Lot Amendments as a whole, the entirety of the Coalition's arguments are directed at the effect of the two No-Prohibition Provisions of W. Va. Code § 61-7-14(d)(1)(storing) and (d)(4)(entering).  That is, the Coalition's arguments are entirely premised on the notion that "[b]y forcing Coalition Members to allow . . . firearms onto shelter property, the law impairs their expressive associational interests."  Pl.'s Mem. at 17.  Because it is not clear on the face of the Coalition's papers how this amounts to a challenge to the Inquiry, Search, Take-No-Action, or Employment provisions, the court will limit its consideration of the Coalition's free association claim to the No-Prohibition Provisions.

In F.A.I.R., the Supreme Court rejected a free association claim asserted by an association of law schools and law faculties challenging the "Solomon Amendment," federal legislation denying universities federal funding unless they provide military recruiters the same access to their campuses and students as nonmilitary recruiters.  547 U.S. at 51, 69.  In denying the challenge, the court found that a law school's associational rights were not affected by the Solomon Amendment because the recruiters remained "outsiders" and no school was

36

forced to accept them as "members of the school's expressive association." Id.  Additionally, the Court found that the Solomon Amendment did not make membership less attractive because students and faculty remained "free to associate to voice their disapproval of the military's message[.]"  Id. at 69—70.

F.A.I.R. squarely forecloses the Coalition's first theory.  If military recruiters were not sufficient to impinge on the expressive associational rights of a group of law schools arguably compelled to accept their presence, then the compelled presence of firearms in a parking lot is an easy case in light of the obvious fact that a military recruiter is a natural person and a firearm is an object.  Insufficient though it was to establish a free association violation in F.A.I.R., the compelled presence of a natural person has a potentially significant ability to influence how a group associates to engage in activity protected by the First Amendment, particularly where that person represents a government agency with discrete and controversial policy stances directly opposed by the group.  Neither of those associational concerns are raised by the mere limited presence of an object, regardless of how odious or antithetical it might be to the views of the group.

As a legal matter, the Coalition is on somewhat firmer ground when it comes to its second theory of associational interference based on the purported effect of the No-Prohibition Provisions making membership less attractive.  See F.A.I.R., 547 U.S. at 69.

Nevertheless, "[t]he right to associate for expressive purposes is not . . . absolute."  Roberts, 468 U.S. at 623.  "[C]onsonant with the First Amendment, government may engage in some conduct that incidentally inhibits protected forms of association."  Fighting Finest, Inc. v. Bratton, 95 F.3d 224, 228 (2d Cir. 1996).  "[W]here government actions 'make it more difficult for individuals to exercise their freedom of association, this consequence does not, without more, result in a violation of the First Amendment.'"  Oberheim v. Bason, 565 F. Supp. 3d 607, 620-21 (M.D. Pa. 2021) (quoting Fighting Finest, 95 F.3d at 228).

"To be cognizable, the interference with associational rights must be 'direct and substantial' or 'significant.'"  Fighting Finest, 95 F.3d at 228 (quoting Lyng v. UAW, 485 U.S. at 366, 367 & n.7).  "That rule is necessary to prevent the 'absurd result that any government action that had some conceivable' impact on the freedom of association would trigger heightened scrutiny under the First Amendment."  Denis v. Ige,

538 F. Supp. 3d 1063, 1080 (D. Haw. 2021) (quoting <u>Arcara v. Cloud Books, Inc.</u>, 478 U.S. 697, 708 (1986) (O'Connor, J., concurring)).  Courts have routinely upheld regulations unrelated to speech that imposed some burden on expressive association.  <u>See</u> <u>F.A.I.R.</u>, 547 U.S. at 69-70; <u>Redlich v. City of St. Louis</u>, 550 F. Supp. 3d 734, 761 (E.D. Mo. 2021); <u>Denis</u>, 538 F. Supp. 3d at 1080; <u>Taverns for Tots, Inc. v. City of Toledo</u>, 341 F. Supp. 2d 844, 851-52 (N.D. Ohio 2004); <u>NYC C.L.A.S.H., Inc. v. City of New York</u>, 315 F. Supp. 2d 461, 474 (S.D.N.Y. 2004) (while the enhancement of First Amendment rights "by custom or practice, may be associated with and perhaps even augment the enjoyment of protected endeavors, it does not follow that they are indispensable conditions to the exercise of particular constitutional rights.").

The Coalition factually supports its assertion by reference to the stipulation that "[i]t is integral to Coalition Members' missions and programming to provide physical safety to victims and survivors of domestic violence, and to provide an environment where these clients feel safe when accessing Members' services."  J.S.F. at ¶ 23; <u>see</u> Pl.'s Mem. at 17.  The Coalition has provided evidence that "[v]ictims and survivors fleeing abuse . . . arrive with an expectation of safety[.]"  Thomas Decl. at ¶ 13.  It has also presented evidence that "victims [have been] deterred from seeking services . . .

because of firearm-related threats that their abusers have made
to them and to [program] staff." Program C Decl. at ¶ 5.
Finally, the Coalition has provided evidence that "firearms are
the source of deep trauma for many of the domestic violence
victims" served by one of its programs and that "allowing
firearms onto [that] property risks re-traumatizing them[.]"
Program A Decl. at ¶ 8; see also J.S.F. at ¶ 11.

On the other hand, the Coalition's own evidence would
tend to show that, at least for some potential clients, the
ability to maintain a firearm in the parking lot would enhance
the perception of safety and make association with the
Coalition's members more attractive, regardless of whether or
not that perception of safety is objectively supported or
normatively sound. See Program C Decl. at ¶ 12 ("It is common
for victims of domestic violence to want to arm themselves based
on an imagined belief that this will help them protect
themselves."); see also Program A Decl. at ¶ 6; Thomas Decl. at
¶ 10.

In light of these facts, there is at least some
ambiguity as to whether an effect of the No-Prohibition
Provisions might be to make association with Coalition members
for current or potential clients less attractive given the
varying notions of safety individuals attach to their ability to

possess a firearm.  However, the Coalition's evidence regarding exposure to trauma is less equivocal and more logically relates to an individual's ability to associate for the purpose of engaging in protected First Amendment conduct, particularly in light of the Coalition's evidence that such exposure has actually deterred prior victims from seeking services from Coalition programs.  <u>See</u> Program C Decl. at ¶ 5 (noting the declarant had "witnessed victims be deterred from seeking services . . . because of firearm-related threats that their abusers ha[d] made to them and to [Program] staff" and providing two such examples).

