UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

THE WEST VIRGINIA COALITION
AGAINST DOMESTIC VIOLENCE, INC.,

      Plaintiff,

v.                    Civil Action No. 2:19-cv-00434

PATRICK J. MORRISEY,
in his official capacity as
Attorney General for the
State of West Virginia,

      Defendant.

## MEMORANDUM OPINION AND ORDER

      Pending is plaintiff West Virginia Coalition Against Domestic Violence, Inc.'s ("the Coalition") Motion for an Award of Attorney's Fees and Costs (ECF No. 56), filed October 3, 2023. The defendant, West Virginia Attorney General Patrick J. Morrisey ("the Attorney General"), filed his response (ECF No. 58), on October 17, 2023, and the Coalition replied (ECF No. 62) on October 31, 2023. This matter, being fully briefed, is ripe for adjudication.

## I. BACKGROUND

      The Coalition represents fourteen domestic violence programs that serve victims and survivors of domestic abuse and

their families through shelters, outreach offices, and some visitation and exchange centers.  Mem. Op. & Order 1–2, ECF No. 52.  "Providing a safe environment for victims and survivors of domestic violence is vital to the work of the Coalition and its Members," part of which involves "creating an environment where victims and survivors will not be retraumatized."  Joint Stipulation of Facts ¶¶ 10–11, ECF No. 34.

Gun violence is central to many acts of domestic violence, and, according to the Coalition, victims of domestic abuse have been "deterred from seeking services . . . because of firearm-related threats . . . made to them and to [Coalition member] staff."  Program C Decl. ¶ 5, ECF No. 38-12; see Mem. Op. & Order 3.  Because of this, some Coalition members had policies that prohibited firearms throughout their property, including in parking lots, pursuant to authority granted by the Business Liability Protection Act ("BLPA").  Then, in March 2018, the West Virginia Legislature amended the BLPA to prohibit property owners from banning firearms in the parking lot areas of their properties (the "Parking Lot Amendments").  Mem. Op. & Order 5, 7–8.

The Parking Lot Amendments consist of five provisions which place prohibitions on the owners, lessees, and persons charged with the care, custody, and control of parking lots:

Subsections 61-7-14(d)(1) and (d)(4), the "No-Prohibition

Provisions;"[1] Subsection 61-7-14(d)(2)(A), the "Inquiry

Provision;"[2] Subsection 61-7-14(d)(2)(B), the "Search

Provision;"[3] Subsection 61-7-14(d)(2)(C), the "Take-No-Action

---

[1] These provisions provide that no parking lot owner, lessee, or person charged with the care, custody, and control of parking lots

> may prohibit any customer, employee, or invitee from possessing any legally owned firearm, when the firearm is (A) Lawfully possessed; (B) Out of view; (C) Locked inside or locked to a motor vehicle in a parking lot; and (D) When the customer, employee, or invitee is lawfully allowed to be present in that area.

It further provides that no such person

> may prohibit or attempt to prevent any customer, employee, or invitee from entering the parking lot of the person's place of business because the customer's, employee's, or invitee's motor vehicle contains a legal firearm being carried for lawful purposes that is out of view within the customer's, employee's, or invitee's motor vehicle.

[2] This provision prohibits owners, lessees, and persons charged with the care, custody, and control of parking lots from "violat[ing] the privacy rights of a customer, employee, or invitee . . . [b]y verbal or written inquiry, regarding the presence or absence of a firearm locked inside or locked to a motor vehicle in a parking lot . . . ."

[3] This provision prohibits owners, lessees, and persons charged with the care, custody, and control of parking lots from "violat[ing] the privacy rights of a customer, employee, or invitee . . . [b]y conducting an actual search of a motor vehicle in a parking lot to ascertain the presence of a firearm within the vehicle . . . ."

Provision;"[4] and Subsection 61-7-14(d)(3)(B), the "Employment Provision."[5]  Mem. Op. & Order 5–7.

       The Coalition filed this action against the Attorney General asserting the following four violations of 42 U.S.C. section 1983: (I) the Inquiry and Take-No-Action Provisions facially violate the First Amendment's right to free speech; (II) the BLPA as a whole, as applied to the Coalition, violates the First Amendment's freedom of association; (III) the BLPA as a whole, as applied to the Coalition, violates Fourteenth Amendment substantive due process; and (IV) the Inquiry, Search, and Take-No-Action Provisions are unconstitutionally vague so as to violate Fourteenth Amendment procedural due process.  Compl. ¶¶ 73–103; see Mem. Op. & Order 8.

---

[4] This provision prohibits an owner, lessee, or person charged with the care, custody, and control of parking lots from taking

> any action against a customer, employee, or invitee based upon verbal or written statements of any party concerning possession of a firearm stored inside a motor vehicle in a parking lot for lawful purposes, except upon statements made pertaining to unlawful purposes or threats of unlawful actions involving a firearm made in violation of § 61-6-24 [pertaining to threats of terrorist acts] of this code.

[5] This provision prohibits, in relevant part, employers from conditioning employment on an employee's agreement to refrain from keeping a firearm locked in or locked to a vehicle in parking lot areas.

On August 31, 2023, the court granted summary judgment, finding in part for the Coalition and in part for the Attorney General.  Mem. Op. & Order 76–77.  The court held that the Inquiry Provision was a content-based speech regulation that facially violated the First Amendment; and that the Take-No-Action Provision was facially void for vagueness in violation of both Fourteenth Amendment procedural due process and First Amendment free speech, as well as facially invalid for failure to be narrowly tailored to advance a substantial Second Amendment interest.  Id. at 22, 27, 30.

The court found for the Attorney General on all other claims.  The court held that the BLPA as-applied does not violate the Coalition's First Amendment freedom of association; that the BLPA does not violate Fourteenth Amendment substantive due process as applied to the Coalition; and that the Inquiry and Search Provisions are not unconstitutionally vague in violation of Fourteenth Amendment procedural due process (the Inquiry Provision, however, was found unconstitutional for reasons discussed above).  Id. at 43, 67, 72, 74, 76.

Of the five Parking Lot Amendment provisions, the Coalition succeeded in having just two struck as unconstitutional.  The Coalition failed in its as-applied challenges to the BLPA as a whole, particularly with respect to

its First Amendment freedom of association claim and its
Fourteenth Amendment substantive due process claim.  The two
unconstitutional provisions were severed from the statute, and
the Parking Lot Amendments otherwise still stand.

The Coalition now moves for an award of attorneys'
fees in the amount of $159,948.05 and $11,143.07 in costs.  Mot.
Attys' Fees 5.  According to the Coalition, it retained three
law firms to represent it: Everytown Law, Gupta Wessler LLP, and
Goodwin & Goodwin, LLP.  See id. at 2.