     The court is thus left to consider whether the risk of potential trauma is a sufficiently direct burden upon the core expressive activity of the Coalition and its members to constitute a cognizable interference with its expressive associational rights.

     The Supreme Court's decision in <u>Lyng v. United Auto. Workers</u> is instructive.  485 U.S. 360 (1988).  There, a number of unions and union members challenged a federal statute that prohibited striking workers from becoming eligible for food stamps or increasing their allotment of food stamps due to a decreased income attributable to the strike.  The court rejected the plaintiffs' argument that the law infringed on their

expressive associational rights, finding that it did not "directly and substantially interfere with [their] ability to associate" even though the law "ma[de] it harder for strikers to maintain themselves and . . . exert[ed] pressure on them to abandon their union." Id. at 366, 368.

While Lyng involved a challenge to a government limitation on provision of a benefit, as opposed to a government imposition of property access and use conditions, the importance of Lyng is its assessment of what constitutes an interference with associational rights.  In that case, the presence of direct economic effects that placed dis-associative pressure on unions and their members was not direct and substantial enough to amount to an interference with their expressive associational rights.  This was the case even though there was record evidence to show that the conditions had even caused some members to terminate their association with the union.  See id. at 366 n.4.

Here, despite the burden that potential exposure to trauma might impose upon a domestic violence victim's ability to associate with a program so that such a person might engage in protected activity related to the Coalition's commitment to non-violence, it is undoubtedly more indirect than the burden of direct adverse economic pressure that was insufficient to carry the day in Lyng.  In light of this authority, the court

concludes that the risk of potential exposure to trauma for current or potential clients of Coalition members does not amount to a direct and substantial interference with their expressive associational rights to advocate their viewpoints sufficient to make a cognizable claim at the second step of the Dale inquiry, nor at the third step is the burden imposed undue.

The Attorney General's motion for summary judgment as to Count II is granted and the Coalition's motion for summary judgment as to Count II is denied.


C. Count III - Fourteenth Amendment Substantive Due Process

The Due Process Clause of the Fourteenth Amendment prevents a state from "depriv[ing] any person of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. XIV, § 1.  This guarantee encompasses both a procedural and substantive component.  Kelley v. Johnson, 425 U.S. 238, 244 (1976).  The substantive component of the Due Process Clause "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  Washington v. Glucksberg, 521 U.S. 702, 720—21 (1997) (internal citations omitted).  Where a fundamental right

is implicated, a regulation is subject to strict scrutiny; however, where the regulation at hand does not impact fundamental rights, then it need only be supported by a rational basis to be consistent with substantive due process.  Id. at 721, 728.

"[A]s a general proposition, courts must be reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this uncharted area are scarce and open-ended[.]"  Hawkins v. Freeman, 195 F.3d 732, 738 (4th Cir. 1999) (quoting Glucksberg, 521 U.S. at 720) (internal marks omitted).  "Substantive due process analysis must begin with a careful description of the asserted right[.]"  Reno v. Flores, 507 U.S. 292, 302 (1993).

The Coalition asserts that the Parking Lot Amendments fail to survive strict scrutiny and therefore violate substantive due process because they interfere with a fundamental right of the Coalition and its members and guests. The Coalition defines the putative right at issue as "[t]he right to protect one's personal security on one's own property" and the "corollary" right "to protect one's personal security by controlling the conditions under which someone may enter [one's] property."  Pl.'s Mem. at 19.  The Attorney General denies the existence of a fundamental right to personal security on one's

private property and characterizes the putative right at issue
as being the Coalition's asserted right "to exclude firearms
from its parking lots." Def.'s Mem. at 5.  The Attorney General
asserts that the Parking Lot Amendments' interference with such
a right satisfies rational basis review and therefore does not
give rise to a substantive due process violation.

As an initial matter, the court notes that the
Coalition's framing of the putative right implicates both a
potential liberty interest (personal security) and a potential
property interest (right to exclude or condition entry).  While
the Coalition has formulated the putative right such that the
vindication of the liberty interest is dependent upon the
vindication of the property interest, the authorities relied
upon by the Coalition in support of the putative right address
either one or the other of these interests individually but do
not provide support for the conjunctive reading of a right to
personal security on private property.[14]  See Pl.'s Mem. at 19-
22.  It may well be the case that the existence of a protected
liberty interest in personal security is dependent on presence

---

[14] The Coalition's memorandum includes one sentence that could be
read as supporting this proposition, which states that "[a]round
the time of the Founding, Blackstone recognized the linkages
between the three great and primary rights [] of personal
security, personal liberty, and private property.'"  Pl.'s Mem.
at 19 (quoting 1 William Blackstone, Commentaries on the Laws of
England 141) (marks as original).

45

or location, but the court is not persuaded that the existence
of a protected liberty interest in personal security is
substantively dependent on the putative rightsholder's property
interests.  Accordingly, the court will address the Coalition's
asserted interests in private property and personal security
separately.

      1.  *Property Interest*

        To make out a substantive due process claim regarding
a property or property interest, a plaintiff must demonstrate
(1) it had a property or a property interest; (2) that the state
deprived plaintiff of this property or property interest; and
(3) that the "state's action falls so far beyond the outer
limits of legitimate governmental action that no process could
cure the deficiency."  <u>Clayland Farm Enters. v. Talbot Cnty.</u>,
987 F.3d 346, 356-57 (4th Cir. 2021).  "This is a high bar, and
an action is illegitimate 'only if the alleged purpose behind
the state action has no conceivable rational relationship to the
exercise of the state's traditional police power[.]'"  <u>Quinn v.
Bd. of Cnty. Comm'rs of Queen Anne's Cnty.</u>, 862 F.3d 433, 443
(4th Cir. 2017) (quoting <u>Sylvia Dev. Corp. v. Calvert Cnty.</u>, 48
F.3d 810, 827 (4th Cir. 1995)); <u>see</u> <u>also</u> <u>Glucksberg</u>, 521 U.S. at
728 (substantive due process requires that a law not concerning

a fundamental right be only "rationally related to legitimate
government interests").