The Coalition says the first of the three firms,
Everytown Law, is "a nonprofit law firm specializing in
litigation relating to firearms and firearm laws."  Id. at 2.
Although three lawyers from Everytown are said to have worked on
the case, the Coalition is only seeking compensation for the
hours worked by James E. Miller and Krystan Hitchcock.[6]  See id.
The Coalition seeks a fee award for 64.0 hours at $400/hour for
Mr. Miller and 15.0 hours at $350/hour for Ms. Hitchcock.  See
id. at 3.  The Coalition requests a total of $30,850.00 in

---

[6] The Coalition states that it is not seeking fees for
unspecified work done by Everytown attorney Alla Lefkowitz or
for any work done by Everytown paralegals and administrative
staff.  See id. at 3.

attorneys' fees for work done by the two Everytown attorneys. See id.

The second firm, Gupta Wessler, is described as a Washington, D.C. boutique "specializing in Supreme Court, appellate, and complex litigation." Id. at 2. The three attorneys at Gupta Wessler for whom the Coalition seeks a fee award are Deepak Gupta, Jonathan E. Taylor, and Neil Sawhney. See id. at 3. The Coalition wants compensation for 41.45 hours at $575/hour for Mr. Gupta, 86.6 hours at $485.50/hour for Mr. Taylor, and 59.4 hours at $350/hour for Mr. Sawhney. See id. at 4. The Coalition stresses that Gupta Wessler is "exercising billing judgment" by only claiming hours for "a smaller subset [of] the core work" and that, "in the interest of facilitating a quick resolution of this motion," Gupta Wessler is "heavily discounting — by as much as half — their market rates." Id. (emphasis in original). In its Reply, the Coalition adds an additional four hours by Mr. Gupta for work on the fee briefing. Reply 9. The total fee award sought by the Coalition for work done by the three Gupta Wessler attorneys is thus $88,968.05. Mot. Attys' Fees 4.

The third firm, Goodwin & Goodwin, is a Charleston, West Virginia firm retained by the Coalition as local counsel. See id. at 2. The two Goodwin & Goodwin attorneys who worked on

the case were J. David Fenwick and Lucas R. White, both of whose
rates increased as of January 1, 2021.  See id. at 4; First
Fenwick Decl. 2, ECF No. 56-3.  The Coalition seeks a fee award
for 67.7 hours of work at initially $325 and then $350/hour by
Mr. Fenwick and 65.1 hours of work at initially $250 and then
$300/hour by Mr. White.  See Mot. Attys' Fees 4; First Fenwick
Decl. 2.  The Coalition requests a total fee award of $40,130.00
for work done by the two Goodwin & Goodwin attorneys.  See First
Fenwick Decl. 2.

     In total, the Coalition requests $171,096.32 –
$159,948.05 in fees and $11,143.07 in costs.  See Mot. Attys'
Fees 5; Reply 9.

## II. LEGAL STANDARD

     Under the traditional "American Rule," each party
bears the cost of their own litigation.  See Buckhannon Bd. &
Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res., 532 U.S.
598, 602 (2001); see also 10 Fed. Prac. & Proc. Civ. § 2675 (4th
ed.).  However, "in recognition of the costly burdens of
litigation and to ensure 'effective access to the judicial
process' for those with civil rights grievances, Congress passed
42 U.S.C. section 1988 as an exception to this general rule."
Stinnie v. Holcomb, 77 F.4th 200, 206 (4th Cir. 2023) (citing
Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (quoting H.R.

Rep. No. 94-1558, at 1 (1976))).  Section 1988 provides that

"[i]n any action or proceeding to enforce a provision of

section[] . . . 1983 . . . of this title . . . the court, in its

discretion, may allow the prevailing party . . . a reasonable

attorney's fee as part of the costs . . . ."  42 U.S.C. §

1988(b).

        In awarding attorneys' fees under section 1988, a

district court must begin its analysis by asking whether the

movant is a "prevailing party."  Stinnie, 77 F.4th at 206.

While only prevailing parties are entitled to an award of

attorney's fees under the statute, a party need not be

successful on all claims to pass this threshold question.  See

Tex. State Tchrs. Ass'n v. Garland Indep. Sch. Dist., 489 U.S.

782, 791–92 (1989); Farrar v. Hobby, 506 U.S. 103, 111–12

(1992).

        If the fee applicant is a prevailing party, the court

follows a three-step process to determine what amount of

reasonable attorney's fees the movant is entitled to receive.

See McAfee v. Boczar, 738 F.3d 81, 88 (4th Cir. 2013); Cantu-

Guerrero v. Lumber Liquidators, Inc. (In re Lumber Liquidators

Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prod.

Liab. Litig.), 27 F.4th 291, 303 (4th Cir. 2022).  First, the

court calculates the lodestar.  See McAfee, 738 F.3d at 88

(citing <u>Robinson v. Equifax Info. Servs., LLC</u>, 560 F.3d 235, 243 (4th Cir. 2009)).  Second, the court deducts fees incurred in pursuit of unsuccessful claims.  <u>See</u> <u>id.</u>  Third, the award is adjusted according to the degree of success obtained.  <u>See</u> <u>id.</u>

Throughout this process, the court is guided by the twelve <u>Johnson</u> factors.  <u>See</u> <u>id.</u>; <u>Johnson v. Georgia Highway Express Inc.</u>, 488 F.2d 714, 717–19 (5th Cir. 1974), <u>abrogated on other grounds by</u> <u>Blanchard v. Bergeron</u>, 489 U.S. 87 (1989).[7] These factors are:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

---

[7] These factors were adopted by the Fourth Circuit in <u>Barber v. Kimbrell's Inc.</u>, 577 F.2d 216, 226 n. 28 (4th Cir. 1978); <u>Johnson</u> was abrogated on other grounds by <u>Blanchard</u>, 489 U.S. 87, but the <u>Johnson</u> factors continue to be used by the Fourth Circuit.  <u>See</u>, <u>e.g.</u>, <u>McAfee</u>, 738 F.3d at 88; <u>In re Lumber Liquidators</u>, 27 F.4th at 303 n. 7.

_Robinson_, 560 F.3d at 243–44 (quoting _Barber v. Kimbrell's Inc._, 577 F.2d 216, 226 n. 28 (4th Cir. 1978)).  While all twelve factors should be considered, in determining the hourly rate (which is critical to the lodestar), "four factors are particularly relevant: the customary fee for like work; the experience, reputation and ability of the attorneys; attorneys' fees awards in similar cases; and the amount in controversy and the results obtained."  _Cobranchi v. City of Parkersburg_, No. 2:18-cv-01198, 2022 WL 5250297, at *3 (S.D.W. Va. Oct. 6, 2022) (Copenhaver, J.) (quoting _Wolfe v. Green_, Civ. No. 2:08-01023, 2010 WL 3809857, at *13 (S.D.W. Va. Sept. 24, 2010) (Copenhaver, J.)) (quotation marks omitted).