     "The reasons for deference to legislative judgments
about the need for, and likely effectiveness of, regulatory
actions are . . . well established" and applicable to
substantive due process challenges to statutory burdens on
private property.  Lingle v. Chevron U.S.A., Inc., 544 U.S. 528,
545 (2005); J. Peter Byrne, Due Process Land Use Claims After
Lingle, 34 Ecology L.Q. 471, 480 (2007).  A fundamental element
of property ownership is not ipso facto a fundamental right for
the purposes of substantive due process analysis.  301, 712,
2103, and 3151 LLC v. City of Minneapolis, 27 F.4th 1377, 1384-
85 (8th Cir. 2022).

     The parties do not dispute that the Coalition has a
property interest in its right to exclude or condition entry
upon its private property, nor that the Parking Lot Amendments
effect an interference with that right.  Instead, the parties'
dispute rests on whether the right to exclude is in fact a
fundamental right, thereby triggering strict scrutiny.  Relying
on the Eleventh Circuit's decision in GeorgiaCarry.Org, Inc. v.
Georgia, 687 F.3d 1244 (11th Cir. 2012), the Coalition argues
that its members, as property owners, have a fundamental right

to decide "whether to allow firearms on [their] premises."
Pl.'s Mem. at 26 (quoting GeorgiaCarry.Org, 687 F.3d at 1266).

In GeorgiaCarry.Org, various plaintiffs brought suit
challenging a provision of Georgia's firearms law which
prohibited the unrestricted carrying of weapons and long guns in
specific locations, including places of worship.  687 F.3d at
1248–49; see Ga. Code Ann § 16-11-127(b)(4).  The plaintiffs
alleged that the provision facially violated their rights under
the First Amendment Free Exercise Clause and the Second
Amendment.[15]  GeorgiaCarry.Org, 687 F.3d at 1249.  In analyzing
the Second Amendment claims, the court recognized that "it is
particularly important that we understand the individual right
to bear arms in light of the historical background of criminal
law, tort law, and property law; for that body of law
establishes the rights of private property owners."  Id.
(emphasis in original).  The court went on to deny the
plaintiffs' Second Amendment challenge, noting that the rights
protected by the Amendment "certainly must be limited by the
equally fundamental right of a private property owner to

---

[15] The Eleventh Circuit found the free exercise claim had been
properly dismissed because the plaintiffs alleged no facts
showing the law burdened a sincerely-held religious belief.
GeorgiaCarry.Org, 687 F.3d at 1255.  On the Second Amendment
claim, the court ultimately held that "the Second Amendment does
not give an individual a right to carry a firearm on a place of
worship's premises against the owner's wishes because such a
right did not pre-exist the Amendment's adoption."  Id. at 1266.

exercise exclusive dominion and control over its land." Id. at 1265.

Notwithstanding this strong language in the Eleventh Circuit's decision to suggest that private property owners have a fundamental right to control their land, it must be emphasized that this was not a holding of the court in GeorgiaCarry.Org inasmuch as the case was addressed to a Second Amendment challenge to a government regulation limiting the right to carry a firearm.  Other courts that have addressed the right to exclude have done so in the context of Takings Clause challenges.  See, e.g., Cedar Point Nursery v. Hassid, 141 S. Ct. 2063, 2071-78 (2021); Lingle, 544 U.S. at 539—50 (2005). Courts have not found a property owner's right to exclude to be "fundamental" in the context of a substantive due process challenge.  Cf. City of Minneapolis, 27 F.4th at 1384 (collecting authority to support the proposition).

The United States Supreme Court has noted that it has "long eschewed" the application of "heightened scrutiny when addressing substantive due process challenges to government regulation."  Lingle, 544 U.S. at 545; see Fla. Retail Fed'n, 576 F. Supp. 2d at 1287—88 (holding, without discussion, that Florida's parking lot law did not implicate a fundamental right for the purposes of substantive due process analysis); Coal. for

Equal Rts., Inc. v. Owens, 458 F. Supp. 2d 1251, 1262–63 (D. Colo. 2006), aff'd sub nom, Coal. for Equal Rts., Inc. v. Ritter, 517 F.3d 1195 (10th Cir. 2008) (substantive due process challenge to Colorado smoking ban subject to rational basis review because "the general right to enjoy one's property is not per se a fundamental right" (emphasis in original)).  Similarly, the court concludes that the Coalition's claimed interference with the property right of its members to exclude from their parking lots lawfully-possessed firearms stored in motor vehicles does not implicate a fundamental right for the purposes of substantive due process analysis.  Consequently, the court must inquire only whether the West Virginia legislature, acting under its police powers, had a rational basis for enacting the Parking Lot Amendments.

      The parties dispute whether the state satisfies even this low threshold.  The Attorney General's position relies on two arguments.  First, the Attorney General argues that the Parking Lot Amendments satisfy rational basis review in that they promote public safety.  Def.'s Mem. at 9.  Second, the Attorney General argues that "[a]dvancing a constitutional right is a sufficient interest under rational basis" review and that the Parking Lot Amendments advance the individual right to bear arms under the Second Amendment.  Id. (citing PruneYard Shopping

Ctr. v. Robins, 447 U.S. 74, 81 (1980));[16] see Def.'s Resp. at 4-5.  In support of this contention, the Attorney General references the Tenth Circuit's statement in Ramsey that "one could argue that the [Oklahoma Parking Lot] Amendments are simply meant to expand (or secure) the Second Amendment right to bear arms."  555 F.3d at 1211 (parenthetical in original).

The Coalition contests the notion that, as applied, the Amendments satisfy rational basis review.  First, the Coalition asserts that the Attorney General's public safety rationale fails to establish a rational basis for the Parking Lot Amendments as applied to the Coalition and its members insofar as it does not "explain how safety will be advanced by forcing guns . . . onto the property of domestic-violence shelters."  Pl.'s Resp. at 16.  In light of record evidence presented by the Coalition in the form of sworn declarations by

---

[16] PruneYard concerned a California state constitutional provision that, as interpreted, compelled a shopping mall owner to allow individuals to reasonably exercise their speech and petition rights on mall property.  As relevant here, the state constitutional provision was attacked under Lloyd Corp., Ltd. v. Tanner, 407 U.S. 551 (1972) (no general entitlement to exercise First Amendment rights on private property of shopping center against owner's wishes and non-discriminatory policy prohibiting such activity).  The PruneYard court found no inconsistency with Lloyd Corp. because "a State in the exercise of its police power may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation or contravene any other federal constitutional provision."  PruneYard, 447 U.S. at 81.  The court further found that this did not amount to a compensable taking and did not infringe on the mall owner's First Amendment rights.  Id. at 88.

directors of member programs, as well as facts stipulated by the parties, the Coalition asserts that "all of the record evidence bears . . . out [that h]aving guns on shelter property significantly increases the danger of violence[.]"  Id.