## III. ANALYSIS

### A.  Threshold Inquiry: Prevailing Party Status

Only prevailing parties are eligible to receive — but are not necessarily entitled to — attorneys' fees under section 1988.  _See_ _Mercer v. Duke Univ._, 401 F.3d 199 (4th Cir. 2005).  According to the Supreme Court,

> to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. . . . [A] plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

Farrar, 506 U.S. at 111–12 (internal citations omitted).  A
plaintiff need not succeed on all their claims; if "the
plaintiff has succeeded on 'any significant issue in litigation
which achieved some of the benefit the parties sought in
bringing suit,' the plaintiff has crossed the threshold to a fee
award of some kind."  Tex. State Tchrs. Ass'n, 489 U.S. at 791–
92 (quoting Nadeau v. Helgemoe, 581 U.S. 275, 278–79 (1978));
see Stinnie, 77 F.4th at 206.  "As the Supreme Court has
emphasized, '[t]his is a generous formulation' that does no more
than bring a plaintiff 'across the statutory threshold' to
eligibility for a fee award."  Stinnie, 77 F.4th at 206 (quoting
Hensley, 461 U.S. at 433).

        The Coalition is a prevailing party under this
"generous formulation."  It succeeded in having two provisions
of the Parking Lot Amendments struck down as unconstitutional
and thus achieved some of the benefit sought in bringing the
litigation.  Although not successful on all, or even most, of
their claims, the Coalition did succeed in modifying the state's
behavior as to the two provisions that were severed from the
statute.  The Coalition is therefore eligible to seek attorneys'
fees under section 1988.

B.   **Step One: Calculating the Lodestar**

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley, 461 U.S. at 433; see also Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 174 (4th Cir. 1994).  The resulting amount has come to be known as the lodestar.  See Pennsylvania v. Del. Valley Citizens' Council for Clean Air (Delaware Valley I), 478 U.S. 546, 564–65 (1986).  Although the lodestar figure is only the starting point, there is a "strong presumption that the lodestar figure . . . represents a 'reasonable fee.'" Id. at 565; see also Hensley, 461 U.S. at 433 ("[The lodestar] provides an objective basis on which to make an initial estimate of the value of a lawyer's services."); Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 552 (2010) ("[T]he lodestar method yields a fee that is presumptively sufficient . . . ."). "[T]he lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee . . . ." Delaware Valley I, 478 U.S. at 565.

"The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed.  Where the documentation of hours is inadequate, the district court may reduce the award accordingly." Hensley, 461 U.S. at 433.  "The

district court should also exclude from this initial fee calculation hours that were not 'reasonably expended.'" <u>Id.</u> at 434 (quoting S. Rep. 94-1011, 6 (1976)).[8]

In its calculation of hourly rates and hours worked, the Coalition emphasizes multiple times that it has already greatly reduced some of the rates and has not included a number of hours to which it is entitled. <u>See</u> Mot. Attys' Fees 2 ("[T]he lodestar figure in this case is especially reasonable because it represents an enormous reduction from the actual number of hours expended by counsel and their actual billing rates.").

1.   Reasonable Hourly Rates

The burden is on the fee applicant to demonstrate that the requested hourly rates are reasonable.  <u>See</u> <u>Plyler v. Evatt</u>, 902 F.2d 273, 277 (4th Cir. 1990); <u>see also</u> <u>Grissom v. Mills Corp.</u>, 549 F.3d 313, 320 (4th Cir. 2008); <u>Blum v. Stenson</u>, 465 U.S. 886, 895 n. 11 (1984).  The hourly fee is "based on market rates for the services rendered," <u>Missouri v. Agyei ex rel. Jenkins</u>, 491 U.S. 274, 283 (1989), and is usually the rate that would be charged by an attorney practicing in the district in

_____

[8] Explaining that "[c]ases may be overstaffed, and the skill and experiences of lawyers vary widely." <u>Hensley</u>, 461 U.S. at 434.

which the action was prosecuted.  See Rum Creek Coal, 31 F.3d at
175 (citing Nat'l Wildlife Fed'n v. Hanson, 859 F.2d 313 (4th
Cir. 1988)); Gilliam v. Allen, 62 F.4th 829, 850 (4th Cir. 2023)
(out-of-town rates are only allowed upon a showing that
equivalently competent local representation was not available).

To meet its burden, the fee applicant should include
counsels' attestations to their own usual billing rates as well
as affidavits from local attorneys on the prevailing market
rates in the area for similar work.  See Grissom, 549 F.3d at
322; Robinson, 560 F.3d at 246 (finding the affidavit of lead
counsel, "standing alone, [was] not sufficient evidence of the
prevailing market rates"); see also Plyler, 902 F.2d at 277.
Acceptable evidence includes "affidavits reciting the precise
fees that counsel with similar qualifications have received in
comparable cases; information concerning recent fee awards by
courts in comparable cases; and specific evidence of counsel's
actual billing practice or other evidence of the actual rates
which counsel can command in the market." Spell v. McDaniel,
824 F.2d 1380, 1402 (4th Cir. 1987) (citing Nat'l Ass'n of
Concerned Veterans v. Sec. of Def., 675 F.2d 1319, 1325–26 (D.C.
Cir. 1982); Ramos v. Lamm, 713 F.2d 546, 555 (10th Cir. 1983)).
Particularly helpful are "affidavits of other local lawyers who
are familiar both with the skills of the fee applicants and more

generally with the type of work in the relevant community." _Robinson_, 560 F.3d at 245 (citing _Plyler_, 902 F.2d at 278).  The Fourth Circuit has acknowledged that this market rate determination, although "inherently problematic," is a necessary inquiry.  _Plyler_, 902 F.2d at 277.

The Coalition requests rates of $400/hour for Mr. Miller and $350/hour for Ms. Hitchcock of Everytown Law; $575/hour for Mr. Gupta, $485.50/hour for Mr. Taylor, and $350/hour for Mr. Sawhney of Gupta Wessler; and $325–350/hour for Mr. Fenwick and $250–300/hour for Mr. White of Goodwin & Goodwin.  Mot. Attys' Fees 2–3.  To support these rates, the Coalition attached to its motion a Declaration of Deepak Gupta (ECF No. 56-1, pp. 1–4); a Declaration of James Miller in Support of Plaintiff's Application for Attorneys' Fees and Costs (ECF No. 56-2); a Declaration of J. David Fenwick (ECF No. 56-3, pp. 1–3); a Declaration of Lucas R. White (ECF No. 56-4); and the biographies of Mr. Gupta (ECF No. 56-1, pp. 6–10), Mr. Taylor (ECF No. 56-1, pp. 11–19), and Mr. Sawhney (ECF No. 56-1, pp. 20–22) from the Gupta Wessler website.  The Coalition filed two additional declarations with its reply: a second Declaration of J. David Fenwick (ECF No. 62-1) and a Declaration of Benjamin L. Bailey (ECF No. 62-2).

In challenging these rates, the Attorney General argues that they are too high for the local market; the litigation in this action was not sufficiently complex to merit such rates; reduced rates should be awarded to attorneys who did not have a prominent role in the litigation; and some of the attorneys lack the experience necessary to command such rates. The Coalition counters that their rates are reasonable because, in part, they are already greatly reduced from the rates normally charged.