The Coalition further dismisses the persuasiveness of the Attorney General's citation to Fla. Retail Fed'n and Ramsey, where both courts found that parking lot laws' promotion of public safety supplied a sufficient rationale under rational basis review.  Id. at 17.  The Coalition discounts the decision of the Tenth Circuit as being too cursory and the decision of the Northern District of Florida as being unsupported by case law or record evidence.  Id.  It further asserts that they are inapposite because the Florida and Oklahoma laws were not as broad as West Virginia's and concerned only the ability of an employee to keep a firearm in a vehicle in their employer's parking lot, rather than the ability of any invitee to do so. Id.

The Coalition does not explain why the promotion of public safety might supply a state legislature with a rational basis to pass a parking lot law regarding employees but not regarding a broader class of invitees or, as applied here, to a group of invitees to properties serving victims of domestic violence.  Indeed, it would be hard to do so, as the core of the

public safety rationale as articulated by the Attorney General
and the courts in Fla. Retail Fed'n and Ramsey is the contested
notion of whether the presence of a firearm promotes or detracts
from public safety.  This is a legitimate difference of
perspective that might inform a vast array of policy approaches
— approaches that might differ wildly in their scope and
apportionment of costs and benefits.  Unless otherwise
constrained by law, the people, acting through their
legislature, are permitted to adopt either view regarding the
effect of a firearm and promote public safety according to their
preferred policy.  Whether such policy is effective or
ineffective, wise or unwise, sweeping or targeted, is not the
concern of a court applying rational basis review.  See Heller
v. Doe, 509 U.S. 312, 319 (1993) (on rational basis review,
courts have no license "to judge the wisdom, fairness, or logic
of legislative choices"); Colon Health Centers of Am., LLC v.
Hazel, 733 F.3d 535, 548 (4th Cir. 2013) ("Rational basis
scrutiny in the due process context . . . is quite
deferential.").

        While it is true that the Coalition has furnished
evidence, in the form of sworn declarations, suggesting that the
application of the Parking Lot Amendments to the Coalition's
members has created new safety risks on shelter properties, this
falls far short of showing a lack of any conceivable rational

relationship to the exercise of the state's traditional police power.  The apportionment of costs and benefits resulting from the legislature's duly-enacted policy, even when at times severe, does not alone make the government's action irrational. Further, a finding in the Coalition's favor on the basis of this evidentiary production is particularly inappropriate insofar as the court, on the Coalition's motion for summary judgment, must resolve all evidentiary inferences regarding the Coalition's declarations in favor of the defendant.  A reasonable juror might attribute far from conclusive weight to the self-serving statements of several of the Coalition's own program directors.

The court turns next to the Attorney General's contention that the Amendments satisfy rational basis review because they advance the individual right to keep and bear arms that the Second Amendment has been interpreted to encompass. Since the parties' cross-motions for summary judgment were filed, significant doctrinal development has occurred with respect to the individual rights conferred by the Second Amendment.  Namely, for the first time in New York State Rifle & Pistol Ass'n v. Bruen, the Supreme Court interpreted the Second Amendment to confer an individual right to carry a firearm outside the home.  142 S. Ct. 2111, 2122 (2022).

Since Bruen, much light has been shed on the interface between the Second Amendment and private property rights.  In particular, several courts have been called upon to determine whether state statutes that prohibit the concealed carrying of firearms on private property unless the property owner specifically consents are consistent with the Second Amendment under Bruen.  See Siegel v. Platkin, - F. Supp. 3d -, 2023 WL 1103676 (D.N.J. Jan. 30, 2023) (interpreting N.J.S. § 2C:58-4.6(a)(24)); Koons v. Reynolds, - F. Supp. 3d -, 2023 WL 128882 (D.N.J. Jan. 9, 2023) (same); Christian v. Nigrelli, - F. Supp. 3d -, 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) (interpreting N.Y. Penal Law § 265.01-d); Antonyuk v. Hochul, - F. Supp. 3d -, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) (same).

These state statutes present somewhat of an inverted presentation of the interface of rights as this case, such that litigation about them is largely addressed to the issue of whether the Second Amendment codified a presumption of public carry of firearms on private property.  Nevertheless, courts hearing challenges to these statutes have shown remarkable unanimity on the point germane here: there is no Second Amendment right to carry firearms on private property against the owner's express wishes.  See Christian, 2022 WL 17100631, at *9 ("[P]rivate property owners have always had the right to exclude others from their property and, as such, may exclude

those carrying concealed handguns . . . [b]ut that right has always been one belonging to the private property owner — not to the State.") (citation and emphasis omitted); id. at n.19 ("The Nation's historical tradition is that individuals may carry arms on private property unless the property owner chooses otherwise."); Antonyuk, 2022 WL 16744700, at *81 ("[T]he Second Amendment has been found to protect the right to keep and bear arms for self-defense only in one's own home or in public.") (emphasis in original); Siegel, 2023 WL 1103676, at *17 ("[T]he Second Amendment's text plainly protect[s] the . . . right to public carry for self-defense, including on the private property of others, unless the owners state otherwise."); Koons, 2023  WL 128882, at *16 n.17 ("[T]he right to exclude another from one's property is an inviolable property right that is in no way abridged by the Second Amendment[.]") (citing GeorgiaCarry.Org, 687 F.3d at 1263-64); Id. at *19 ("[P]rivate property owners . . . have long had the right to exclude firearms from their properties."); see also Jacob D. Charles, Securing Gun Rights by Statute: The Right to Keep and Bear Arms Outside the Constitution, 120 Mich. L. Rev. 581, 583, 586-87, 615 (2022).

Because the court finds that the Parking Lot Amendments' interference with the Coalition's property interests in excluding or conditioning entry on its parking lots is supported by a rational basis under the Attorney General's

public safety theory, the court finds it unnecessary to break
with the long history and consensus in this country's property
and firearms laws and determine that there is a Second Amendment
right to carry firearms on private property against the owner's
express wishes to the contrary.  The court can find no authority
binding upon it that would counsel in favor of the Attorney
General's theory that would import PruneYard principles into a
court's analysis of the Second Amendment's outer reach.  Cf.
Joseph Blocher & Noah Levine, Constitutional Gun Litigation
Beyond the Second Amendment, 77 N.Y.U. Ann. Surv. Am. L. 175,
187 (2022).[17]  Rather than needlessly break new ground in a
rapidly developing area of constitutional law, the court defers
this question for another day and resolves the Coalition's
substantive due process property claim in the Attorney General's
favor on the basis of his proffered public safety rationale.[18]

_____

[17] The article questions the viability of Second Amendment
PruneYard justifications for parking lot laws in light of Cedar
Point Nursery.  In the context of a landmark Taking Clause
decision, the Supreme Court in Cedar Point Nursery offered a
narrow reading of PruneYard that distinguished it and emphasized
the significance of the degree to which the mall in PruneYard
was open to the public and patronized by 25,000 people a day.
See Cedar Point Nursery, 131 S. Ct. at 2076-77.