Mr. Fenwick's declaration as local counsel for the Coalition and the Declaration of Benjamin L. Bailey (ECF No. 62-2), a prominent Charleston lawyer not involved in the present litigation, provide significant support for the Coalition's requested rates.  The declarations of the out-of-town Coalition attorneys support their usual rates for paying clients in their own market, but do not, on their own, support the position that the rates fit the local market.  These two critical pieces of evidence, along with the court's review of local district cases discussing local rates, enable the court to evaluate the propriety of the rates requested by Coalition counsel.

Reasonable attorney fees awarded by the court in the Southern District of West Virginia have been found in 2018 to range from $150 to $550 an hour.  See Johnson v. Ford Motor Co.,

No. 3:13-cv-06529, 2018 WL 1440833, at *5 (S.D.W. Va. Mar. 22, 2018) (Eifert, M.J.) (providing a survey of then-recent fee awards in the district).  The services by the Coalition attorneys were very largely rendered from 2019 through the first half of 2021.

Earlier this year the court awarded $550/hour (reduced from the requested $795/hour) in a case involving complex environmental and nuisance law to an attorney with over thirty years of experience in the field.  See Cnty. Comm'n of Fayette Cnty. ex rel. Ciliberti v. Gadsden, Gaillard, & West, LLC, No. 2:22-cv-00449, 2023 WL 416198, at *3 (S.D.W. Va. Jan. 25, 2023) (Berger, J.); see also Active Res., Inc. v. Hagewood, No. 2:22-cv-00172, 2022 WL 10177688, at *5 (S.D.W. Va. Oct. 17, 2022) (Berger, J.) (awarding rates of $495/hour for experienced counsel to $310/hour for less experienced counsel for complex removal case); Cobranchi, 2022 WL 5250297, at *7 (awarding hourly rates of $375–250); Lockhart v. Dolgencorp, LLC, No. 5:18-cv-01296, 2019 WL 3211264, at *2 (S.D.W. Va. July 15, 2019) (Berger, J.) (awarding rate of $325/hour to attorney with two decades experience when removal was untimely); Good v. W. Va.-Am. Water Co., Civ. No. 14-1374, 2017 WL 2884535, at *27 (S.D.W. Va. July 6, 2017) (Copenhaver, J.) (awarding a blended hourly rate of $360 in a complex class action involving contaminated

water supply for 300,000 customers; highest rate incorporated
into the blended rate calculation was $575/hour); <u>Greenbrier
Hotel Corp. v. Unite Here Health</u>, No. 5:13-cv-11644, 2017 WL
2058222, at *2–4 (S.D.W. Va. May 12, 2017) (Berger, J.), <u>vacated
on other grounds</u>, 719 F. App'x 168 (4th Cir. 2018) (awarding
between $275–$550 for partners and $150–$400 for associates and
senior attorneys in case involving ERISA health benefits).

The Coalition seeks a rate of $575/hour for Mr. Gupta.
Mot. Attys' Fees 3.  Mr. Gupta is a founder of the firm Gupta
Wessler LLP, "a boutique law firm in Washington, DC, that
focuses on Supreme Court, appellate, and constitutional
litigation," and which "t[ook] the lead role on the core legal
work" in this litigation.  Gupta Decl. 1–2.  Mr. Gupta is a
faculty member at Harvard Law School, where he teaches courses
and leads the Harvard Supreme Court Litigation Clinic; he has
litigated before the Supreme Court and before every federal
circuit court of appeals and has numerous other credentials.
<u>Id.</u> at 2.  Mr. Gupta graduated from law school in 2002 and now
has over twenty years of experience.  <u>See</u> <u>id.</u>  Also of Gupta
Wessler are Mr. Taylor, a partner at Gupta Wessler who graduated
law school in 2010, and Mr. Sawhney, who graduated law school in
2014 and was an associate at Gupta Wessler during the instant
litigation.  <u>See</u> <u>id.</u> at 2–3.  The Coalition seeks $485.50/hour

for Mr. Taylor and $350/hour for Mr. Sawhney.  See id.  Mr.
Gupta emphasizes that the rates requested by the Coalition are
half the normal rates of the three Gupta Wessler attorneys.[9]  See
id.

   The Attorney General argues that the rates of $325–
350/hour and $250–300/hour charged by the Coalition's local
counsel (Mr. Fenwick and Mr. White) show that the rates sought
by the Gupta Wessler attorneys – particularly Mr. Gupta and Mr.
Taylor – are not in keeping with the local market.  See Resp. 7–
8.  Mr. Fenwick, in his second declaration that was attached to
the Coalition's reply brief, explains that most of his work is
done for a single client and so his hourly rate underrepresents
the local market because Goodwin & Goodwin offers that client a
reduced rate for that work.  Second Fenwick Decl. 2.  Mr.
Fenwick says that three other senior partners at Goodwin &
Goodwin (Thomas Goodwin, Booth Goodwin, and Richard Owen) charge
rates of between $400–$500/hour.  See id.

   Additionally, the Coalition offers the Declaration of
Benjamin L. Bailey, a Charleston lawyer not associated with this
litigation and one of the founding partners of the Charleston,

---

[9] This assertion provides little aid to the court, as the rate
charged in another locality – or the discount thereof – has
limited bearing on the propriety of that rate in the local
Charleston market.

20

West Virginia-based firm Bailey & Glasser, LLP, with offices spread nationally.  Bailey Decl. 1.  Mr. Bailey praises Mr. Gupta and Mr. Taylor, and the Gupta Wessler firm as a whole.[10] See id. at 2.  Mr. Bailey goes on to say of the rates requested by all Coalition attorneys that, based on both his experience in West Virginia and more than forty years of experience as an attorney, the "requested rates are more than reasonable and appropriate for work performed in litigation before this Court," and that they are "substantially less than a reasonable rate in this market for work of this caliber, and substantially less than the rates that [his] firm bills for West Virginia-barred lawyers in West Virginia courts." Id. at 3 (emphasis in original).  He offers the following insight into his own billing practices in Charleston:

> In a recent case before the West Virginia Supreme Court, for example[,] I billed at a rate of $850 per hour, with other partners at my firm billing between $660 and $715; associates billed at rates of $550 per hour. In cases in the U.S. District Court for the Southern District of West Virginia over the last three years, we billed West Virginia-barred lawyers at rates of $605, 650, 675, 725, 840, and 1075; associates billed at

---

[10] Mr. Bailey writes of Mr. Gupta and the Gupta Wessler firm — he has worked with them many times in the past ten years — that "[t]hey are widely respected in the national legal community" and that "Mr. Gupta is widely known as one of the best lawyers in America." Id. 2.  Mr. Bailey says that his partners who have worked with Mr. Taylor "report that his legal work is among the best they have seen in any jurisdiction."