[18] Relatedly, the court does not address the Coalition's
responsive argument that the Parking Lot Amendments violate an
implied negative right under the Second Amendment that the
Coalition cannot be compelled to bear arms on its property.  See
Pl.'s Resp. at 15.  Since this alleged constitutional violation
is neither necessary for the court's disposition of the issues
presented nor raised in the plaintiff's complaint or memorandum

2.   *Personal Security Interest*

The court turns next to the Coalition's substantive due process challenge to the Parking Lot Amendments' interference with its asserted fundamental right of personal security, noting that the Coalition raises this as an as-applied challenge.  <u>See</u> Pl.'s Mot. Summ. J. at 1.

The Due Process Clause of the Fourteenth Amendment "has been held to guarantee some rights that are not mentioned in the Constitution, but any such right must be 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'"  <u>Dobbs v. Jackson Women's Health Org.</u>, 142 S. Ct. 2228, 2242 (2022) (quoting <u>Glucksberg</u>, 521 U.S. at 721).  "Among the historic liberties so protected was a right to be free from . . . unjustified intrusions on personal security[.]"[19]  <u>Ingraham v. Wright</u>, 430 U.S. 651, 673 (1977).

---

in support of summary judgment, being raised for the first time in the Coalition's reply and response memorandum, the court declines to address it.  <u>See</u> De Simone v. VSL Pharms., Inc., 36 F.4th 518, 531 (4th Cir. 2022) (district court has discretion to depart from the general rule that new arguments raised in a reply brief are waived and not to be considered).

[19] It is noted that the Supreme Court's discussion of this liberty interest in <u>Ingraham</u> arose in a case where the Court had granted certiorari solely on the procedural due process question raised in the case while declining certiorari on the substantive due process question.  <u>See Ingraham</u>, 430 U.S. at 659 & n.12.

This right and its imbrication with the principle of due process of law stretches back at least as far as the time of the Magna Carta.  Id. at 674 n.41 (citing Magna Carta cl. 39).  However, "the contours of this historic liberty interest . . . have not been defined precisely[.]"  Ingraham, 430 U.S. at 673.

In deciding a fundamental rights substantive due process claim, a court must make a "'careful description' of the asserted fundamental liberty interest."  Glucksberg, 521 U.S. at 721 (quoting Reno, 507 U.S. at 302).  A court should not accept characterizations of an asserted right of liberty interest that are "issue-begging generalizations" that do not fit the requisites of the inquiry.  Hawkins, 195 F.3d at 747.  Instead, "[a] properly precise description can . . . be found in the facts and legal authorities relied upon by [a party] in support of [its] claim."  Id.  An asserted liberty interest that is of a "heavily subjective nature" is "not the traditional stuff of substantive due process rights" because it lacks objective criteria to rein in "subjective judgments of judges applied to widely varying factual circumstances."  Id. at 748.

The Ingraham court's observation about the undefined "contours of th[e] historic liberty interest" in personal security, 430 U.S. at 673, provides a strong inference that "personal security" is an insufficiently careful description of

the right at issue to facilitate appropriately restrained judicial review of a substantive due process fundamental rights claim. This inference is borne out by the inconsistent outcomes and factual diversity of the case law relied upon by the parties. See Pl.'s Mem. at 19, 21; Def.'s Mem. at 6-7 & n.3. Accordingly, the court will adhere to the Fourth Circuit's command and discern a properly precise description of the asserted liberty interest by turning to the authorities relied upon by the Coalition in support of its claim. See Hawkins, 195 F.3d at 747.

The legal basis for the Coalition's asserted liberty interest derives from the ancient right of personal security discussed by Blackstone and cited with affirmation in Ingraham. The Coalition then cites to a number of cases that acknowledge personal security or closely related concepts such as "bodily security," as being a fundamental right — whether or not the existence of such a liberty interest was found on the facts of those cases. Several of these cases do little to elucidate the particulars of the Coalition's asserted liberty interest, but three provide limited support to the idea that the liberty interest in personal security includes the freedom from threats of violence in certain factual circumstances. See Kennedy v. City of Ridgefield, 439 F.3d 1055, 1061-63 (9th Cir. 2006) (crime victim's liberty interest in "bodily security" included

freedom from increased risk of violence by law enforcement disclosure of sensitive information); <u>Kallstrom v. City of Columbus</u>, 136 F.3d 1055, 1062-63 (6th Cir. 1998) (undercover police officers' liberty interest in "personal security and bodily integrity" included freedom from threat of violence where city inadvertently disclosed personal information to gang members with a "propensity for violence and intimidation"); <u>Estate of Rosenbaum v. City of New York</u>, 975 F. Supp. 206, 216-18 (E.D.N.Y. 1997) (community members' liberty interest in personal security included freedom from exacerbated danger of violence by private actors resulting from implementation of police policy).[20]  These legal authorities demonstrate that the Coalition's asserted liberty interest in personal security can be more narrowly understood as freedom from the threat of violence.

The court turns first to the question of whether a right to be free from the threat of violence is deeply rooted in this nation's history and tradition.  At common law, there is an absolute right of personal security, meaning a person is "entitled . . . to security from the corporal insults of menaces, assaults, beating, and wounding[.]"  1 William

---

[20] The court observes that the substantive due process claims in these cases all concern the state-created danger doctrine whose relevance is discussed <u>infra</u>.

Blackstone, <u>Commentaries on the Laws of England</u> 134.  In general, however, such a right extended only to the freedom from actual intrusive harms to the body, as opposed to the simple threat of such harms.[21]  James Paterson, <u>Commentaries on the Liberty of the Subject and the Laws of England Relating to the Security of the Person</u> 188 (1877).