> between $350-500 per hour.  These are rates
> that we actually billed to hourly-paying
> clients who paid us at those rates.

Id.

Mr. Bailey's declaration describes rates of the past three years.  The rates described by Mr. Fenwick and Mr. Bailey are somewhat at odds, though their declarations are welcome evidence of local rates.  The court finds that, along with the local rates set forth in the seven Southern District of West Virginia cases earlier listed, they are sufficient evidence of local rates to meet the Coalition's burden — especially in light of the fact that the Attorney General suggests no rates (only that they be reduced) and provides no evidence of his own beyond pointing to the caselaw.

The Everytown lawyers, Mr. Miller and Ms. Hitchcock, seek rates of $400/hour and $350/hour, respectively.  Everytown specializes in "litigation relating to firearms and firearm laws."  Mot. Attys' Fees 2.  Mr. Miller graduated from law school in 2009 and was an associate at the firm O'Melveny & Myers LLP in New York before he moved to Everytown Law in 2018, where he worked first as Counsel and now Senior Counsel.  See Miller Decl. 1–2.  Ms. Hitchcock graduated law school in 2013 and previously worked for the New York state government before moving to Everytown in 2018.  See id. at 2.  In this case,

Everytown attorneys took the lead in drafting the complaint and developing the factual record.  See id.  Everytown is a 501(c)(3) non-profit that does not charge clients attorneys' fees, but has been authorized by its clients in this case to seek an award of costs and fees from the court.  See id. at 5. The rates sought by Mr. Miller and Ms. Hitchcock were, according to Mr. Miller, based on factors such as expertise, experience, complexity of the issues, and the market rate for attorneys in Charleston.  Mr. Miller avers that he consulted with local attorney and co-counselor Mr. Fenwick on the matter of fees in the Charleston market, but he does not provide any more specific evidence as to how these rates were reached.  See id. at 5–6.

The Coalition retained the Charleston firm, Goodwin & Goodwin, as local counsel and was represented by Goodwin & Goodwin attorneys Mr. Fenwick and Mr. White.  Mr. Fenwick, who graduated law school in 1992 and has been a lawyer at Goodwin & Goodwin since that time, seeks an hourly rate of $325 for work done through December 31, 2020, and $350 an hour for work done on or after January 1, 2021.  First Fenwick Decl. 1–2.  Mr. White graduated law school in 2014 and was a partner at Goodwin & Goodwin from January 2019 until his departure in June 2023; he seeks an hourly rate of $250 prior to January 1, 2021 and $300 for work done on or after that date.  See Mot. Attys' Fees 3;

First Fenwick Decl. 2; White Decl. 1.  Mr. Fenwick avers that his and Mr. White's rates increased on January 1, 2021, "to reflect customary rate increases for these lawyers consistent with rate increases being charged for comparable work."  First Fenwick Decl. 2.

The Coalition argues that the highest award of $550/hour five and six years ago in Greenbrier Hotel and Johnson v. Ford Motor supports their request of $575/hour for Mr. Gupta today.  See Reply 2; Greenbrier Hotel, 2017 WL 2058222; Johnson v. Ford Motor, 2018 WL 1440833.  It argues that, with inflation, the highest rates awarded in Greenbrier Hotel today equate to nearly $700.  See Reply 2.  The Attorney General does not question the experience of the Coalition attorneys, but argues that the present case was not sufficiently complex to warrant the high rates awarded in cases such as Greenbrier Hotel and Johnson v. City of Aiken.[11]  See Resp. 9.  The Attorney General says the instant litigation was more comparable to Cobranchi, which he describes as a "run-of-the-mill" First Amendment civil action decided by the court last year where the central issue

---

[11] The Attorney General also says that this case involved only a Joint Stipulation of Facts and a Motion for Summary Judgment. It also involved an early motion to dismiss.  However, this does not speak to the complexity of the issue being litigated, but the number of hours billed.

was that a Christian prayer was led by the city council or one
of its members at the start of each of its meetings.  See id.;
Cobranchi, 2022 WL 5250297, at *1.

        The Coalition replies that the Attorney General "fails
to acknowledge the obvious novelty, complexity, and risk
associated with this litigation – a first-impression challenge
to the constitutionality of a West Virginia statute that
parallels legislation enacted, and successfully defended, by
states across the country.  The state's attempt to equate this
case with garden-variety litigation is simply not credible."
Reply 4.  Indeed, the instant litigation was more complex than
the Attorney General represents, and the support supplied by the
Coalition for its rates is compelling.  At the same time,
neither party addresses the fact that the bulk of the work in
this case was done over two years ago in the first half of 2021
in connection with the cross motions for summary judgment, and
the rest was done prior thereto.

        The Attorney General also argues that reduced rates
are warranted for Mr. Miller and Ms. Hitchcock as they had minor
roles in the litigation, primarily drafting the joint
stipulation and client declarations for the motion for summary
judgment.  See Resp. 9–10.  The Attorney General again cites
Cobranchi, where the court reduced one attorney's fee because,

although an experienced and well-qualified lawyer, she "did not
play a prominent role in the litigation." Id. (quoting
Cobranchi, 2022 WL 5250297, at *6). The Attorney General is
correct in that attorneys' fees are "based on market rates for
the services rendered." Agyei ex rel. Jenkins, 491 U.S. at 283
(emphasis added). For example, work normally done at an
associate level should be billed as such, even if it was
performed by a highly experienced senior partner. Similarly,
lead counsel ought to receive a higher hourly rate than that of
other counsel with more minor roles. The Attorney General does
not provide the court with a suggestion for what those reduced
rates should be.

Taking all this into consideration the court finds it
appropriate to award the hourly rates requested to Mr. Gupta
($575), Mr. Sawhney ($350), and Mr. Fenwick ($325 prior to
January 1, 2021, and $350 thereafter). The court awards the
modestly reduced rates of $450/hour to Mr. Taylor and $250/hour
to Mr. White until January 1, 2021, and $275 thereafter, to
better match the local market, as well as $350/hour to Mr.
Miller and $300/hour to Ms. Hitchcock in recognition, too, of
the less prominent roles Everytown played in the litigation.
However, insofar as the Coalition seeks compensation for four
hours of work by Mr. Gupta on the fee award reply, the court is

unwilling to award $575/hour for work on the fee petition —
these final four hours will be awarded at a rate of $350/hour,
which is the same rate awarded Mr. Fenwick for his role on the
fee petition.

   2.   Reasonable Number of Hours

       To finish calculating the lodestar, the awarded hourly
rates are multiplied by the hours worked by each attorney.  The
number of hours worked must be reasonable.  See Rum Creek Coal,
31 F.3d at 175 (citing Hensley, 461 U.S. at 435) ("At bottom,
the number of hours must be reasonable and must represent the
product of 'billing judgment.'").  These hours must be
appropriately documented by the fee applicant and the applicant
must have taken care to eliminate from the request "hours that
are excessive, redundant, or otherwise unnecessary, just as a
lawyer in private practice ethically is obligated to exclude
such hours from his fee submission."  Hensley, 461 U.S. at 434;
see also Rum Creek Coal, 31 F.3d at 175.