　　　　Courts in this country have been reluctant to expand the scope of the common law right of personal security.  <u>See</u>, <u>e.g.</u>, <u>DeShaney v. Winnebago Cnty. Dep't of Social Servs.</u>, 489 U.S. 189, 196-98 (1989) (liberty interest in personal security does not create entitlement to state protection from private violence); <u>Doe v. Rosa</u>, 795 F.3d 429, 440 (4th Cir. 2015) (same); <u>Lambert v. Hartman</u>, 517 F.3d 433, 443-44 (6th Cir. 2008) (liberty interest in personal security not implicated where plaintiff did not show that government action "put her at any risk of physical harm").  It should be noted, however, that discussion of the right to personal security has arisen

---

[21] Freedom from threatened, as opposed to actual, violence was guaranteed in limited circumstances through sureties of the peace.  Paterson, <u>Commentaries</u> 189-90; <u>see</u> Michael Dalton, <u>Countrey Justice</u> 140-47 (1619); William Waller Hening, <u>The New Virginia Justice</u> 430 (1795); <u>see also</u>, <u>e.g.</u>, <u>Lord Vane's Case</u>, 93 Eng. Rep. 1128 (K.B. 1743); <u>King v. Bowes</u>, 99 Eng. Rep. 1327, 1327-28 (K.B. 1787); <u>King v. Doherty</u>, 104 Eng. Rep. 334, 335 (K.B. 1810).

primarily in the context of substantive due process claims under the state-created danger doctrine.

The state-created danger doctrine is a "narrowly drawn" exception to the general rule that there is no fundamental right to state protection from private violence, and it applies where a state actor "directly create[s] or increase[s] the risk of harm to [a] victim and . . . d[oes] so directly through affirmative acts." Callahan v. North Carolina Dep't of Pub. Safety, 18 F.4th 142, 146-47 (4th Cir. 2021); see also Burns-Fisher v. Romero-Lehrer, 57 F.4th 421, 424-25 (4th Cir. 2023) ("Importantly, the state-created danger exception applies only when the state affirmatively acts to create or increase the risk that resulted in the victim's injury."). This doctrine maps poorly onto the Coalition's substantive due process claim inasmuch as it is addressed to dangers caused by the state's executive, rather than legislative, acts and contemplates retrospective, rather than prospective relief.[22]

---

[22] Although a limited number of courts in other circuits have applied the state-created danger doctrine to cases where injunctive relief from a generally-applicable policy enactment was sought, the court does not find such cases to be consistent with the scope of the state-created danger doctrine as recognized in the Fourth Circuit. See Santa Cruz Homeless Union v. Bernal, 514 F. Supp. 3d 1136, 1141 (N.D. Cal. 2021); Phillips v. City of Cincinnati, 479 F. Supp. 3d 611, 648-49 (S.D. Ohio 2020).

Bearing in mind the limited relevance of the state-created danger doctrine to this case, the court observes that the Coalition has identified some state-created danger cases, earlier noted, in which the common law right of personal security was arguably found to encompass a liberty interest in the freedom from threatened violence of some sort. See, e.g., Kennedy, 439 F.3d at 1061-63; Kallstrom, 136 F.3d at 1062-63; Estate of Rosenbaum, 975 F. Supp. at 216-18. Of these, Rosenbaum holds little persuasive effect inasmuch as its analysis of the liberty interest failed to employ the methodology required by the then-recent 1997 Glucksberg decision and could scarcely be expected to stand under the proper test. As a simple matter of quantum, there is reason to doubt that Kennedy and Kallstrom establish the Coalition's putative liberty interest as objectively "deeply rooted in this Nation's history and tradition" so as to establish Glucksberg's first prong.[23]  In any event, the court will consider the applicability of each case and the nature of the liberty interest at issue.

Kennedy considered the liberty interest in "bodily security" within the context of a state-created danger case

---

[23] Subsequent to the parties' filing of papers in support of summary judgment, the Supreme Court issued a landmark substantive due process decision, which suggested courts should analyze this prong of the Glucksberg test with particular rigor toward the quantum of historical support.  See Dobbs, 142 S. Ct. at 2246-48.

brought under 42 U.S.C. § 1983.  This case involved a defendant police officer's alleged deliberate indifference to the elevated threat of violence faced by the plaintiff, a crime victim, upon the officer's disclosure of serious criminal allegations to the mother of an alleged perpetrator, who was a minor with a known propensity for violence.  On one view, this case might seem to provide a degree of support to the notion that the common law right to bodily security encompasses a putative liberty interest in the freedom from the threat of violence.

Yet a more measured reading of <u>Kennedy</u> would observe that the right of bodily security was implicated precisely because the plaintiff crime victim had experienced actual intrusion upon her person when the minor perpetrator, upon learning of the allegations, entered her home and shot the plaintiff and her husband, seriously wounding her and killing him.  While <u>Kennedy</u>'s factual application of the right of bodily security necessarily discussed the threat of violence, the court sees no reason to conclude that the Ninth Circuit intended to recognize a more capacious notion of the liberty interest itself.

<u>Kallstrom</u> more clearly supports the Coalition's asserted liberty interest in freedom from threatened violence.  There, the Sixth Circuit found that a municipality's inadvertent

release of private personal information about undercover police
officers to counsel for gang members with a "propensity for
violence and intimidation" implicated the undercover officers'
liberty interests in "personal security and bodily integrity" so
as to constitute a substantive due process violation on a state-
created danger theory.  Kallstrom, 136 F.3d at 1063-64.  The
Kallstrom court notably limited its holding:

> [W]e do not mean to imply that every governmental act
> which . . . threatens to intrude upon an individual's
> body invokes the Fourteenth Amendment.  But where the
> release of private information places an individual at
> substantial risk of serious bodily harm, possibly even
> death, from a perceived likely threat, the "magnitude
> of the liberty deprivation . . . strips the very
> essence of personhood."

Kallstrom, 136 F.3d at 1064 (quoting Doe v. Claiborne Cnty., 103
F.3d 495, 506-07 (6th Cir. 1996)).

The court notes that Kallstrom is an outlier in
finding that the liberty interest in personal security extends
beyond actual intrusions upon the body to encompass those that
are merely threatened.  Additionally, like Rosenbaum, the
decision in Kallstrom was issued in the months following the
Supreme Court's landmark Glucksberg decision and did not cite to
Glucksberg in its reasoning.  The court doubts that Kallstrom's
expansive view of the liberty interest in personal security
could find support under the proper application of the "deeply
rooted" prong of the Glucksberg test.