       The Coalition seeks compensation for a total of 403.25
hours worked by the attorneys in this case.  See Mot. Attys'
Fees.  The Attorney General asserts that this is "an
unreasonable number of hours," Resp. 10, to which the Coalition
replies that this case warranted that number of hours because it
presented a novel legal issue involving shelters from across the

state and extensive briefing.  See Reply 4.  The Coalition also
says that the number of hours billed is not unreasonable because
the three firms exercised extensive billing judgment.  See id.
The Attorney General retorts that, despite claims that the
Coalition was conscientious of time and costs, "somehow the
Coalition's attorneys still managed to ring up nearly 400 hours
of attorney time in a case that required no discovery and never
went to trial."  Resp. 10.

While it is questionable that seven plaintiff lawyers
in three firms were needed, the court does not find the number
of hours billed to be facially unreasonable.  The Attorney
General attempts to compare this litigation to Cobranchi, which,
although involving a constitutional issue, was of a much smaller
scale than this action.  It is unsurprising, based on the
pleadings and the complexity of the issues in this litigation,
that, as the Attorney General points out, five plaintiff
attorneys billed more than fifty hours in this case, whereas
only two did so in Cobranchi.  See Resp. 11.  Additionally, the
court does not find, nor does the Attorney General point to, any
instances of Coalition attorneys billing an unreasonable amount
of time for any one task.

The court is similarly unconvinced by the Attorney
General's argument that the Coalition worked "by committee" in

this case, that is, that it had multiple attorneys working on
the same task that could have been accomplished by a single
person.  See id.  It is a stretch for the Attorney General to
compare this case to Allen v. Monsanto, an "extreme fact
pattern" where "seven different attorneys billed 179.75 hours
for 'routine procedural work' and spent inordinately large
amounts of time talking to each other."  Reply 5 (quoting Allen
v. Monsanto, Civ. No. 2:05-0578, 2007 WL 1859046 (S.D.W. Va.
June 26, 2007)).  By contrast, the Attorney General points to
time entries showing that five attorneys had a two-hour
conversation discussing that which became the pivotal plaintiff
motion for summary judgment in this case.  See Resp. 11.  The
court agrees with the Coalition that it is not unusual for co-
counsel to spend that amount of time discussing a motion for
summary judgment, particularly when it is accompanied by the
most important rounds of briefing in the case.  See Reply 5.

     a.   Block Billing

          The Attorney General next argues that Coalition
timekeepers block-billed some of their hours, which warrants a
reduction in the fee award.  Resp. 12.  "'Block billing' is
generally defined as 'grouping, or lumping, several tasks
together under a single entry, without specifying the amount of
time spent on each particular task.'"  McAfee v. Boczar, 906 F.

Supp. 2d 484, 498 (E.D. Va. 2012), <u>vacated on other grounds</u>, 738 F.3d 81 (4th Cir. 2013) (quoting <u>Guidry v. Clare</u>, 442 F. Supp. 2d 282, 294 (E.D. Va. 2006)).  While the Coalition is correct that block billing is not strictly prohibited, it is important that billing entries are appropriately detailed where, as here, they are necessary to determine the reasonableness of fees.[12] <u>See</u> Reply 5–6.  "Thus, the issue is not whether the court classifies [the fee applicant]'s timekeeping as demonstrating . . . 'block billing,' but whether [the fee applicant] has satisfied its burden of providing the court with evidence from which the court can assess the reasonableness of the time requests."  <u>Project Vote/Voting for Am., Inc. v. Long</u>, 887 F. Supp. 2d 704, 716 (E.D. Va. 2012).  "The traditional remedy for block billing is to reduce the fee by a fixed percentage reduction."  <u>Jones v. Southpeak Interactive Corp. of Del.</u>, No. 3:12cv443, 2014 WL 2993443, at *9 (E.D. Va. July 2, 2014), <u>aff'd</u>, 777 F.3d 658 (4th Cir. 2015); <u>see also</u> <u>Denton v. PennyMac Loan Servs., LLC</u>, 252 F. Supp. 3d 504, 525 (E.D. Va. 2017); <u>McAfee</u>, 906 F. Supp. 2d at 498 ("The practice of 'block billing'

---

[12] "There is nothing inherently inappropriate with lumping or block billing.  And, if clients accept the practice, lawyers may properly engage in it.  But[] more precision is required[] when seeking to have the losing adversary pay the fees of a prevailing party."  <u>McAfee</u>, 906 F. Supp. 2d at 499 n. 14.

has been generally disfavored in federal courts across the country and has often led to a reduction in attorney's fees.").

There is merit to both the Attorney General's argument that there is block billing and the Coalition's reply that the entries show careful timekeeping and "cover the same subject or similar subject matter and that reflect either small amounts of time or substantial time spent on activities that one would expect to take several hours."  Reply 5.  Both parties overstep their positions – not all of the entries cited by the Attorney General constitute block billing (and some that he doesn't reference are), but the Coalition also makes overbroad characterizations of the applicable caselaw in arguing that there should be no deductions for block billing.

The court finds that Coalition attorneys have engaged in block billing to a limited degree and that some minor downward reductions are warranted for a given attorney rather than an across-the-board percentage.  See McAfee, 906 F. Supp. 2d at 500 (reducing hours of attorneys that block billed by ten percent);[13] Project Vote, 887 F. Supp. 2d at 717 (reducing entire

---

[13] A sample of the block billing in McAfee was a time entry for 7.5 hours where the notation read: "prepare for deposition of Sharon Wampler and Jane Emerson; take deposition of Sharon Wampler; confer with Eileen McAfee after deposition; place call to Mike Ward and obtain extension on response date to motion to amend answer."  906 F. Supp. 2d at 498 n. 11.

fee award by ten percent for block billing);[14] Denton, 252 F.
Supp. 3d at 526 (reducing offending attorney's hours by ten
percent for block billing);[15] Lusk v. Va. Panel Corp., 96 F.
Supp. 3d 573 (W.D. Va. 2015) (reducing total fee award by five
percent for block billing);[16] Triplett v. N.C. Dep't of Pub.
Safety, No. 515-cv-00075-RLV-DCK, 2017 WL 3840422, *4 (W.D.N.C.
Sept. 1, 2017) (reducing by ten percent the "time entries
infected by block billing");[17] Wolfe, 2010 WL 3809857, at *8

---

[14] The block billing in Project Vote was particularly egregious:
"the court did not find a single instance in which a timekeeper
recorded multiple entries for a single day; instead, only the
total amount of time for each day [was] reported, with no
breakdown of how that time was spent among often as many as four
or five distinct tasks."  887 F. Supp. 2d at 716.