In view of the foregoing discussion, the court is unable to conclude that a right to personal security encompassing the freedom from threatened violence is "deeply rooted in this Nation's history and tradition" so as to satisfy the first prong of the <u>Glucksberg</u> test.  Accordingly, because the Coalition's substantive due process challenge to the Parking Lot Amendments' interference with this interest does not implicate a fundamental right, it is subject only to rational basis review.

The court incorporates its foregoing rational basis analysis of the Coalition's substantive due process challenge. For the reasons set forth in that discussion, the court finds that the Parking Lot Amendments' interference with the Coalition's security interest in being free from potential threatened violence is supported by a rational basis under the public safety rationale proffered by the Attorney General.

The Attorney General's motion for summary judgment as to Count III is granted and the Coalition's motion for summary judgment as to Count III is denied.

D. <u>Count IV - Fourteenth Amendment Procedural Due Process</u>

As its final challenge, the Coalition submits that two provisions of the Parking Lot Amendments are unconstitutionally vague.  Specifically, it alleges that subsections 61-7-14(d)(2)(A)-(B) and subsection 61-7-14(d)(2)(C) "do not define or otherwise provide Coalition Members with <u>any</u> notice about what these two prohibitions actually mean."  Pl.'s Mem. at 22 (emphasis in original).

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  <u>Grayned</u>, 408 U.S. at 108.  Regulations should be written so that "the person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited, so that he may act accordingly."  <u>Id.</u>  Additionally, a law is unconstitutionally vague if it "authorizes or even encourages arbitrary and discriminatory enforcement."  <u>Hill v. Colorado</u>, 530 U.S. 703, 732 (2000).  Finally, a statute may be considered vague where it "abuts upon sensitive areas of basic First Amendment freedoms," causing citizens to steer clear of protected conduct.  <u>Grayned</u>, 408 U.S. at 108 (internal quotation marks and citations omitted); <u>United States v. Miselis</u>, 972 F.3d 518, 544 (4th Cir. 2020).

1. *Inquiry and Search Provisions*[24]

Subsection 61-7-14(d)(2) has been drafted with a chapeau, providing that "[n]o owner, lessee, or other person charged with the care, custody, and control of real property may violate the privacy rights of a customer, employee, or invitee[,]" which applies to both the Inquiry and Search Provisions as subparagraphs beneath it.[25]

Regarding these provisions, which together prohibit owners, lessees, and persons charged with the care, custody, and control of parking lots from "violat[ing] the privacy rights of a customer, employee or invitee" by either making inquiries into

---

[24] The court notes that this memorandum opinion and order has already concluded that the Inquiry Provision is facially invalid on other grounds.

[25] The Inquiry and Search Provisions, respectively, read as follows:

"(2) No owner, lessee, or other person charged with the care, custody, and control of real property may violate the privacy rights of a customer, employee, or invitee either:
(A) By verbal or written inquiry, regarding the presence or absence of a firearm locked inside or locked to a motor vehicle in a parking lot; or
(B) By conducting an actual search of a motor vehicle in a parking lot to ascertain the presence of a firearm within the vehicle: *Provided,* That a search of a motor vehicle in a parking lot to ascertain the presence of a firearm within that motor vehicle may only be conducted by on-duty, law enforcement personnel, in accordance with statutory and constitutional protections."

W. Va. Code § 61-7-14(d)(2)(A)-(B).

the presence or absence of a firearm or by conducting an actual search of the vehicle for the purpose of determining whether a firearm is contained therein, the Coalition states that the Parking Lot Amendments fail to "define the term 'privacy rights' or specify the circumstances in which such rights are supposedly violated." Pl.'s Mem. at 23.  Accordingly, it avers that "Coalition Members have no way to know what actions count as 'violating the privacy rights' of their staff, residents, or visitors." Id.

The Coalition correctly identifies that the Parking Lot Amendments supply no definition for the term "privacy rights."  Under West Virginia law, an undefined word or term used in a legislative enactment is to be given its "common, ordinary and accepted meaning[.]"  Murrell B. v. Clarence R., 836 S.E.2d 9, 18 (W. Va. 2019).  The legislature is presumed to have drafted with familiarity toward "all existing law[] applicable to the subject matter, whether constitutional, statutory, or common" and to have "intended the statute to harmonize completely . . . if its terms are consistent therewith."  State v. Snyder, 63 S.E. 385, Syl. Pt. 5 (W. Va. 1908) (cited with approval by Sale ex rel. Sale v. Goldman, 539 S.E.2d 446, 452 (W. Va. 2000)).

The Supreme Court of Appeals of West Virginia first recognized a "right of privacy" in 1958.  O'Dell v. Stegall, 703 S.E.2d 561, 594 (W. Va. 2010) (citing Roach v. Harper, 105 S.E.2d 564 (W. Va. 1958)); see also Cantrell v. Forest City Pub. Co., 419 U.S. 245, 248 n.2 (1974) ("It is clear . . . West Virginia recognize[s] a legally protected interest in privacy.").  In Roach, the court did not provide a definition of the full scope of the right of privacy but did expressly hold that it "includ[ed] the right of an individual to be let alone and to keep secret his private communications, conversations and affairs[.]"  Roach, 105 S.E.2d at Syl. Pt. 1.  The Roach court's definition of the "right of privacy" reflects that it is compound in nature and encompasses, at least, a right to be let alone and a right to keep one's private communications, conversations and affairs a secret.  A separate line of cases recognizes that, in West Virginia, the right of privacy also extends to one's person and property.  See Sutherland v. Kroger Co., 110 S.E.2d 716, 723-24 (W. Va. 1959) ("An illegal search by a private individual is a trespass in violation of the right of privacy.").

The right to keep one's private communications, conversations and affairs secret recognized in Roach does not embrace acts or communications occurring in an "open place[.]"

See O'Dell,[26] 703 S.E.2d at 594.  Nor does it "extend to communications . . . which have been consented to[.]"  Jordan v. Town of Pratt, 886 F. Supp. 555, 561 n.4 (S.D. W. Va. 1995) (quoting Crump v. Beckley Newspapers, Inc., 320 S.E.2d 70, Syl. Pt. 9 (W. Va. 1983)).

Meanwhile, the right of privacy in one's person and property does not extend to searches that are not illegal.  See Sutherland, 110 S.E.2d at 723-24.  Although generally "[s]earches conducted outside the judicial process" are presumptively illegal, there are a few "jealously and carefully drawn" exceptions.  State v. Snyder, 857 S.E.2d 180, 185, 187-88 (W. Va. 2021).  A search is not illegal where the search is consensual or where items are in plain view.  Id. at 188-89.