[15] One such example of the block billing in Denton was an entry
for 1.3 hours for "minor edits to P.O., correspondence to
counsel re: depo dates, differentiate btw 30(b)(6) and 30(b)(1)
witnesses, additional time to complete discovery by PNMC;
settlement inquiry," and the court wrote that "[w]hile both of
these tasks [editing a document and corresponding with counsel]
may be compensable, the listing of multiple tasks in a single
billing entry does not allow the Court to determine whether a
reasonable amount of time was spent on each activity."  252 F.
Supp. 3d at 526 (citing Two Men & A Truck/Int'l, Inc. v. A Mover
Inc., 128 F. Supp. 3d 919, 929 (E.D. Va. 2015) (emphasis in
original).

[16] One entry characteristic of the block billing found in Lusk is
an entry for nine hours for "further legal research and
drafting; shepardizing cases; review brief w/ Mr. Schulte;
teleconference w/ Ms. Schulte; research and revise brief; read
cases [listed]; review Defendant's brief; teleconference Schulte
re defenses needed.  Client consult; finalize declaration on
further efforts to obtain work."  Lusk, 96 F. Supp. 3d at 582
(alteration in original).

[17] The court in Triplett noted that "although a greater reduction
might otherwise have been warranted . . . the block billing in

(reducing total fee award by ten percent for "counsels' practice from time to time of block billing," even though "the total number of hours requested by plaintiff's counsel does not appear to be facially unreasonable.").

Although the overall number of hours billed here are not facially unreasonable, the block billing makes it more difficult to determine the reasonableness of the time claimed. Entries involving block billing are more likely as the amount of time for the entry increases and the length (and number of semi-colons) in the entry increases – all indications that disparate tasks are being done for the same case without recording the individual tasks.  Usually, the attorney appears to have been recording all the work he did on the case that day in a single entry.  Some examples of the block billing in the instant case are as follows:

> May 16, 2019, 5.8 hours billed by Mr. Taylor for "Reviewing & editing WV complaint; preparing for call with Everytown; call with Everytown; meeting with Deepak to discuss intro . . . [rest of entry omitted],"

---

this case, for the most part, does not significantly hinder the Court's ability to assess the reasonableness of [counsel's] listed hours because the grouped tasks are typically related to a single topic or issue and are the types of tasks that an attorney might perform during a single sitting[, and] the overall hours expended do not appear facially unreasonable." Triplett, 2017 WL 3840422, at *4.

Gupta Wessler Billing Statement, ECF No. 56-1 at 24;

> June 23, 2020, 4.5 hours billed by Mr. Miller
> to "review summary judgment materials to plan
> for client outreach; emails w/ local counsel
> re: case timing,"

Everytown Billing Statement, ECF No. 56-2 at 4;

> March 14, 2021, 5.7 hours billed by Mr. White
> to "Draft, edit, finalize Motion for Summary
> Judgment, Memorandum of Law in Support of
> same, Motion for File Documents Under Seal,
> Memorandum of Law in Support of same, Proposed
> Order Granting the same, exhibits in support
> of same; correspondence with team re same,"

Goodwin & Goodwin Billing Statement, ECF No. 56-3 at 10.

The Attorney General spends several pages listing what he calls a "modest sampling" of the Coalition's "numerous instances of block billing." Resp. 12. The court finds that not all of the so-called block billing cited by the Attorney General is actually block billing; additionally, only a few entries not identified in the Attorney General's "modest sampling" include block billing.

Nevertheless, the court finds it appropriate to reduce by ten percent the hours recorded in entries infected with block billing. From the billing statements submitted to the court, it appears that 6.3 of the 64.0 hours billed by Mr. Miller were the subject of block billing, as were 21 of the 86.6 hours billed by Mr. Taylor, 8 of the 59.4 hours billed by Mr. Sawhney, 15.4 of

the 67.7 hours billed by Mr. Fenwick, and 26.2 of the 65.1 hours billed by Mr. White.  The entries of Ms. Hitchcock and Mr. Gupta appear free of block billing.  Thus, Mr. Miller's hours are reduced .63 to 63.37 total hours; Mr. Taylor's hours are reduced by 2.1 to 84.5 hours; Mr. Sawhney's hours are reduced by .8 to 58.6 hours; Mr. Fenwick's hours are reduced by 1.5 to 66.2 hours; and Mr. White's hours are reduced by 2.6 to 62.5 hours. As Mr. Fenwick and Mr. White's fees increased partway through the litigation, the time deducted from their hours will be split evenly between their time billed at their earlier and later rates, that is, 0.7 hours for Mr. Fenwick and 1.3 hours for Mr. White will be deducted from both the pre-January 1, 2021 total and the total from January 1 onwards.

C.    Step Two: Deduction of Hours Expended on Unsuccessful
      Claims

        The second and third steps in calculating the fee award involve an adjustment for unsuccessful claims.  At the second step the court "subtract[s] fees for hours spent on unsuccessful claims unrelated to successful ones."  Johnson v. City of Aiken, 278 F.3d 333, 337 (4th Cir. 2002) (citing Hensley, 461 U.S. at 433, 435–37).  Then, at the third step, the court "awards some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff."  Id.

1.   Degree of Success

The Attorney General characterizes the Coalition as
only marginally successful, pointing to the "roughly forty-one
pages" of the seventy-eight-page Memorandum Opinion and Order
which the court spent "dispatching the Coalition's claims."
Resp. 4.  The Attorney General emphasizes the number of
Coalition claims that were rejected by the court and the fact
that the Parking Lot Amendments still stand, aptly
characterizing the Amendments as "surviv[ing] in the most
important respects."  Id.

The Coalition in its motion says that because two
provisions of the Parking Lot Amendments were struck down, it
prevailed, and it does not discuss the matter further therein.
See Mot. Attys' Fees 1.  In its reply, the Coalition calls the
Attorney General's attempt to characterize it as only partially
successful "baseless."  Reply 6.  The Coalition calls the case
"groundbreaking, first-impression litigation that succeeded in
invalidating the key provisions of West Virginia's Parking Lot
law," and asks the court to "focus on the practical effect of
this litigation and the relief obtained by the plaintiff," which
it characterizes thusly: "[A]s a result of this litigation,
shelters no longer face [the No-Inquiry Provision's] onerous
restriction.  [The shelters] are able to make inquiries to keep

their residents safe, and take action as necessary.  Despite what the state says, there is no credible way to describe this result as 'only marginally successful.'"  Reply 6-8.

While the Coalition insists that they achieved their goals and there should be no subtraction of hours worked on unsuccessful claims or downward adjustment for its limited degree of success, the fact of the matter is that the Parking Lot Amendments still stand.  The court found that the No-Inquiry Provision and the No-Action Provision facially violated Freedom of Speech under the First Amendment and the No-Action Provision was facially void for vagueness under Fourteenth Amendment Procedural Due Process.  The court rejected the Coalition's claims that the No-Inquiry and No-Search Provisions were unconstitutionally vague, and, in particular, that the Parking Lot Amendments as a whole violated the Coalition's First Amendment Freedom of Association and Fourteenth Amendment Substantive Due Process.  The Coalition was unsuccessful on a majority of their claims, and most of the provisions that they challenged are still in effect.  It is therefore appropriate to reduce the Coalition's award of attorneys' fees based on this limited success.