Upon this background, the Coalition's vagueness challenge to the Inquiry and Search Provisions of the Parking Lot Amendments must fail.  These provisions provide a person of ordinary intelligence a reasonable opportunity to understand what conduct they prohibit.  Namely, subsections (d)(2)(A) and

---

[26] In O'Dell, the court referred to a gravel road over which the parties both held or purported to hold an easement as, interchangeably, both a "public place" and "open place" in which the plaintiff had no right to privacy regarding defendants' photographing his vehicle and recording a conversation between the plaintiff and a defendant.  Id. at 594-95.  The court termed the conversation a "public communication" as opposed to a "secret, private communication" by virtue of its occurrence on the "open place" of the roadway.  Id. at 594.

(B) clearly outline two courses of conduct,[27] inquiry and actual search, which are prohibited where they interfere with the bundle of rights recognized as the "right of privacy" under West Virginia common law.  The reference to "privacy rights" in the chapeau of section 61-7-14(d)(2) thus limits the scope of the statute's proscription of inquiry and actual search.

A person of ordinary intelligence, referencing the Inquiry Provision, could reasonably understand it to forbid, for example, an uninvited inquiry about the presence of a firearm in a motor vehicle, while understanding that it does not prohibit inquiries on the topic to which the invitee has previously consented.  While undoubtedly unconstitutional for the reasons set forth elsewhere in this opinion, the conduct that the Inquiry Provision seeks to prohibit is clear enough on its face to survive a vagueness challenge.

Likewise, a person of ordinary intelligence, referencing the Search Provision, could reasonably understand it to forbid, for example, a nonconsensual physical search of an invitee's vehicle, while understanding that it creates no prohibition (impossible as one would be) on a regulated party's

---

[27] The Coalition does not argue that the proscription of either provision is unconstitutionally vague for any reason other than the purportedly undefined term "privacy rights."

ability to see what is in plain view,[28] nor does it prohibit an invitee from consenting to a search of his or her own vehicle. Accordingly, the court cannot find that the Search Provision violates procedural due process by depriving an ordinary person of a reasonable opportunity to understand the conduct it seeks to prohibit.

2. *Take-No-Action Provision*[29]

The Coalition also avers that the Take-No-Action Provision's declaration that Coalition Members may not "take any action" against customers, employees, and invitees based on statements about the possession of a firearm in a vehicle in a parking lot for lawful purposes, "does not specify what actions are covered by the prohibition." Pl.'s Mem. at 24 (marks omitted). Because the Coalition Members are unsure of what actions they may take, and in turn what questions they may ask, they "are likely to steer far wider of the lawful zone and

---

[28] This is further confirmed by the Search Provision's reference to an "actual search." W. Va. Code § 61-7-14(d)(2)(B). As used here, "actual" has the meaning of "carried out, acted in reality." Actual, Oxford English Dictionary (3d ed. 2010). An "actual search" would therefore seem distinct from the kind of incidental conduct implicated by the mere viewing of something in plain sight.

[29] The court notes that this memorandum opinion and order has already concluded that the Take-No-Action Provision is facially invalid on other grounds.

thereby chill their protected speech." Id. (quoting Miselis, 972 F.3d at 544) (marks omitted).

For example, the Coalition submits that one of its member's program directors is unsure whether the organization is permitted to ask an individual to move their weapon off the member's property for safety purposes. Id. at 24–25 (citing Program D Decl. at ¶ 8). A second program director "had no idea what she was legally allowed to do when she saw a semiautomatic handgun sitting on the front seat of an employee's car." Id. at 25 (citing Program B Decl. at ¶¶ 8–9). A third program director declared that in the wake of the Parking Lot Amendments, shelter staff are "unsure of whether [they] can follow-up about a gun in a resident's car the way [they] can about knives, pepper spray, and prescriptions." Program C Decl. at ¶ 9. The same questions could be posed by any business.

The Take-No-Action Provision is undeniably broad in scope.[30] Of greater significance, as noted infra, pp. 23–27, the term "any action against" leaves the one in charge of the care, custody and control of real property uncertain as to what steps may be taken, whether by way of comment or conduct, with respect to the possessor of the stored firearm or the firearm itself.

---

[30] The Coalition did not challenge the Take-No-Action Provision as unconstitutionally overbroad.

Consequently, action including speech is chilled, if not frozen, because of the prospect of liability under the BLPA.  That term, "any action against," is found void for vagueness for lack of notice of that which is proscribed contrary to Fourteenth Amendment procedural due process.

The Attorney General's motion for summary judgment is granted as to Count IV to the extent it relates to § 61-7-14(d)(2)(A) and (B) and is otherwise denied; and the Coalition's motion for summary judgment is granted as to Count IV to the extent it relates to § 61-7-14(d)(2)(C) and is otherwise denied.

### IV.  Conclusion

Inasmuch as the parties in their respective motions for summary judgment and briefing have treated the Count I First Amendment claim and the Count IV void for vagueness claim as facial attacks, the court has done so as well and affords relief accordingly.  The Count II free association claim and the Count III due process claim are treated on an as applied basis as sought by and on behalf of the Coalition.

It is accordingly DECLARED that West Virginia Code § 61-7-14(d)(2)(A) and (C) violate the First Amendment to the United States Constitution and are void.

It is further DECLARED that West Virginia Code § 61-7-14(d)(2)(C) violates the procedural Due Process Clause of the Fourteenth Amendment to the Constitution of the United States and is void.

It is further ORDERED that the defendant Attorney General of the State of West Virginia be, and hereby is, enjoined from enforcement of West Virginia Code § 61-7-14(d)(2)(A) and (C).

It is further ORDERED that judgment be entered in favor of the plaintiff Coalition with respect to the above DECLARED and ORDERED matters herein and against the defendant Attorney General, and in favor of the defendant Attorney General and against the plaintiff Coalition on all other matters herein; and that the parties furnish the court with a jointly proposed Judgment Order, or separate proposed Judgment Orders if agreement is not achieved, on or before September 14, 2023.

It is further ORDERED that the plaintiff Coalition file any request for attorney fees on or before September 14, 2023, to which the defendant Attorney General shall respond by September 21, 2023, and any reply shall be filed by September 25, 2023.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER:  August 31, 2023

John T. Copenhaver, Jr.
Senior United States District Judge