2.   Deduction of Time Spent on Unsuccessful Claims

The court must now consider how to deduct the time spent by the Coalition on unsuccessful claims.  According to the Coalition, because the Attorney General admitted that "the Coalition won and lost on claims that involve common facts and related legal theories," Resp. 16, those charges should remain awarded to the Coalition.  See Reply 7.  This argument is short-sighted and misconstrues the case law.

The Coalition cites to Hensley to support its position that hours for unsuccessful claims cannot be deducted because the legal theories are too intertwined.  See Reply 6–7; Hensley, 461 U.S. at 435.  In that case, the Supreme Court stated that when a common core of fact or related legal theories make it nearly impossible to divide the case into disparate claims, hours cannot be deducted on a claim-by-claim basis.  See Hensley, 461 U.S. at 435.  Where plaintiffs "raise alternative legal grounds for a desired outcome, . . . the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing the fee.  The result is what matters."  Id. What the Court describes is a scenario where multiple legal theories are raised for relief on a single claim.  The Court in Hensley goes on to say that "[i]f, on the other hand, a plaintiff has achieved only partial or limited success, the

product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." Id. at 436.

Where it is difficult to determine what hours were spent on which claims and deduct hours spent on unsuccessful claims on a line-by-line basis, a greater percentage of the lodestar will be deducted for those unsuccessful claims at step three. The difference is not in whether the partially-successful party receives a deduction for unsuccessful claims, but how that deduction is implemented.

Here, the Coalition sought to have all five provisions of the Parking Lot Amendments struck and raised multiple theories for doing so. The court ruled only that the Inquiry Provision and Take—No-Action Provision violated the Constitution, and the court severed them from the statute. Thus, the Coalition is eligible to receive attorneys' fees for time spent on any and all theories for the unconstitutionality of the Inquiry and Take-No-Action Provisions, and some additional time for the case generally, such as working with Coalition members and meeting with the court. Nevertheless, the Coalition's total award must be reduced for its failure to prevail on the majority of its claims.

In many instances, time billed was spent on tasks that encompass both successful and unsuccessful claims (e.g., "review and revise draft factual stipulations for summary judgment," Decl. Miller 5, ECF No. 56-2).  Mr. Sawhney and Mr. Taylor were the only attorneys who described the substance of what they were working on such that the court can at times determine which legal theory they were billing for, but the occasions on which they can be found to have done so are so minimal as to make the exercise unproductive.  Because so little of the time spent on the unsuccessful issues can be determined from reviewing the invoices, the court will need to focus its attention on the next step.

D.   Step Three: Adjusting for Degree of Success

In the third and final step, the court will "award[] a percentage of the remaining amount, in consideration of 'the degree of success enjoyed by the plaintiff.'" In re Lumber Liquidators, 27 F.4th at 300 (quoting McAfee, 738 F.3d at 88)). This "is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." Hensley, 461 U.S. at 434.  The downward adjustment is necessary "even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith . . . [i]f the relief, however significant, is limited in comparison to the

scope of the litigation as a whole." Id. at 436, 439-40. The
court in Hensley explained that "Congress has not authorized an
award of fees whenever it was reasonable for a plaintiff to
bring a lawsuit or whenever conscientious counsel tried the case
with devotion and skill." Id. at 436. The Supreme Court has
been quite clear that "the most critical factor is the degree of
success obtained." Id.

> The Supreme Court has explained that:
>
> In some cases a plaintiff may present in one
> lawsuit distinctly different claims for relief
> that are based on different facts and legal
> theories. In such a suit, even where the
> claims are brought against the same defendants
> . . . counsel's work on one claim will be
> unrelated to his work on another claim.
> Accordingly, work on an unsuccessful claim
> cannot be deemed to have been 'expended in
> pursuit of the ultimate result achieved.'

Hensley, 461 U.S. at 434-35 (quoting Davis v. County of Los
Angeles, 8 E.P.D. ¶ 9444, at 5049 (C.D. Cal. 1974)).

This action involved a constitutional challenge of the
letter of the law, and thus the "facts" are all legal in nature:
statutes, constitutions, legal theories, and caselaw. The
Coalition's argument that there was a common core of facts that
warrant allowance of its attorney fees as requested is not
compelling. See Reply 6-7. It is, nevertheless, a factor to be
taken into account.

And as discussed above, the Coalition's success was limited.  It succeeded on fewer than half of its claims, and these were of lesser consequence than the ones that failed.  As a result, the Parking Lot Amendments remain standing in large measure.  The court recognizes that there is core work that must be done for any litigation and much of it would have occurred here had the Coalition only raised its successful claims.  When the court takes into account all of the foregoing factors, the court finds that a reduction of the fee award by fifty percent is appropriate, so that an award of fifty percent as set forth in the schedule below is found reasonable and warranted.

Accounting for all adjustments made by the court, the fee award for the Coalition is as follows:

| Attorney | Hourly Rate | Hours | Total |
|---|---|---|---|
| James E. Miller (Everytown) | $350 | 63.37 | $22,179.50 |
| Krystan Hitchcock (Everytown) | $300 | 15.0 | $4,500.00 |
| Deepak Gupta (Gupta Wessler) | $575 | 41.45 | $25,233.75 |
| | $350 | 4.0 | |

| | | | |
|---|---|---|---|
| Jonathan E. Taylor (Gupta Wessler) | $450 | 84.5 | $38,025.00 |
| Neil Sawhney (Gupta Wessler) | $350 | 58.6 | $20,510.00 |
| J. David Fenwick (Goodwin & Goodwin) | $325 | 50.65 | $21,903.75 |
| | $350 | 15.55 | |
| Lucas R. White (Goodwin & Goodwin) | $250 | 34.9 | $16,315.00 |
| | $275 | 27.6 | |
| | | | Subtotal: $148,667.00 |
| 50% Reduction for Degree of Success | [$148,667.00 x 0.5] | | |
| Total Attorneys' Fees Awarded | | | $74,333.50 |

### IV. COSTS AND EXPENSES

The court awards the plaintiff Coalition $11,143.00 in costs and related attorney expenses, all of which appear reasonable and are undisputed. See Mot. Attys' Fees 4.

V. CONCLUSION
---

For the foregoing reasons, it is ORDERED that the plaintiff's motion for attorneys' fees and costs and expenses be, and hereby is, GRANTED to the extent that the plaintiffs are awarded $74,333.50 in attorneys' fees and $11,143.00 in costs and expenses, for a total of $85,476.50, to be paid by the Attorney General for the State of West Virginia, and the motion is otherwise DENIED.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: December 11, 2023

John T. Copenhaver, Jr.
Senior United States District Judge